**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP,<br><br>    Plaintiff,<br><br>  v.<br><br>MICHAEL D. COHEN,<br><br>    Defendant. | Case No.:<br><br><br>**COMPLAINT AND DEMAND**<br>**FOR JURY TRIAL** |

Plaintiff President Donald J. Trump, by and through his counsel, as and for causes of action against the Defendant, Michael D. Cohen, alleges as follows:

## NATURE OF THE ACTION

1. This is an action arising from Defendant's multiple breaches of fiduciary duty, unjust enrichment, conversion, and breaches of contract by virtue of Defendant's past service as Plaintiff's employee and attorney.

2. Defendant breached his fiduciary duties owed to Plaintiff by virtue of their attorney-client relationship by both revealing Plaintiff's confidences, and spreading falsehoods about Plaintiff, likely to be embarrassing or detrimental, and partook in other misconduct in violation of New York Rules of Professional Conduct, including Rules 1.5, 1.6, 1.9, and 8.4.[1]

3. Defendant breached the contractual terms of the confidentiality agreement he signed as a condition of employment with Plaintiff by both revealing Plaintiff's confidences, and spreading falsehoods about Plaintiff with malicious intent and to wholly self-serving ends.

---

[1] The ABA Model Rules of Professional Conduct largely parallel, for purposes of the ethical standards referenced in this Complaint, the New York Rules of Professional Conduct.

4.  Defendant unlawfully converted Plaintiff's business property when he fraudulently misrepresented a business expenditure, and stated that he was owed an extra $74,000 over the true amount of the expenditure. Defendant was reimbursed based on the fraudulent misrepresentation, and accordingly converted $74,000 from Plaintiff.

5.  Defendant committed these breaches through myriad public statements, including the publication of two books, a podcast series, and innumerable mainstream media appearances, as detailed herein. Defendant has engaged in such wrongful conduct over a period of time and, despite being demanded in writing to cease and desist such unacceptable actions, has instead in recent months increased the frequency and hostility of the illicit acts toward Plaintiff. Defendant appears to have become emboldened and repeatedly continues to make wrongful and false statements about Plaintiff through various platforms. Such continuous and escalating improper conduct by Defendant has reached a proverbial crescendo and has left Plaintiff with no alternative but to seek legal redress through this action.

6.  Plaintiff has suffered vast reputational harm as a direct result of Defendant's breaches.

## THE PARTIES

7.  Plaintiff President Donald J. Trump is a private citizen of the United States, and a resident of the state of Florida.

8.  Defendant Michael D. Cohen is a natural person over the age of eighteen, and a resident of the state of New York in the County of New York.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as the parties are diverse, and the amount in controversy is greater than seventy-five thousand dollars ($75,000).

10. The Court possesses personal jurisdiction over Defendant pursuant to Florida Statute §48.193(2) on the grounds that Defendant, during the operative period alleged in the Complaint, engaged in substantial and not isolated business activities in Florida, and more specifically in this District, in the context of his representation of, and relationship with, Plaintiff. Upon information and belief, Defendant traveled to Miami, Florida to engage in services for the Plaintiff. In addition, this Court possesses personal jurisdiction over Defendant pursuant to Florida Statute § 48.193(1)(a)(6) on the grounds that Defendant engaged in business activities in Florida in the marketing and selling of the Books (as defined below), the marketing and publication of the Podcast (also defined below), and through additional media appearances and public statements, all of which were accessible and were accessed in this state and which caused injury to Plaintiff within this state while Defendant was engaged in solicitation or service activities within this state and/or products, materials, or things processed, serviced, or manufactured by Defendant were used or consumed within this state in the ordinary course of commerce, trade, or use.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and also because Defendant is subject to this Court's personal jurisdiction with respect to this action.

## STATEMENT OF FACTS

### A. Generally

12. Defendant received his law license in New York in or about 1992 and, therefore, was governed by the ethical Rules promulgated by the state of New York.

13. Beginning in or about the fall of 2006, Defendant served as an attorney to Plaintiff, both for Plaintiff personally, and as counsel to Trump Organization LLC ("the Trump Organization").

14. Among other innumerable positive statements made by Defendant about Plaintiff and his role as Plaintiff's attorney, Defendant described his job as "very surreal," claiming he had "been admiring Donald Trump since [] high school."[2] Defendant viewed Plaintiff as a "wonderful man" who would be "an amazing president,"[3] and someone Defendant thought "the world" of as "a businessman" and "a boss."[4]

15. Defendant stated that Plaintiff was "smart," and "the greatest negotiator on the planet,"[5] and described his own role as the one "who protects the President and the family," and strongly stated that he "would take a bullet" for Plaintiff.[6]

---

[2] Michael Falcone, *Donald Trump's Political 'Pit Bull': Meet Michael Cohen*, ABC News (Apr. 15, 2022), *available at* https://abcnews.go.com/Politics/donald-trumps-political-pit-bull-meet-michael-cohen/story?id=13386747.

[3] *Michael Cohen: I Will Remain the Personal Attorney to Trump; Omarosa: Hollywood Has No Impact on the Will of the People*, HANNITY (Mar. 20, 2017), *available at* https://www.foxnews.com/transcript/michael-cohen-i-will-remain-the-personal-attorney-to-trump-omarosa-hollywood-has-no-impact-on-the-will-of-the-people.

[4] Falcone, *supra* note 2.

[5] *Michael Cohen: Trump 'Best Negotiator in the History of This World,'* HANNITY (Aug. 4, 2015), *available at* https://grabien.com/file.php?id=53826.

[6] Emily Jane Fox, *Michael Cohen Would Take a Bullet for Donald Trump*, VANITY FAIR (Sep. 6, 2017), *available at* https://www.vanityfair.com/news/2017/09/michael-cohen-interview-donald-trump.

16. Defendant claimed he would "never walk away" because Plaintiff "deserve[d]" Defendant's "loyalty" because "[o]ne man who wants to do so much good with so many detractors against him needs support."[7]

17. Defendant stated that Plaintiff was "an honorable guy,"[8] and that he "never [saw] a situation where Mr. Trump has said something that's not accurate."[9]

18. Defendant claimed that "[t]here's no money in the world that could get me to disclose anything about" the Trump Organization.[10]

19. Defendant resigned as counsel to the Trump Organization on January 20, 2017, when Plaintiff was inaugurated the 45th President of the United States, but Defendant continued to represent Plaintiff personally until in or about June 2018.

20. Starting in 2017, Defendant maintained his representation of Plaintiff as a solo attorney under Michael D. Cohen & Associates P.C., an entity wholly owned by Defendant.[11]

21. Soon thereafter, Defendant set up his own law firm and consulting business (Michael D. Cohen & Associates P.C., and Essential Consultants LLC, respectively), partnering with a major law firm that paid him $500,000 annually, in an attempt to enrich himself to the tune of millions of dollars in lucrative corporate contracts.[12]

---

[7] *Id.*

[8] Transcript, *New Day*, CNN (Nov. 24, 2015), *available at* http://www.cnn.com/TRANSCRIPTS/1511/24/nday.04.html.

[9] Transcript, *The Lead With Jake Tapper*, CNN (Nov. 30, 2015), *available at* http://www.cnn.com/TRANSCRIPTS/1511/30/cg.02.html.

[10] Fox, *supra* note 6.

[11] Government's Opposition to Michael Cohen's Motion for a Temporary Restraining Order (ECF Doc. No. 1) at 11, *Cohen v. United States*, No. 1:18-mj-03161-KMW (S.D.N.Y. April 13, 2018) ("Gov't Opposition").

[12] *See, e.g.,* Dan Mangan, N*ovartis Paid Trump Lawyer Michael Cohen $1.2 Million for Advice on Obamacare – Work He Was Unable to Do*, CNBC (May 9, 2018), https://www.cnbc.com/2018/05/09/novartis-paid-trumps-lawyer-michael-cohen-more-than-1-million-for-work-he-was-unable-to-do-company-says.html; Rosaline S. Helderman et al., *Cohen's*

B. **Defendant's Personal and Professional Downfall**

22. On April 9, 2018, the FBI executed warrants to search Defendant's home, office, safety deposit box, electronic devices, and hotel room as authorized upon a finding of probable cause.[13]

23. The warrants reportedly included references to Defendant's father-in-law's loans to a taxi fleet operator in Chicago, worth tens of millions of dollars.[14]  Defendant's father-in-law was previously charged with conspiring to defraud the IRS,[15] and pleaded guilty to money-laundering charges in connection with accounting practices related to his New York taxi business.[16]

24. In connection with the federal investigation, Defendant spoke with attorney Robert Costello, who counseled him over the course of "hours, meeting and speaking by phone."[17]

---

*$600,000 Deal With AT&T Specified He Would Advise on Time Warner Merger, Internal Company Records Show*, WASH. POST (May 10, 2018), https://www.washingtonpost.com/politics/cohens-600000-deal-with-atandt-specified-he-would-advise-on-time-warner-merger-internal-company-records-show/2018/05/10/cd541ae0-5468-11e8-a551-5b648abe29ef_story.html.

[13] Government's Opposition to Michael Cohen's Motion for a Temporary Restraining Order (ECF Doc. No. 1) at 1, *Cohen v. United States*, Case No. 1:18-mj-03161-KMW (S.D.N.Y. April 13, 2018) ("Gov't Opposition").

[14] *See, e.g.*, Dan Managan, *Father-in-Law of Trump Lawyer Michael Cohen Reportedly Loaned at Least $20 Million to Chicago Cab Mogul Mentioned in FBI Search Warrants for Cohen*, CNBC (Apr. 19, 2018), *available at* https://www.cnbc.com/2018/04/19/father-in-law-of-trump-lawyer-michael-cohen-loaned-millions-to-cab-mogul.html.

[15] *Id.*

[16] Jake Pearson & Stephen Braun, *Trump Personal Attorney Michael Cohen Loaned Millions to Ukraine-Born Cab Mogul*, Assoc. Press (Apr. 27, 2018), available at https://www.jacksonville.com/story/news/2018/04/27/trump-personal-attorney-michael-cohen-loaned-millions-to-ukraine-born-cab-mogul/12385950007/.

[17] Ben Protess, Sean Piccoli & Kate Christobek, *Trump Grand Jury Hears From Lawyer Who Assails Cohen's Credibility*, N.Y. Times (Mar. 20, 2023), available at https://www.nytimes.com/2023/03/20/nyregion/costello-cohen-trump-grand-jury.html. Defendant later waived his attorney-client privilege with Mr. Costello and refused to pay a bill for Mr. Costello's legal services. *Id.*

25. In particular, at Defendant's request, Mr. Costello met with Defendant in April 2018, shortly after the search warrant on Defendant's home was executed.[18]

26. According to Mr. Costello, at that meeting, Defendant was highly distressed, "was in a manic state," was "pacing like a wild tiger in a cage,"[19] appeared "frazzled"[20] "like he hadn't slept in three, four, five days," and even relayed to counsel "that he had contemplated suicide."[21]

27. Defendant told Mr. Costello that Defendant did not know of any criminal wrongdoing by Plaintiff in any matter,[22] even when pressed by Mr. Costello: "I said, 'Michael, these people in the Southern District are not interested in you—You're a bump in the road. Their interest clearly is Donald Trump. So the way out of this is to cooperate if you have something to cooperate, because if it's Donald Trump you're cooperating against, you can get in on a prosecution agreement, which means you're out of this picture at all.' I said, 'It's a lot better than suicide.' And he thought and said, 'I don't have anything against Donald Trump.' And I must have asked him that same question. We were there for two hours, probably seven different ways, just to make sure that he kept on reiterating. And after the first time, where he simply said, 'I don't have anything on Donald Trump,' after that every time his response

---

[18] Brooke Singman, *Trump-Manhattan DA Case: Bob Costello Testifies to Grand Jury, Says Michael Cohen Is A 'Serial Liar,'* Fox News (Mar. 20, 2023), *available at* https://www.foxnews.com/politics/trump-manhattan-da-case-bob-costello-testifies-grand-jury-says-michael-cohen-serial-liar.
[19] *Id.*
[20] Caitlin Yilek, *Attorney Seeks to Discredit Michael Cohen in Trump Grand Jury Investigation*, CBS (Mar. 20, 2023), *available at* https://www.cbsnews.com/news/trump-grand-jury-new-york-robert-costello-michael-cohen/.
[21] Singman, *supra* note 18.
[22] Jack Forrest & Zachary Cohen, *Trump's Team Puts Forward Ally in Hopes of Undercutting Cohen Testimony in NY Hush Money Case*, CNN (Mar. 20, 2023), *available at* https://www.cnn.com/2023/03/20/politics/michael-cohen-robert-costello-manhattan-grand-jury/index.html.

was, 'I swear to God, Bob, I don't have anything on Donald Trump.'" Costello also attests to the fact of how Cohen "would suddenly stop in the middle of whatever he was talking about, and turn and point his finger at us and say, 'I want you guys to understand—I will do whatever the F I have to do. I will never spend a day in jail.' He said that at least 10 to 20 times during that two-hour period. It was, it was a bizarre mantra, but it made it clear to us that Michael Cohen was saying, 'I will lie, cheat, steal, shoot someone, I will never spend a day in jail.'"[23]

28. In particular, Defendant told Mr. Costello during the course of the meeting that he had "decided [on] his own . . . to see if he could take care of" certain "negative information" that Stephanie Clifford "wanted to put in a lawsuit against" Plaintiff.[24] According to Mr. Costello, Defendant was clear that the resulting payment was his "idea."[25]

29. Defendant told Mr. Costello that Defendant and Clifford's lawyer "negotiated a nondisclosure agreement for $130,000," and expressly stated that the $130,000 payment did not come from Plaintiff.[26]

30. Instead, Defendant told Mr. Costello that Defendant had taken a loan out for the $130,000 because he "wanted to keep [the payment a] secret," both from his wife and from Plaintiff's wife.[27]

---

[23] Sean Hannity, *Defending Trump — March 31st, Hour 2*, OMNY-FM, (Mar. 31, 2023), *available at* https://omny.fm/shows/the-sean-hannity-show/defending-trump-march-31st-hour-2.
[24] *Id.*; Kelly Garrity & Erica Orden, *Former Legal Adviser to Michael Cohen Tries to Discredit Him in Grand Jury Testimony*, Politico (Mar. 21, 2023), *available at* https://www.politico.com/news/2023/03/20/former-attorney-to-michael-cohen-tries-to-discredit-him-in-grand-jury-testimony-00087982.
[25] Protess et al., *supra* note 17.
[26] Singman, *supra* note 18.
[27] *Id.*

31. Mr. Costello's account is consistent with a letter dated two months before the FBI raid, on February 8, 2018, from another attorney representing Defendant in response to a complaint filed with the Federal Election Commission (FEC). That letter plainly states that Defendant "used his own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford. Neither The Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed Mr. Cohen or the payment directly or indirectly."[28]

32. Mr. Costello has further completely discredited Defendant's subsequent accounts implicating Plaintiff's involvement in any violation of law surrounding the payment, and on the basis of his interactions with Defendant, calls Defendant a "serial liar,"[29] and a "totally unreliable"[30] individual who "has great difficulty telling the truth."[31]

33. Subsequent to the investigation by law enforcement, Defendant asked for, and Plaintiff repeatedly rejected, Defendant's requests for a presidential pardon.[32]

34. The criminal investigation culminated on August 21, 2018, when Defendant pleaded guilty in the United States District Court for the Southern District of New York to an eight-count

---

[28] Letter from McDermott, Will & Emery attorney Stephen M. Ryan to Fed. Election Comm'n Office of Complaints Exam., Re: MUR 7313 (Feb. 8, 2018).

[29] *See* Brooke Singman, *Trump-Manhattan DA Case: Bob Costello Testifies to Grand Jury, Says Michael Cohen Is A 'Serial Liar,'* Fox News (Mar. 20, 2023), *available at* https://www.foxnews.com/politics/trump-manhattan-da-case-bob-costello-testifies-grand-jury-says-michael-cohen-serial-liar.

[30] Yilek, *supra* note 20.

[31] Singman, *supra* note 18.

[32] *See* Protess et al., *supra* note 17; Rebecca Ballhaus, *Cohen Told Lawyer to Seek Trump Pardon*, WALL ST. J. (Mar. 6, 2019), *available at* wsj.com/articles/attorney-says-cohen-directed-his-lawyer-to-seek-trump-pardon-contradicting-testimony-11551931412; *see also* David Greene & Ryan Lucas, *Cohen, Trump and the Pardon That Wasn't*, Nat'l Public Radio (Mar. 7, 2019), *available at* https://www.npr.org/2019/03/07/701081872/cohen-trump-and-the-pardon-that-wasnt.

criminal information brought by the United States Attorney's Office for the Southern District of New York charging violations of tax evasion, making false statements to a financial institution, causing an unlawful corporate contribution, and making an excessive campaign contribution.

35. News reports also indicated that "prosecutors had evidence that also implicated [Defendant's] wife in potential criminal activity," though "[his] wife was never charged."[33]

36. On November 29, 2018, Defendant pleaded guilty to one count of making a false statement to Congress, a charge brought by Special Counsel Robert Mueller III.

37. "[E]ach" of the counts to which Defendant pleaded guilty "involved deception," and in the words of the sentencing judge, Defendant was guilty of a "veritable smorgasbord of fraudulent conduct."[34]

38. In connection with Defendant's consolidated sentencing proceedings, federal prosecutors submitted two scathing sentencing memoranda, each dated December 7, 2018; one from the Special Counsel's Office ("SCO") run by Robert S. Mueller III and another from the U.S. Attorney's Office for the Southern District of New York ("SDNY").

39. The SCO's memorandum focused on Defendant's "deliberate and premeditated" false statements to Congress.[35]

---

[33] Rebecca Ballhaus & Michael Rothfeld, *Trump Again Blasts Michael Cohen, the Former Lawyer Who Broke With Him*, WALL ST. J. (Dec. 3, 2018), *available at* https://www.wsj.com/articles/trump-again-blasts-former-lawyer-who-broke-with-him-1543858254.

[34] *Id.*

[35] Gov't Sentencing Mem., *United States v. Cohen*, No. 18-850 (S.D.N.Y. Dec. 7, 2018), ECF No. 15, at 2 (submitted by the SCO).

40. The SDNY's memorandum, meanwhile, acknowledged that any assistance Defendant may have provided arose at least in part out of a "desire for leniency," and does not "reflect a selfless and unprompted about-face."[36]

41. The SDNY noted that Defendant's crimes were "motivated . . . by personal greed," and were effectuated by "repeatedly us[ing] his power and influence for deceptive ends." Indeed, Defendant exhibited "a pattern of deception that permeated his professional life[.]"

42. Each of Defendant's crimes "involve[d] deception, and each were [sic] motivated by personal greed and ambition."

43. Defendant's "desire for even greater wealth and influence precipitated an extensive course of criminal conduct."

44. But even when faced with overwhelming evidence of willful tax evasion, Defendant refused to take ownership of his wrongdoing, blaming his accountant for his failure to report millions of dollars over a period of years from income completely unrelated to his work with Plaintiff or the Trump Organization, including profitable loans and investments from the lease of taxi medallions.[37]

45. The SDNY also released a public statement which stated, in part, that "Michael Cohen is a lawyer who, rather than setting an example of respect for the law, instead chose to break the law, repeatedly over many years, and in a variety of ways. His day of reckoning serves as a reminder that we are a nation of laws, with one set of rules that applies equally to everyone."[38]

---

[36] Gov't Sentencing Mem., *United States v. Cohen*, No. 18-850 (S.D.N.Y Dec. 7, 2018), ECF No. 27, at 15 (submitted by the SDNY) [hereinafter SDNY Sentencing Mem.].
[37] *Id.* at 5-6.
[38] Press Release, Dep't of Justice, *Michael Cohen Pleads Guilty in Manhattan Federal Court to Eight Counts, Including Criminal Tax Evasion and Campaign Finance Violations* (Aug. 21, 2018),

46. To this day, Defendant refuses to take responsibility for his actions; he called the SDNY's public statement "100 percent inaccurate and . . . [the] SDNY prosecutors knew it," insisting that "I did not engage in tax fraud" but "had to plead guilty to it in order to protect my wife and family."[39]

47. Defendant repeatedly suggested that his plea agreement was coerced: "[L]ike a man in a hostage video, [Defendant] agreed to the SDNY deal. . . . They put a metaphorical gun to [Defendant's] wife's head and forced [Defendant] to execute a plea deal," to which he allocuted at his plea proceeding like "a well-rehearsed actor" reading a "letter of lies" "to insure full compliance to [the SDNY's] demands."[40]

48. The SDNY concluded that Defendant's conduct constituted an "abuse of both his standing as an attorney and," referring to Plaintiff, "his relationship to a powerful individual," which is "repugnant from anyone, let alone an attorney of the bar."[41]

49. On December 12, 2018, Defendant was sentenced to three years in prison based upon the convictions secured by the SDNY, a two-month concurrent sentence for the conviction secured by the SCO, concurrent three-year terms of supervised release in both cases, and was ordered to pay two fines of $50,000 each, to forfeit $500,000, and to pay $1,393,858 in restitution to the Internal Revenue Service.

50. On February 26, 2019, pursuant to disciplinary proceedings instituted by the Attorney Grievance Committee for the First Judicial Department, Defendant was disbarred by a panel of judges sitting on the New York Supreme Court. Indeed, in addressing the

---

*available at* https://www.justice.gov/usao-sdny/pr/michael-cohen-pleads-guilty-manhattan-federal-court-eight-counts-including-criminal-tax.
[39] MICHAEL COHEN, REVENGE 54 (Melville House Publ'g 2022), *see infra*, note 59.
[40] *Id.* at 91, 97.
[41] SDNY Sentencing Mem., *supra* note 36, at 32.

seriousness of the unlawful conduct engaged in by Defendant, the panel's written decision noted that Defendant's conviction for making false statements to Congress was analogous to a first degree felony conviction under New York law and, therefore, automatic disbarment was appropriate.

51. In or around May 2019, Defendant began serving his sentence at Federal Correction Institution, Otisville ("FCI Otisville") in Orange County, New York.

52. Time and again, Defendant refused to accept responsibility for his actions. In 2020, Defendant moved his sentencing judge for a reduced sentence. The court denied his request, admonishing that, "[t]en months into his prison term, it's time that Cohen accept the consequences of his criminal convictions for serious crimes that had far reaching institutional harms."[42]

## C. **Defendant's Continuing Fiduciary Obligations to Plaintiff**

53. Defendant, at all relevant times prior to his disbarment in February 2019, was an attorney licensed to practice law in the state of New York.

54. As a member of the state Bar of New York before his disbarment, Defendant was subject to stringent ethical obligations and professional standards applicable to all lawyers in New York.

55. The obligations and standards imposed against attorneys by the state of New York create a fiduciary relationship between the lawyer and his client; among these fiduciary duties, Defendant undertook fiduciary duties on behalf of his client.

56. For example, New York Rule of Professional Conduct ("NYRPC") 1.6 prohibits an attorney from "reveal[ing] confidential information . . . or us[ing] such information to the

---

[42] Mem. & Order, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Mar. 24, 2020).

disadvantage of the client or for the advantage of the lawyer" unless circumstances exist which are not relevant here; confidential information consists of all "information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information that the client has requested to be kept confidential."

57. NYRPC Rule 1.5 prohibits an attorney from "charg[ing] or collect[ing] an excessive or illegal fee or expense." Such illegal expenses include fraudulent billings that are "knowingly and intentionally based on false or inaccurate information," including where, for example, "the client has agreed to pay the lawyer's cost of in-house services," and the attorney were to charge the client "more than the actual costs incurred."[43]

58. NYRPC Rule 1.6 prohibits an attorney, as relevant here, from "knowingly reveal[ing] confidential information . . . or us[ing] such information to the disadvantage of a client or for the advantage of the lawyer or a third person" unless the client gives informed consent.

59. NYRPC Rule 1.9 extends an attorney's fiduciary obligations to former clients: as relevant here, "[a] lawyer who has formerly represented a client in a matter" shall not thereafter "(1) use confidential information of the former client protected by Rule 1.6 to the disadvantage of the former client[,]" or "(2) reveal confidential information of the former client protected by Rule 1.6 except as these Rules[.]"

60. Defendant's fiduciary duties owed to Plaintiff survive the attorney-client relationship and Defendant's disbarment and are still in effect today.

---

[43] Rule 1.5 (New York State Bar Association Comment [1A]).

D. **Defendant's Duties Under the Confidentiality Agreement**

61. As a material condition of his employment with the Trump Organization, Defendant signed a confidentiality agreement entitled "Employee Agreement of Confidentiality" ("the Confidentiality Agreement").

62. The Confidentiality Agreement requires that during Defendant's "term of . . . employment and at all times thereafter," with exceptions not relevant here, Defendant "agree[d] not to directly or indirectly disseminate, or publish, or cause to be disseminated or published any Confidential Information in any form, including but not limited to any diary, memoir, book, letter, story, speech, photography, interview, article, essay, account, description or depiction of any kind whatsoever, whether fictionalized or not."

63. The Confidentiality Agreement defines "Confidential Information" to include "(i) the personal life or business affairs . . . of Trump; (ii) the personal lives and/or business affairs of members of Trump's family; and/or (iii) the business affairs of [the Trump Organization], or an of its affiliates, officers, directors, or employees."

64. Beginning on or about 2018, after Defendant's representation of Plaintiff had ended, Defendant committed the first of an onslaught of fiduciary and contractual breaches against Plaintiff by making numerous inflammatory and false statements about Plaintiff.

E. **Defendant Seeks Profit and Notoriety By Disparaging Plaintiff Through Books, Podcast, and Other Public Statements**

65. Defendant's most egregious breaches of fiduciary duty and contract arise in connection with the publication of his books and podcast, discussed in further detail herein.

i.      *The Books*

66. In mid-to-late 2019, while incarcerated at FCI Otisville, Defendant began working on a manuscript, which would eventually be formulated into his first book, *Disloyal: A Memoir:*

15

*The True Story of the Formal Personal Attorney to President Donald J. Trump* ("*Disloyal*").[44]

67. *Disloyal* purports to reveal confidential information about Plaintiff, as defined by the Confidentiality Agreement, and as contemplated by the New York Rules of Professional Conduct.

68. *Disloyal* also provides fictionalized accounts of Defendant's interactions with Plaintiff that are prohibited by the Confidentiality Agreement, and which are intended to be embarrassing or detrimental to Plaintiff, and redound to Plaintiff's disadvantage, in violation of the New York Rules of Professional Conduct.

69. In connection with the publication and promotion of *Disloyal*, Defendant committed a vast number of breaches of fiduciary duty and violations of the Confidentiality Agreement.

70. Defendant was aware that the publication of *Disloyal* would violate the Confidentiality Agreement and his fiduciary duties to Plaintiff, his former client.

71. Defendant never sought or received consent or authorization from Plaintiff regarding the disclosure of confidential information prior to the dissemination and publication of *Disloyal*.

72. In fact, on or about April 20, 2020, Plaintiff submitted a cease-and-desist letter to Defendant's counsel, advising that the release of *Disloyal* would violate Plaintiff's confidentiality rights as required as Plaintiff's former attorney and by the Confidentiality Agreement. Defendant acknowledged receipt of the letter.

73. Defendant's *Disloyal* was published by Skyhorse Publishing, and distributed by Simon and Schuster, beginning on September 8, 2020.

---

[44] MICHAEL COHEN, DISLOYAL: A MEMOIR (Skyhorse Publ'g 2020).

74. The timing of *Disloyal*'s release, just prior to the November 3, 2020 Presidential Election, suggests that Defendant intended to improperly disclose Plaintiff's confidences when it would be most lucrative to do so—and while *Disloyal* would be sure to have the most damaging reputational effect on Plaintiff.

75. Plaintiff refutes the truth of any and all disclosures made by Defendant which are contained in *Disloyal*.

76. Despite being advertised as a factual memoir, *Disloyal* is replete with mischaracterizations, falsehoods, and flat-out misrepresentations about Plaintiff.

77. This was by design; indeed, the purpose of Defendant's book was to share a purported non-public insider's account of Plaintiff that would breach both his fiduciary duties and those he assumed under the Confidentiality Agreement: access to "the real real Donald Trump—the man very, very, very few people know."[45]

78. *Disloyal* is fashioned as a "tell-all" recounting of Defendant's decades-long relationship, interactions, and dealings with Plaintiff, wherein Defendant purports to present readers with an "intimate portrait" of Plaintiff.

79. Throughout *Disloyal*, Defendant uses quotation marks to fabricate verbatim conversations, and falsely put words directly in Plaintiff's mouth.

80. These alleged conversations, portrayed by Defendant to have taken place verbatim, date back to 2006, a full 14 years before Defendant began writing *Disloyal* in March 2020.[46]

---

[45] *Id.* at 7.
[46] *Id.* at 22, 26.

81. *Disloyal*'s forward nods both to the unprecedented breaches of fiduciary duties found therein, and further suggests Defendant's bad faith in publishing the confidential information: "this is a book the President of the United States does not want you to read."[47]

82. By way of example, the following paragraphs contain a non-exhaustive overview of Defendant's countless disclosures of information in violation of his Confidentiality Agreement and his fiduciary duties to Plaintiff.

83. Defendant describes an exchange in which Plaintiff is verbatim described as asking for Defendant's "help" on an "issue" regarding a "rogue board" at Trump World Tower, which Defendant represented solicitation of his "assess[ment] [of] a serious situation" to which he "determine[d] strategy on a critical business matter."[48]

84. Defendant claims that he "research[ed] the issues" on the "rogue board" issue, describes his legal "conclu[sion] that the board had indeed wrongly accused" Plaintiff, "and recorded that conclusion in a three-page memorandum outlining the allegation, the controversial issues and the way to proceed, as I saw it."[49]

85. Defendant describes working on various real-estate and other business matters for Plaintiff in a legal capacity as Plaintiff's "personal attorney," including the Running Horse golf project, Meadowlands development, and Trump Network.[50]

86. Defendant claims to describe verbatim a 2011 conversation he had with Plaintiff regarding the legal and real-estate strategies for acquiring what would become Trump Winery.[51]

---

[47] *Id.* at 15.
[48] *Id.* at 30-31.
[49] *Id.* at 32.
[50] *Id.* at 99-101.
[51] *Id.* at 148-49.

87. Defendant describes the legal work he did in connection with Trump University, and the Plaintiff's alleged approving reaction.[52]

88. Defendant represents that he stole from Plaintiff by "l[ying]" to inflate expenditures Plaintiff owed to him in an effort to "sneakily up[] my bonus."[53]

89. Defendant represents that "[o]f course" he "cash[ed] in on [his] relationship with" Plaintiff.[54]

90. Defendant likewise intended to disclose confidential information, claiming time and again that he "was dealing with the personal and extremely confidential matters that could make or break" Plaintiff.[55]

91. At bottom, Defendant's account is indeed incredible; he concedes that he must distinguish between "the time [he] lied" and "the time he told the truth" in prior testimony.[56]

92. Defendant repeatedly wrongfully calls Plaintiff racist.[57]

93. Defendant incorrectly declares that Plaintiff "didn't care about American national security."[58]

94. Defendant repeatedly misrepresents that Plaintiff engaged in illegal or unethical conduct as to matters in which Defendant purportedly represented Plaintiff.

95. Defendant's untruthful claims against Plaintiff are simply of a piece with Defendant's other indicia of unreliability, including Defendant's renunciation of all responsibility for the

---

[52] *Id.* at 167-68.
[53] *Id.* at 316.
[54] *Id.* at 341.
[55] *Id.* at 287-88.
[56] *Id.* at 168.
[57] *Id.* at 106, 272.
[58] *Id.* at 248.

multiple convictions to which he pleaded guilty by claiming that his plea was coerced by federal prosecutors.

96. Defendant went on to publish a second book, *Revenge: How Donald Trump Weaponized the US Department of Justice Against His Critics*, published in 2022 by Melville House Publishing ("*Revenge*"; collectively, "the Books").[59]

97. In *Revenge*, Defendant repeatedly disclaims responsibility for any wrongdoing that resulted in his pleading guilty to multiple felonies; and details how, in his view, he was railroaded by federal prosecutors at Plaintiff's direction.[60]

98. *Revenge* also purports to reveal confidential information about Plaintiff, as defined by the Confidentiality Agreement, and as contemplated by the New York Rules of Professional Conduct.

99. Plaintiff refutes the truth of any and all disclosures made by Defendant which are contained in *Revenge*.

100.    For example, Defendant baldly asserts that Plaintiff "lies" with "frequency and ferocity . . . about damn near everything."[61]

101.    Defendant recycles his false attacks on Plaintiff as a racist and bigot,[62] and attacks Plaintiff as corrupt,[63] among other insults.

102.    Defendant received significant monetary compensation from his publishers or other third parties in connection with the writing and/or publication of the Books.

---

[59] MICHAEL COHEN, REVENGE (Melville House Publ'g 2022).
[60] *See, e.g.*, *id.* at 54 ("While I did not engage in tax fraud, I had to plead guilty to it in order to protect my wife and family."); *id.* at 91 (stating that SDNY "forced me to execute a plea deal"); *id.* at 97 (describing his prepared remarks for the plea allocution as "a letter of lies").
[61] *Id.* at 247.
[62] *See, e.g.*, *id.* at 8, 126.
[63] *Id.* at 60.

103.     Defendant's actions were driven by greed and his desire to capitalize on the fame and success of Plaintiff, his former client who became President of the United States, to Plaintiff's embarrassment and detriment, and at Plaintiff's expense.

ii.     *The Podcast and Other Public Statements*

104.     Beyond publication of the Books, Defendant has also made numerous false public statements about Plaintiff through various forms of traditional media (including television, radio, in print, etc.) as well as via the internet, many of which violate Defendant's fiduciary duties with respect to Plaintiff, and Defendant's contractual obligations regarding Plaintiff.

105.     Many such statements were published in Defendant's podcast, entitled *Mea Culpa*, which he launched in September 2020 (the "Podcast").

106.     Defendant represents that he "decided . . . to create [the] podcast [] to keep [his] brain active, to be productive, and, maybe most importantly, to get the word out about the nonsense going on. I called it 'Mea Culpa' in an acknowledgement of my wrongdoing"— though the Defendant refuses to accept wrongdoing in connection with the eight federal convictions for which he pleaded guilty.[64]

107.     The Podcast is produced by MeidasTouch, an independent political action committee, or "Super PAC," "fueled by anti-Trump donors" which, according to *Rolling Stone*, is focused on "grandiose self-promotion [that] doesn't match reality."[65]

108.     Promotional materials advertising Defendant's Podcast clearly state his malicious intent and retributive motive to harm Plaintiff at any cost: Defendant states that he is on "a

---

[64] *Id.* at 153.
[65] Seth Hettena, *The Trouble with MeidasTouch*, ROLLING STONE (Apr. 8, 2021), *available at* https://www.rollingstone.com/politics/politics-features/meidastouch-2020-campaign-finance-trump-1152482/.

mission to right the wrongs [Defendant] perpetrated," allegedly on behalf of Plaintiff, and "dismantle the Trump legacy" now that Defendant finds himself "imprisoned in his home, [with] his life, reputation and livelihood destroyed."[66]

109.     In the more than 250 episodes of the Podcast produced to date, Defendant repeatedly and consistently reveals, or purports to reveal, confidential information gleaned by nature of his prior attorney-client relationship with Plaintiff, as well as information pertaining to Plaintiff's personal and private life.

110.     As with the Books, a significant amount of the information revealed on the Podcast is inflammatory, misleading, or outright false.

111.     For example, in February 2021, September 2021, January 2022, and April 2022, Defendant hosted Stephanie Clifford on his Podcast, delving into the details of her allegations against Plaintiff and revealing purported client confidences about Defendant's role in that matter, but failing to make plain that Plaintiff relied on Defendant's legal advice, and Plaintiff acted out of a desire to protect his family from the malicious and false claims made by Clifford.[67]

---

[66] Home Page, *Mea Culpa*, https://podcasts.apple.com/us/podcast/mea-culpa/id1530639447.
[67]"Stormy   Daniels   Is   Not   Afraid,"   *Mea   Culpa*   (Feb.   8,   2021), https://podcasts.apple.com/us/podcast/stormy-daniels-is-not-afraid-february-8-2021/id1530639447?i=1000508279909; "Breaking!!! Stormy Daniels Returns to Mea Culpa," *Mea Culpa* (Feb. 17, 2023), https://podcasts.apple.com/us/podcast/breaking-stormy-daniels-returns-to-mea-culpa/id1530639447?i=1000535959714; "World Exclusive Interview!!! Stormy Daniels   to   Michael   Avenatti:   F@ck-Off!,"   *Mea   Culpa*   (Jan.   26,   2022), https://podcasts.apple.com/us/podcast/world-exclusive-interview-stormy-daniels-to-michael/id1530639447?i=1000581743372; "Blockbuster Stormy Daniels Interview," *Mea Culpa* (Apr. 9, 2022), https://www.youtube.com/watch?v=6rlIEGUenwI.

112.    Further, in November 2021, Defendant aired a "Best of *Mea Culpa*: Stormy Daniels" episode.[68]

113.    Although he was former counsel to Plaintiff in regards to this matter, Defendant stated, "I should not have gotten involved into it, and then would that have stopped him from maybe being President," adding his own hopes that her pending defamation case (which she lost against the President) would move forward, because "I think it's important."[69]

114.    On March 16, 2023, in the days after Defendant's appearances before the Manhattan District Attorney's grand jury regarding its investigation into the payment to Clifford, Defendant released a new episode claiming, "Exclusive!! Stormy Daniels Tells All…" only to re-air his first Interview with her from February 2021, discussing her allegations against Plaintiff,[70] but beginning with his own purported interactions with the grand jury.

115.    Defendant has also recently hosted episodes of the Podcast that discuss Defendant's putative legal exposure and falsely implicate confidential information, including with

---

[68]"Best of Mea Culpa: Stormy Daniels," *Mea Culpa* (Nov. 29, 2021), https://podcasts.apple.com/us/podcast/best-of-mea-culpa-stormy-daniels/id1530639447?i=1000581743326.

[69] "Stormy Daniels Is Not Afraid," *supra* note 66.

[70] "Exclusive!! Story Daniels Tells All.. [sic] Hush Money & Trump's Mushroom Shaped Pecker," *Mea Culpa* (Mar. 16, 2023), https://audioboom.com/posts/8264819-exclusive-stormy-daniels-tells-all-hush-money-trump-s-mushroom-shaped-pecker?playlist_direction=forward.

guests who have historically been hostile towards Plaintiff, Norm Eisen,[71] Elie Honig,[72] and Glenn Kirschner.[73]

116.    Defendant has made countless other media appearances wherein he discusses his prior attorney-client relationship with Plaintiff, and purports to disclose privileged details of their prior interactions and dealings.

117.    During one such appearance, for example, Defendant discussed that he testified in front of the Manhattan District Attorney's grand jury, and suggested that Plaintiff was, by virtue of Defendant's knowledge of confidential information, criminally exposed.[74]

118.    Plaintiff has not authorized any of the public disclosures made by Defendant.

119.    Plaintiff refutes the truth of any and all disclosures made by Defendant which are contained in the Podcast and other media appearances.

120.    Defendant's improper, self-serving, and malicious statements about his former client, his family members, and his business constitute repeated and substantial violations of his continuing fiduciary obligations as an attorney.

121.    Defendant chose to capitalize on his confidential relationship with Plaintiff to pursue financial gain and repair a reputation shattered by his repeated misrepresentations

---

[71] "Breaking!!! Trump Indictment Imminent + A Conversation With Norm Eisen," *Mea Culpa* (Mar. 13, 2023), *available at* https://audioboom.com/posts/8262581-breaking-trump-indictment-imminent-a-conversation-with-norm-eisen.

[72] "HOLY SH!T: J6th Committee Subpoenas Trump + A Conversation With Elie Honig," *Mea Culpa* (Oct. 14, 2022), *available at* https://audioboom.com/posts/8174416-holy-sh-t-j6th-committee-subpoenas-trump-a-conversation-with-elie-honig?playlist_direction=forward.

[73] "Breaking!!! Criminal Charges For Trump Likely + A Conversation With Glenn Kirschner," *Mea Culpa* (Mar. 10, 2023), *avaialbe at* https://audioboom.com/posts/8261414-breaking-criminal-charges-for-trump-likely-a-conversation-with-glenn-kirschner.

[74] *See, e.g.*, *Michael Cohen: Stormy Daniels Will Do 'A Fantastic Job' As Possible Witness In Hush Money Probe*, MSNBC (Mar. 16, 2023), *available at* https://www.youtube.com/watch?v=NHJYuzcnE6Q.

and deceptive acts, fueled by his animus toward the Plaintiff and his family members. His actions constitute grave violations of his contractual and fiduciary duties to the Plaintiff, and Defendant must be held accountable.

122.     Any further statements or disclosures made by Defendant after the date of this Complaint will likewise constitute a breach of the Confidentiality Agreement and a violation of Defendant's fiduciary duty owed to Plaintiff. As such, Plaintiff expressly incorporates any such statements or disclosure as if pleaded at length herein, and reserves his right to amend the Complaint to supplement Plaintiff's claim for damages to encompass any such additional violations.

123.     All conditions precedent to the bringing of this action have occurred, been satisfied, or have otherwise been waived.

124.     As a result of the Defendant's wrongful conduct, described herein, and Plaintiff's need to protect and enforce his legal rights, Plaintiff has retained the undersigned attorneys, and is required to pay attorneys' fees in order to prosecute this action.

## FIRST CAUSE OF ACTION
### *(Breaches of fiduciary duties)*

125.     Plaintiff repeats and realleges the allegations contained within paragraphs 1 through 124 as if set forth at length herein.

126.     At all relevant times, Defendant was in a fiduciary relationship with Plaintiff by virtue of his past representation as Plaintiff's former attorney, and owed Plaintiff all fiduciary duties inherent with the attorney-client relationship.

127.     In representing Plaintiff, Defendant was obligated to faithfully comply with his fiduciary duties and the duties imposed upon him by common law and statute, including the New York Rules of Professional Conduct, and in particular Rules 1.5, 1.6, 1.9, and 8.4.

128.     Disclosing client confidential communications and disclosing information relating to the representation of a client to the client's disadvantage in violation of Rules 1.6, 1.9, and 8.4 of the New York Rules of Professional Conduct, constitute misconduct.

129.     Defendant engaged in misconduct when he breached the fiduciary duty of confidentiality he owed to Plaintiff by disclosing, through publication and release of the Books, production and dissemination of the Podcast, and numerous other media appearances, both confidential information, including attorney-client privileged communications; and falsehoods and misstatements that have damaged Plaintiff's reputation.

130.     Defendant engaged in misconduct when he breached the duty of confidentiality owed to Plaintiff specifically by disclosing confidential information, misstatements, and misrepresentations likely to be embarrassing or detrimental to Plaintiff without Plaintiff's consent.

131.     Defendant did not obtain Plaintiff's consent or authorization before publishing any confidential information.

132.     Defendant knowingly, willfully, and intentionally violated his fiduciary duty of confidentiality to Plaintiff.

133.     Defendant derived a significant benefit, to Plaintiff's detriment and at Plaintiff's expense, as a direct result of his breach of fiduciary duty, including, without limitation, realization of substantial monetary gain in the form of compensation, advances, royalties, proceeds and/or profits received for his role in the writing, publication, promotion, and/or sale of the Books.

134.     Defendant's breaches directly caused Plaintiff's damages.

135.     It is against equity and good conscience for Defendant to retain his ill-gotten gains.

136.     Accordingly, Plaintiff is entitled to an award for restitutionary damages in an amount equal to or greater than the total and actual monetary gain received by Defendant in connection with the publication, promotion, and/or sale of the Books.

137.     In addition, due to the egregious and deliberate nature of Defendant's wrongdoing, the outrageous and wide-spanning nature of his breach of attorney-client privilege, and his conscious and wanton disregard for Plaintiff's rights as a client and/or former client, Plaintiff is entitled to an award of punitive damages.

138.     Plaintiff is further entitled to an award for interest, attorneys' fees, and costs of this action.

## SECOND CAUSE OF ACTION

### *(Breaches of Contract)*

139.     Plaintiff repeats and realleges the allegations contained within paragraphs 1 through 124 as if set forth at length herein.

140.     Defendant is a party to, obligated under, and bound by the terms of the Confidentiality Agreement.

141.     Defendant, at all relevant times, has been bound by the confidentiality and non-disclosure obligations set forth in the Confidentiality Agreement.

142.     Defendant materially breached the Confidentiality Agreement by disclosing confidential information, misstatements, and misrepresentations likely to be embarrassing or detrimental to Plaintiff without Plaintiff's consent.

143.     Specifically, Defendant committed multiple material breaches of the Confidentiality Agreement by, among other acts, causing the Books to be published and releasing the Podcast, thereby disclosing actual information and/or disclosing misleading,

fabricated, or fictionalized information about Plaintiff, his personal life, his business affairs, and his attorney-client relationship, without prior authorization or consent from Plaintiff.

144. As a direct and proximate result of Defendant's breach of the Confidentiality Agreement, Plaintiff has sustained, and will continue to sustain, significant damages in an amount to be determined at trial, including, but not limited to, actual, compensatory, and incidental damages, plus interests and the costs of this action.

145. Plaintiff is further entitled to attorneys' fees, disbursements, and related costs incurred by Plaintiff in connection with this action pursuant to Section 8 of the Confidentiality Agreement.

## THIRD CAUSE OF ACTION

### *(Breaches of the Implied Covenant of Good Faith and Fair Dealing)*

146. Plaintiff repeats and realleges the allegations contained within paragraphs 1 through 124 as if set forth at length herein.

147. Defendant owed Plaintiff a duty of good faith and fair dealing as implied in the terms of the Confidentiality Agreement.

148. In accordance with this duty, Defendant was obligated to refrain from engaging in any conduct that would destroy or injure Plaintiff's rights to the benefit of the Confidentiality Agreement, including each and every material provision contained therein.

149. Defendant failed to deal with Plaintiff in good faith and instead conducted himself so as to intentionally and maliciously breach his confidentiality and non-disclosure obligations owed to Plaintiff through his unauthorized disclosure of confidential information protected under the Confidentiality Agreement.

150.    In doing so, Defendant willfully and/or negligently breached his implied covenant of good faith and fair dealing at the expense of Plaintiff.

151.    As a direct and proximate result of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiff has sustained significant damages in an amount to be determined at trial in actual and compensatory damages, and is due the disgorgement of any profits, payments, compensation, advances, royalties, and/or other monetary proceeds received by Defendant as a direct or indirect result of the publication of the Books, plus interests and the costs of this action.

### FOURTH CAUSE OF ACTION

### *(Unjust Enrichment)*

152.    Plaintiff repeats and realleges the allegations contained within paragraphs 1 through 124 as if set forth at length herein.

153.    By causing the Books to be published and his other wrongful acts laid out herein, Defendant callously disregarded the fiduciary duties owed to his former client, Plaintiff, and, in addition, intentionally and blatantly breached the clear and unambiguous terms of the Confidentiality Agreement.

154.    Defendant's wrongful actions were intentional, calculated, malicious, and motivated by his desire to acquire fame, attention, notoriety, and wealth.

155.    Defendant received substantial compensation, proceeds, and/or profits as a direct result of, without limitation, his role in the publication, promotion, and/or sale of the Books, as well as from his production and marketing of the Podcast, all at the expense of Plaintiff.

156.    As a result of the foregoing, Defendant was unjustly enriched, at Plaintiff's expense, by virtue of his own wrongful, intentional, and egregious actions.

157.     It is against equity and good conscience to permit Defendant to retain such enrichment.

158.     Accordingly, Plaintiff is entitled to an award for restitutionary damages in an amount equal to or greater than the total and actual monetary gain received by Defendant in connection with the publication, promotion, and/or sale of the Books.

159.     In addition, due to the egregious and deliberate nature of Defendant's wrongdoing, the outrageous and wide-spanning nature of his breach of attorney-client privilege, and his conscious and wanton disregard for Plaintiff's rights as a client and/or former client, Plaintiff is entitled to an award of punitive damages.

**FIFTH CAUSE OF ACTION**

*(Conversion)*

160.     Plaintiff repeats and realleges the allegations contained within paragraphs 1 through 124 as if set forth at length herein.

161.     By his own account, Defendant "lied" about the amount of money he was owed in reimbursement for an expense he made on Plaintiff's behalf, instead "load[ing] up" and "sneakily upping [his] bonus" in order to "counter screw[]" Plaintiff.[75]

162.     Defendant admits that the cost of the expenditure was $13,000 but he "lied" and represented that his expenditure was $50,000. Such statement was false, and Defendant made the statement knowingly.

163.     In so doing, Defendant intentionally took property (specifically, funds allocated for the particular purpose of reimbursement) belonging to Plaintiff.

---

[75] DISLOYAL, *supra* note 44, at 315-16.

164.    Indeed, Defendant was only authorized to collect the amount of the expenditure, plus such additional money as the Trump Organization officials found sufficient to "gross[] up . . . to make up for taxes" on the original expenditure.

165.    Accounting for the "gross[ing] up" process authorized by the Trump Organization to reimburse Defendant, Defendant fraudulently misrepresented the amount owed to him for reimbursement and converted $74,000 in funds to which he was not entitled.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that this Court enter judgment in its favor grating the following relief:

(a) For actual, compensatory, incidental, and punitive damages in an amount to be determined at trial, but expected to substantially exceed Five Hundred Million Dollars ($500,000,000);

(b) For restitution and disgorgement of any profits, payments, compensation, advances, royalties, and/or other monetary proceeds received by Defendant as a direct or indirect result of the publication of the Books, the Podcast, and other ancillary products;

(c) For the $74,000 that was subject to unlawful conversion and made via fraudulent misrepresentation by Defendant, plus interest and other costs and expenses;

(d) For interest, costs, expenses, and attorneys' fees pursuant to statute; and

(e) For such other relief as this Court may deem fair, equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial as to all issues so triable.

Dated:  April 12, 2023

Respectfully submitted,

**BRITO, PLLC**
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Office:  305-614-4071
Fax:  305-440-4385

By: /s/ *Alejandro Brito*
    **ALEJANDRO BRITO**
    Florida Bar No. 098442
    Primary: abrito@britopllc.com
    Secondary: apiriou@britopllc.com