```
 1                THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
                         MIAMI DIVISION
 3
                  CASE NO.:  23-cv-21377-DPG
 4

 5

 6

 7   DONALD J. TRUMP,         )
                             )
 8          Plaintiff,        )            September 5, 2023
                             )
 9   v.                       )
                             )            Pages 1 - 34
10   MICHAEL D. COHEN,        )
                             )
11          Defendant.        )
     _____/
12

13

14
                         DISCOVERY HEARING
15
             BEFORE THE HONORABLE EDWIN G. TORRES
16           UNITED STATES CHIEF MAGISTRATE JUDGE

17

18

19

20

21   APPEARANCES:

22   Counsel on behalf of the Plaintiff:

23                      BRITO, PLLC
                        2121 Ponce de Leon Boulevard
24                      Suite 650,
                        Coral Gables, FL 33134
25                      BY:  ALEJANDRO BRITO, ESQ.
```

```
 1
 2   APPEARANCES CONTINUED:
 3   Counsel on behalf of the Defendant:
 4                       BRODSKY FOTIU-WOJTOWICZ PLLC
                         169 E. Flagler Street
 5   ,                   Suite 1224,
                         Miami, FL 33133
 6                       BY:  BENJAMIN H. BRODSKY, ESQ.
                         BY:  MAX A. EICHENBLATT, ESQ.
 7
 8
 9   (Appearing telephonically:)
10                       E. DANYA PERRY PLLC
                         157 East 86th Street,
11                       4th Floor,
                         New York, NY 10028
12                       BY:  E. DANYA PERRY, ESQ.
13
14
15   Transcribed By:
16                       BONNIE JOY LEWIS, R.P.R.
                         7001 SW 13 Street
17                       Pembroke Pines, FL  33023
                         954-985-8875
18                       caselawrptg@gmail.com
19
20
21
22
23
24
25
```

1          (Thereupon, the following proceeding was held:)

2          THE COURTROOM DEPUTY:  Calling case of Donald J. Trump

3   versus Michael D. Cohen; Case Number 23-cv-21377-Judge Gayles.

4          Counsel, please state your appearances for the record

5   starting with the Plaintiff.

6          MR. BRITO:  Good morning.  Alejandro Brito on behalf

7   of the Plaintiff.

8          MR. BRODSKY:  Good morning, Your Honor.

9          Ben Brodsky and Max Eichenblatt on behalf of the

10  Defendant and I believe my co-counsel is on the telephone as

11  well.

12         MS. PERRY:  Yes.  Good morning, Your Honor.

13         E. Danya Perry for Mr. Cohen.  Thank you for allowing

14  us to appear telephonically.

15         THE COURT:  Okay.  Good morning, everybody.

16         This is a discovery hearing that was requested for

17  this week.  We moved it up to today and I received some

18  material I believe yesterday, which I will pull up.

19         While I do that, let me turn to Mr. Brodsky.  Tell me

20  what, if any, progress has been made in the interim period and

21  where you are.

22         MR. BRODSKY:  So, Judge, we are here because the meet

23  and conferral process has appeared to have broken down in this

24  case.

25         And among the materials that we submitted are a number

4

1  of e-mails, text messages, and references to phone calls that

2  we have made to Plaintiff's counsel in an attempt to get

3  discovery compliance in this matter.

4        One of the primary issues that we were having was

5  attempting to get confirmation from Mr. Trump's counsel that

6  the September 6th deposition, which is a date he chose, was

7  going to be proceeding.

8        And on Friday late afternoon we received --

9        THE COURT:  Well, what made you think it was a

10  problem, though?  In other words, why was there any doubt?

11        MR. BRODSKY:  Because we had not set the location of

12  the deposition by virtue of Mr. Trump's insistence that he

13  would not do it in my office.

14        And so we reached out seven or eight times to get

15  confirmation that the deposition would either occur at

16  Mar-a-Lago or at the West Palm Beach Courthouse at the Court's

17  invitation.  And despite those many, many, many requests

18  Plaintiff's counsel was unable to respond with confirmation.

19        And so not knowing where the deposition was happening

20  was a little --

21        THE COURT:  What is on the notice?

22        MR. BRODSKY:  My office.

23        THE COURT:  Okay.

24        MR. BRODSKY:  And so what happened is on Friday

25  afternoon, Mr. Brito wrote an e-mail to say, well, Mr. Trump

1    can't make it because one of his lawyer's children is having a

2    baby and he has a very busy schedule.

3         We felt basically put into a corner because we are not

4    going to have a hearing in front of Your Honor until Thursday

5    and the deposition was Wednesday.  What were we going to say?

6    That, no, we are insisting on going forward on Wednesday with

7    no deponent present?

8         So we agreed and that may be, in a sense, water under

9    the bridge, but it is of a type and it exemplifies the

10   challenges that we face in this case in getting ordinary

11   discovery cooperation from the Plaintiff.  Who, apparently,

12   does not believe that he is bound by the Federal Rules of Civil

13   Procedure, notwithstanding, that he chose to bring the case in

14   this court.

15        So here we are having to require a court order to get

16   deposition dates.  We got a deposition date upon that court

17   order and then got sandbagged a few days before saying we are

18   not showing up after Mr. Trump had already not shown up to a

19   properly noticed deposition earlier in the case.

20        THE COURT:  And when was that?

21        MR. BRODSKY:  That deposition was set in July and

22   Mr. Trump simply did not show up.

23        In previous discovery materials we filed a certificate

24   of nonappearance for Mr. Trump's deposition.  He didn't seek a

25   protective order.  He simply said I am not appearing.  His

1  purported rationale was there was no confidentiality order in

2  place and yet he sought no protection.

3       So we are faced now with a Plaintiff who is, frankly,

4  notorious for litigation abuse of not showing up twice for his

5  deposition.  And if that were only it, maybe we would not be

6  here today, but there is a larger problem and that has to do

7  with the documents for which we have been waiting several

8  months now to receive.

9       The Court ordered that the Plaintiff produce all

10  documents by September 3rd.  He did not.  We received a partial

11  production yesterday and there is an indication there may be

12  more documents to come.

13       And we were advised by Plaintiff's counsel that

14  because the deposition has been moved, there is no urgency for

15  the production of these documents and, of course, we feel the

16  exact opposite.

17       There is extreme urgency given that our client is

18  faced with a lawsuit seeking five hundred million dollars in

19  damages.  And we need to get going in this case and have been

20  undertaking very diligent efforts to do so, but have been

21  stymied.

22       We also have a reasonable basis --

23       THE COURT:  Under the circumstances, do you prefer to

24  get the documents before the deposition or do you prefer to go

25  forward with the deposition tomorrow?

1      MR. BRODSKY:  We are prepared to go forward tomorrow
2  if the Court will so order it, if the Court is so inclined.
3      THE COURT:  Okay.
4      MR. BRODSKY:  I would say, Judge, as to the production
5  itself, we have a reasonable basis to conclude that the search
6  has not been done in accordance with the Federal Rules of Civil
7  Procedure.
8      Only 246 pages of documents have been produced.  Half
9  of which are duplicates.  So a hundred or so pages of documents
10 have been produced and facially there is something very wrong
11 here.
12      These are major events that are covered by the
13 discovery request, for which we know by the public record that
14 there were numerous consultants, and lawyers, and outside
15 parties involved over which Mr. Trump has control within the
16 definition of Rule 26.
17      And yet, we have been left with this skimpy production
18 with large gaps that are completely unexplained.  And we have
19 asked Mr. Brito, on more than one occasion, to explain to us
20 how these documents are being gathered.
21      What custodians are being searched.  What search terms
22 are being used.  What the protocol is to separate out
23 responsive and nonresponsive documents.  What is being held
24 back and why.  And we were told Mr. Brito advises he would not
25 tell us because that was work product, which is wrong.  It is

1    not work product.  It is part of Rule 26 for the party to

2    explain to the other side what they have done to reasonably

3    search for documents.

4            We have no privilege log.  There has been an

5    indication by Mr. Brito, on behalf of Mr. Trump, in his

6    responses that documents are going to be withheld on the basis

7    of privilege.  We don't know when we are getting that privilege

8    log.  We don't know which documents are responsive to which

9    requests.

10           Mr. Trump is treating this entire process like it is

11   an afterthought and it is not.  We have a due process right to

12   this information and he is flouting the rules.  We want an

13   Order to Show Cause, Your Honor, for three things.

14           One, we want the Plaintiff to explain to the Court the

15   exact process by which he gathered these documents.  Whose

16   e-mails were searched, by whom, with what criteria and what

17   timeframe and who has gone through those documents.

18           We would like the Plaintiff to explain why his

19   objection should not be overruled for failure to timely comply

20   with these discovery obligations for document requests that

21   have been pending for three months.  And we would like an Order

22   to Show Cause why the Plaintiff's privilege should not be

23   deemed waived for failing to give us a privilege log.

24           And if the Court is so inclined, we would like the

25   Court to order Mr. Trump to appear for his deposition tomorrow.

```
 1   We will do it at Mar-a-Lago if that is where he wants it.  We
 2   will do it anywhere so long as he shows up in person in South
 3   Florida and sits and gives testimony under oath.
 4            So that is why we are here today and we appreciate
 5   your time.
 6            THE COURT:  Okay.  Turning to counsel for the
 7   Plaintiff.
 8            MR. BRITO:  Good morning, Your Honor.
 9            Your Honor, with respect to the deposition issue,
10   going back to the July deposition, as Mr. Brodsky noted, they
11   just unilaterally selected the deposition.
12            I had a very amicable conversation with Mr. Brodsky
13   and I said we need to have this confidentiality issue addressed
14   by the Magistrate before we proceed with the discovery that you
15   are seeking in the form of a deposition.
16            That was not an issue.  We went ahead and rescheduled
17   the deposition.  We came before the Court to deal with the
18   confidentiality issue.  In essence, I think it is a bit of
19   piling on for purposes of trying to establish their record.  I
20   appreciate that, but that was never a contentious issue.  It
21   was really not a matter of dispute.  We agreed to reschedule
22   it.
23            We did select a date.  Mr. Todd Blanche, who is one of
24   the criminal attorneys who is representing Mr. Trump in the
25   other matters, notified me that his daughter was due to give
```

1  birth at a different timing than what he had anticipated.  He

2  wanted to be present at the birth of his child.

3       I reached out to counsel.  My understanding is that

4  Miss Perry and Mr. Blanche have a history.  They have worked

5  together for some time.  They know one another.  I think Miss

6  Perry knows Mr. Blanche's daughter who is having a child and

7  she said fine.

8       It is late in the game and I acknowledge that, Judge,

9  and I am sorry that we are here on that matter, but it was

10  brought to my attention and I immediately communicated it to

11  him.

12       THE COURT:  The problem is why do I care?  He can have

13  it -- in other words, why is that an issue?  He is not counsel

14  of record in the case.

15       MR. BRITO:  He is not, but by virtue, as I explained

16  to the Court, there are going to be other lawyers that will

17  need to be present for purposes of preserving privileges in the

18  criminal matters that we understand that they are going to be

19  asking about.

20       When we were last before you and Your Honor gave us

21  some fairly clear guidelines as to what you anticipated would

22  be fair examination and would not be fair examination, and not

23  to spend three hours of time asking questions that would invoke

24  the Fifth Amendment privilege, Miss Perry went out on her

25  LinkedIn page and posted that she was free to ask whatever she

1  wanted to.

2          So that gave us some concern.  I had to bring in

3  criminal counsel, as I told the Court I was going to have to do

4  anyway, for purposes of making sure that those privileges were

5  preserved.

6          THE COURT:  Then, in other words, like why does it

7  have to be that one person?  I am sure he has multiple lawyers.

8          MR. BRITO:  He does, but this is the head criminal

9  defense lawyer that is involved in every single one of the

10  criminal matters that involves Mr. Trump at this point in time.

11  So he is the person that I was told needs to be at the

12  deposition.

13          And Mr. Brodsky was right.  To a certain extent,

14  Judge, it is water under the bridge because we agreed to move

15  the date.  They said that is fine.  We will agree to it so long

16  as you give us a date or if we agree at Mar-a-Lago, which we

17  did, and if you agree to give us the security protocols in

18  advance, which we said we would.

19          And what transpired over the weekend is once we had

20  this back and forth, they sent us a proposed order which listed

21  out the deposition and the production.  I agreed to -- I think

22  I may have tweaked the start time of the deposition from 9:30

23  to 10:00 and changed the complete production date from

24  September 11th to -- I'm sorry -- from September 4th to

25  September 11th.  That's it.

1        It was their order and they said fine.  And then, I

2   get a different order from Mr. Brodsky that says no, no, no, I

3   sent you the wrong order.  So now the order that they then

4   asked us to agree to again contemplates agreement of the

5   deposition date on October 3rd, which we had no issue with.

6        We proposed it and they accepted it, but now they

7   inserted language with regard to the Show Cause order.  And I

8   said if we are trying to reach agreement and avoid a hearing

9   using up the Court's time on things that we have already agreed

10  to because of the deposition, we all agreed this is the date.

11  This is how it is going to play out.

12        I am hearing now from Mr. Brodsky that he wants to

13  proceed tomorrow.  And I think that that is just following up

14  on something that the Court said this morning, but we were all

15  past that.  We had resolved that deposition issue and we were

16  moving forward and that is the date.

17        As it related to the production, as I explained to

18  Mr. Brodsky over the weekend, the way that the documents were

19  produced to us was in a particular format that we were unable

20  to transfer from access to documents to PDFs for purposes of

21  being able to produce them and produce them in a searchable

22  fashion.

23        So I explained that to Mr. Brodsky.  My assistant is

24  here and she was tasked with this responsibility all weekend to

25  figure out.  And unfortunately, couldn't get it done by Sunday,

1   but yesterday was able to figure it out and was on-line trying

2   to figure out this platform to be able to transfer the

3   documents.  And we transmitted all of the documents with the

4   exception of one document that I told Mr. Brodsky about that I

5   am going to be sending to him as soon as I get back to my

6   office.

7         We provided the entirety of the production.  They

8   said, well, we are going forward with the hearing nevertheless.

9   And I said on what?  I would like to have some indication and

10   their response was something akin to what I heard now, which is

11   the insufficiency of the production.

12         And I said, well, tell me specifically what it is

13   because, Your Honor, when we were here before you, you limited

14   some of the document requests in a very meaningful way.  And

15   you sustained a substantial amount of the objections in a

16   meaningful way and did not address a huge chunk of it, which

17   dealt with the financial production.

18         And that is just the reality of where we are right

19   now, but I am representing to the Court in communications that

20   I have had with Alan Garten, who is the Chief Legal Officer or

21   General Counsel for the Trump organization, that we have gone

22   beyond.  And not just going through Mr. Trump's personal files,

23   but we've gone through the Trump organization to gather all of

24   these documents.

25         But the reality is Mr. Trump is not an e-mailer.

1   Mr. Cohen is not an e-mailer.  The e-mails that I had from

2   Mr. Cohen, or that had the word Cohen in it, was for a

3   different Cohen that worked for Mr. Trump; David Cohen.

4          When I reviewed hundreds of e-mails none of which

5   related to Michael Cohen.  The handful of e-mails that I saw

6   that related to Michael Cohen dealt with him communicating with

7   somebody about a baseball camp apparently for one of the

8   children, but unrelated to Mr. Trump.

9          There are no other documents with the exception of the

10  one document that I am going to send to Mr. Brodsky today that

11  is subject to production based upon these requests, Your

12  Honor's objections, and that is the reality of it.

13         And the reason why I said that it is not so urgent is

14  because of the fact that I was struggling to comply with the

15  Court's order that I received late last week to get the

16  documents to him on Sunday on a Labor Day weekend and to task

17  my assistant with you need to drop whatever you are doing.  I

18  need to get this done.  And she was, like, I can't.  I can't

19  physically get these documents in a way that are produceable.

20         THE COURT:  Now when was the production due from the

21  last hearing?

22         MR. BRITO:  Your Honor, I don't believe you set a date

23  for production and this is just an observation.  There is no

24  order with respect to the specific rulings that you made on a

25  category-by-category basis and so there was no deadline for

1    when to produce the documents.

2         It was just left between us to -- obviously we took

3    copious notes.  We knew what you said.  We understood the

4    ruling.  We prepared an amended response that dealt with those

5    categories that you asked us to acknowledge and either you

6    produce them or you have no such documents.

7         THE COURT:  And what about the privilege log, though?

8         MR. BRITO:  There are, based upon the Court's rulings

9    and the fact that Your Honor did not address some of the

10   categories of documents in the document request at that time,

11   there is no privilege log.  There are no documents being

12   withheld on the basis of privilege.

13        So I am just being transparent.  We have given him the

14   documents that are responsive.  I have nothing else to produce.

15   I have had very extensive conversations.  We have run searches.

16        And as I mentioned, we ran something as broad as the

17   word Cohen within a large organization and there is nothing

18   else that relates to these categories of documents.  That's all

19   I can say.

20        As it relates to the deposition, I appreciate the fact

21   that Your Honor is probably frustrated that we are even here

22   having this conversation.  My apologies to the Court that we

23   are.  I wish I could have been able to deal with the deposition

24   issue sooner, but I didn't.  I dealt with it as quickly as I

25   could based on the information that was supplied to me by those

1   who have a lot more information than I do with regard to

2   availability.

3           I will not be able to have Mr. Trump available for

4   deposition tomorrow.  Especially not in Mar-a-Lago.  He is not

5   even in Florida right now.  I am, again, just underscoring the

6   fact that we had an agreement.  And I believe that that

7   agreement ought to be honored as opposed to Mr. Brodsky now

8   saying, oh, we are willing to go forward tomorrow.

9           We had an agreement.  It is e-mailed between one

10  another.  If there is a proposed order that sets it out that we

11  are prepared to have the Court sign so we can eliminate the

12  need for this morning's hearing, but I simply won't be able to

13  get Mr. Trump anywhere because of Secret Service issues,

14  because of travel issues, and because of issues related to the

15  criminal matter.

16          One of the reasons why last week was a bit uncertain

17  for us is because the date tomorrow was the date that there was

18  supposed to be an arraignment in the Georgia case.  They ended

19  up waiving that arraignment late last week and that was a

20  roadblock that we needed to clear.

21          But that arraignment date was something that came on

22  the radar after we had selected that deposition date.  I didn't

23  want to get into it because I had a feeling that that was going

24  to happen, but I could not give Mr. Brodsky the go-ahead one

25  way or the other until that issue was resolved.

1          And in having that conversation, Mr. Blanche told me

2    about his personal issue.  And I respected that and I was

3    hopeful that opposing counsel would respect that as well and

4    they did.

5          And so I am asking the Court to simply allow the

6    parties to move forward with respect to what we agreed to as it

7    relates to the production.  Mr. Brodsky has a specific issue

8    that he -- not just the number of pages that have been

9    produced, but if there are specific categories that he believes

10   are not being responded to, I will have that conversation with

11   him.

12         And if not, I am sure he obviously knows how to get it

13   before the Court and tee up that issue, but I am representing

14   to the Court based upon the communications with my client, I

15   have nothing else to produce, with the exception of that one

16   document, which I said I will be producing today.

17         THE COURT:  So based on your description, obviously

18   you were not the person supervising the search, correct?

19         MR. BRITO:  I was not.

20         THE COURT:  And the person supervising the search was

21   Mr. Garten?

22         MR. BRITO:  Correct.

23         THE COURT:  Okay.

24         MR. BRITO:  There is another gentleman that works with

25   him.  They work hand-in-hand, but Mr. Garten is the person who

1  I communicate with for purposes of --

2      THE COURT:  And he is a lawyer?

3      MR. BRITO:  He is.  He is General Counsel or Chief

4  Legal Officer.  I am not sure of the specific title within the

5  Trump organization, yes.

6      THE COURT:  Okay.  Well, on the deposition date, did

7  you, in fact, agree to postpone and set it to October the 3rd?

8      MR. BRODSKY:  Under duress because we had no choice.

9  We weren't --

10     THE COURT:  You could have enforced the notice.  In

11 other words, you could have said, no, we have to go forward.

12     MR. BRODSKY:  Well, except that we were not going to

13 be before the Court until Thursday.

14     We didn't know the Court was going to move the hearing

15 until today, at which point we would have had the ability to

16 enforce it.  But we felt like we were put in a corner by virtue

17 of the fact that --

18     THE COURT:  The bottom line is did you agree to

19 October 3rd or not?

20     MR. BRODSKY:  We did.

21     THE COURT:  Okay.  So is that date workable on your

22 end?

23     MR. BRODSKY:  It is.

24     THE COURT:  Okay.  And do you want to do it at

25 Mar-a-Lago?

1          MR. BRODSKY:  We prefer to do it in the courthouse.

2          THE COURT:  Okay.  Because, obviously, that cannot be

3    arranged in a couple of days.  So to the extent that you did

4    not have that set up well in advance, I guess there is no other

5    -- well, you can obviously do it also at a videographer

6    location, right?

7          MR. BRODSKY:  You know, the materials we submitted

8    evidence and the back-bending efforts we undertook to do those

9    logistics and --

10         THE COURT:  But, see, one of the concerns I had was,

11   though, at the last hearing I thought when this came up you all

12   kind of had already a game plan of the logistics.  I thought

13   that that was already kind of in play.

14         MR. BRODSKY:  Well, no.

15          Immediately after that hearing we wrote Mr. Brito an

16   e-mail and said do you want to do it in West Palm in the

17   courthouse because we need to advise Judge Torres so he can

18   assist us, or we can do it someplace else, but just tell us.

19   And then, we repeated those e-mails pretty much every day for

20   ten days with no response.

21          So that is part of the challenge here is we just have

22   not been getting cooperation from the Plaintiff in the

23   logistical side of this and we are relatively agnostic about

24   the location.

25          We would prefer the courthouse, but are not going to

1  lie down on the railroad tracks, so to speak, if Mr. Trump

2  insists to do it at Mar-a-Lago if we can get the logistics set

3  up so we are able to appear and do it.

4        So one additional request we would make, before I turn

5  back to the documents issue, is that we get a court order

6  requiring that Mr. Trump advise where he wants the deposition

7  to happen.  Either at Mar-a-Lago or the West Palm Beach

8  Courthouse by some date certain and that they then give us

9  logistical information a number of days in advance.

10        Let's say two weeks in advance of the set deposition

11  date so we have that squared away.  We do not want to be

12  scrambling and then rushing into the Court and saying, well, we

13  don't even know who is going to let us in the front door.

14        MR. BRITO:  Your Honor --

15        MR. BRODSKY:  So that is the deposition issue.

16        To the document point, you know, Mr. Brito does not

17  know what searches were done because he did not supervise them.

18        If Mr. Garten wants to submit a sworn declaration to

19  the Court explaining exactly what he did and how he did it,

20  then we can assess it, but Mr. Brito is in the dark just like

21  we are because he is just relying on someone's say-so.

22        So I would request, Judge, that by Friday Mr. Garten

23  give a sworn declaration explaining in detail the search that

24  he did.  And if Mr. Brito in turn went through and had his own

25  involvement that he submit a declaration as well explaining to

1  the Court and to us what he did so we can assess whether the

2  search was done in a reasonable manner.  We don't think it has

3  been.

4        THE COURT:  And what makes you think that?

5        In other words, I mean, we did have various arguments

6  back and forth as to the scope of the production at the last

7  hearing, right?  And so given the rulings that we had what

8  makes you think that you don't have -- first of all, you only

9  had a day to review them.

10       MR. BRODSKY:  It does not take very long to review

11  346 pages of documents.

12       I would represent to the Court that out of the hundred

13  unique pages, ten of those pages are taken up by Mr. Cohen's

14  employment agreement.  Another forty or fifty pages are taken

15  up with his pay stubs.  There are maybe ten pages of e-mails;

16  maybe four or five e-mails that are in the entire production.

17       And I find it impossible to believe that of Mr.

18  Trump's army of attorneys, advisers, and consultants all of

19  whom he has control of, none of them e-mailed about Stormy

20  Daniels.  If they did some of those might be privileged, but

21  this was a major scandal and a big multi-month news event.

22       I am certain, as the day is long, that there are

23  e-mails amongst his team about this and they are very likely to

24  lead to the discovery of admissible evidence here.

25       Particularly on the point of whether Mr. Trump, in

1  fact, had a relationship with Stormy Daniels and what Mr.

2  Cohen's role is in buying her silence, which Mr. Trump has put

3  squarely at issue.  So this is a key issue in the case.

4       And you know, I represent wealthy people with lots of

5  lawyers and a team of professionals.  I know what happens when

6  something of a scandal of this magnitude breaks that there is a

7  lot of back and forth.

8       THE COURT:  Remind me because, frankly, I do not

9  remember.  But remind me and give me an example of a category

10  of document that I compelled, right, or I ruled on an

11  objection, I guess I should say, that you feel is missed.

12       MR. BRODSKY:  All documents, communications, and

13  correspondence reflecting the existence of any personal

14  relationship between Mr. Trump and Stephanie Clifford/Stormy

15  Daniels.

16       THE COURT:  And what did you get?

17       MR. BRODSKY:  What's that?

18       THE COURT:  What did you get on that category?  What

19  did you get?

20       MR. BRODSKY:  Well, I am a little reluctant to

21  disclose them because they may be deemed confidential and there

22  is news media listening to this.

23       THE COURT:  Well, categorically.

24       MR. BRODSKY:  Categorically they are e-mails between

25  Mr. Cohen and Miss Clifford's attorney about the nondisclosure

1    agreement.

2           THE COURT:  Okay.

3           MR. BRODSKY:  There were no other communications from

4    anybody afterwards discussing the nondisclosure agreement when

5    the scandal broke.  There was not one e-mail in the Trump

6    organization or amongst Mr. Trump's advisers about the

7    nondisclosure agreement after it was front page news for

8    multiple days.

9           I mean, that is absurd.  There are e-mails for

10   certain.  Unless there is some *omerta* that transcends what the

11   most sophisticated crime families in the world can do.

12          THE COURT:  Well, most of them do not use e-mail, in

13   fairness.

14          MR. BRODSKY:  That is true, but Mr. Trump's lawyers

15   and PR people, and surrogates, and individuals who go out and

16   speak to the media on his behalf have e-mails.

17          I mean, they didn't do a coordinated effort to fight

18   back the Stormy Daniels scandal by some elaborate game of

19   telephone.  It didn't happen that way.

20          THE COURT:  Okay.  All right.  Did you want to add

21   anything?

22          MR. BRITO:  Just the specific response that we

23   provided to that specific request.

24          Plaintiff is not in possession, custody, or control of

25   responsive documents because there are no documents that Mr.

1  Trump has that would reflect the personal relationship between

2  him and Miss Clifford.  Including any communications and

3  correspondence between Mr. Trump and Miss Clifford.

4          Mr. Brodsky is correct that we did produce other

5  documents related to that issue involving Miss Clifford, but

6  there are no other documents specific to the category that he

7  outlined.

8          And again, if we were to go one-by-one, especially

9  with regard to what Your Honor asked us to respond to, either

10  overruling our objections and/or modifying certain requests,

11  which Your Honor did, we produced everything.

12          With respect to the declaration for Mr. Garten, I have

13  no issue with that.  If they want that type of clarity, Mr.

14  Garten is an attorney and he's got his ethical obligations and

15  that is a nonissue.

16          As it relates to the deposition location, I did want

17  to at least read to the Court from the order that we had agreed

18  to, which says that:

19          "The Plaintiff's deposition shall occur October 3rd of

20  2023 at the Mar-a-Lago Club in West Palm Beach, Florida.

21  Plaintiff must provide all logistical details requested by

22  counsel for Defendant.  Including any security protocols and

23  requirements by..."

24          They even put September 12th.  I asked to have it

25  September 19th.

1           "...as this is a court ordered deposition, the

2   location and date may not be changed unless otherwise agreed by

3   the parties or upon leave of Court."

4           So what they are asking the Court in terms of the

5   order, we had agreed to the language of that on Sunday.  And

6   unfortunately, we are still dealing with this because I thought

7   this was a done deal.  The only thing I modified in that

8   paragraph --

9           THE COURT:  It does not sound, though, on that issue

10  like they are agreeing to do it at Mar-a-Lago, *per se*.  The

11  normal rule is that the person seeking the deposition sets the

12  location so long as it complies with Rule 45.

13          MR. BRITO:  There are other e-mails, some of which I

14  believe have been submitted to the Court, for purposes of this

15  morning's hearing, where they said we will agree to conduct it

16  at Mar-a-Lago.

17          Not just in a proposed order, but in e-mail

18  communications when this issue first came up because the Court

19  -- I don't want to say reluctantly, but offered to potentially

20  assist the parties in trying to have the West Palm Beach

21  Courthouse be made available, or at least make an inquiry of

22  the Chief Judge.

23          THE COURT:  Well, why wouldn't they just be better to

24  put it -- there are tons of videographer locations that are big

25  enough to accommodate anybody.  Wouldn't that be a better

1   place?

2           MR. BRITO:  Better?

3           THE COURT:  Than in an office building.

4           MR. BRITO:  I think better is a bit subjective in

5   relation to the security issues that we are going to have to

6   confront and potentially the media getting Mr. Trump in and out

7   of that location.

8           As I have banged my, you know, proverbial hand on the

9   table in this, I don't want a lot of media attention related to

10  the events of this case.  That has not been something that we

11  have been a proponent of and I am trying to remain consistent

12  in that respect.

13          So if Mar-a-Lago is fine, they have asked for a

14  separate break-out room and whatever they need, we will

15  accommodate that.  I think the only issue was, as they have

16  referenced in the order, we just need the security protocols to

17  get in and out, which is a nonissue.

18          It is going to make the security aspect of what we are

19  trying to do that much more simpler to be able to do it at

20  Mar-a-Lago, as opposed to a courthouse or a videographer in an

21  office building.  I think that becomes a little less manageable

22  and again --

23          THE COURT:  But why, though?  In other words, why?

24          MR. BRITO:  So I think it is Secret Service above

25  everything else.

1      THE COURT:  He goes to play golf every weekend.

2  Somehow that is manageable.

3      MR. BRITO:  It is manageable because they are out

4  playing golf, but in a deposition setting it is a bit different

5  in terms of a public building.

6      THE COURT:  But how so, though?

7      In other words, the media is not allowed to roam a

8  building, right?  The media is not allowed to roam a courthouse

9  any more than they are allowed to roam a private golf course.

10      Nor are they allowed to just roam in around a private

11  building.  I mean, there are areas where the media would be

12  allowed because it is a public location, right?

13      MR. BRITO:  Right.

14      THE COURT:  But that does not mean that a person with

15  tons of security couldn't come in and out of.  That part I just

16  don't understand.

17      MR. BRITO:  It is not something that I deal with on a

18  regular basis clearly, Your Honor, with regard to what the

19  Secret Service protocols are with regard to these types of

20  events.

21      My order, if I could have an order of preference,

22  would be at Mar-a-Lago because we have agreed to it and the

23  Defendants are okay with that location, or a courthouse which

24  is a far more secure location.

25      And then if we were, you know, obligated, if you will,

1    or directed by this Court to do it in a court reporter and

2    videographer office building of sorts, that would be my

3    request, but I think I haven't heard any real objection as to

4    why they don't want to do it in Mar-a-Lago.

5             They have asked for accommodations.  We will provide

6    them all the room, space, and privacy that they are looking

7    for.  And obviously, it is not going to be sitting outside in

8    the sun.  We are going to be doing it in a convenient place for

9    everybody.

10            That is just a request that my client has made just

11   for ease of getting people in and out and avoiding any of the

12   extraneous issues that I do not want to have to get involved

13   with and I am sure that the Secret Service does not want to

14   have to get involved with.

15            It is far easier to run clear into the individuals on

16   the Defendant's side who plan to attend the deposition because

17   it is only a couple of people.  That way we can just eliminate

18   the issue.

19            And again, their language, their proposed order, I

20   said absolutely fine.  Just give me a little bit more time to

21   clear all the protocols, but other than that, that is fine and

22   they agreed to that.

23            THE COURT:  I guess on the document issue, I mean, I

24   guess ordinarily, of course, I would rely on the representation

25   of the lawyer, but you are candidly telling me that you did not

1  manage the review.

2        So, like, I guess I need to get the declaration of

3  both Mr. Garten and the client and take that as the first step,

4  right?  In other words --

5        MR. BRODSKY:  Yes.  And so I think we would ask,

6  Judge, again, have Mr. Garten swear under oath what custodians

7  were searched.  What timeframe.  What search terms.  Who

8  reviewed the documents after they were initially pulled from

9  the search and what criteria were used to separate out the

10  responsive from the nonresponsive documents.  That will be a

11  starting point.

12        My suspicion is that it is going to be deficient

13  because there will be people that have not been -- whose boxes

14  have not been searched.  That is why we need to know that so

15  that we can say, well, you have not gone to John, and Sue, and

16  Michael, or whoever.

17        THE COURT:  All right.  That way we can take that as a

18  starting point, I suppose.

19        MR. BRITO:  And Your Honor --

20        THE COURT:  All right.  So you need to decide, then,

21  are you comfortable with it at Mar-a-Lago or not?  Because we

22  need to put it in the order and if it is going to be --

23        MR. BRITO:  Our preference would be the courthouse.

24        THE COURT:  The one thought I had, though, now that I

25  think about it, the downside of the courthouse is it is a

1  public building.

2      So I did not appreciate this when I first suggested

3  it, in fairness.  But since it is a public building, as opposed

4  to a private building, right?  Since it is a private building,

5  do I have to be careful in terms of restrictions that I place

6  on access by the media.

7      Frankly, I do not know off the top of my head.  So

8  that I raise as something that we would have to think about

9  which, frankly, it did not occur to me.  I was not thinking

10  along those lines, but I think it is a fair consideration.  So

11  that is the first thing.

12      The second thing is obviously the Plaintiff's proposal

13  is if we do it at Mar-a-Lago it solves that problem because it

14  is a private building.  The alternative to that is a different

15  private building, right?  So to some extent, I kind of need you

16  to work it out one way or the other this week.

17      MR. BRITO:  Yes.  I don't --

18      THE COURT:  Give yourself a week.  In the meantime, I

19  can find out, realistically, if the courthouse is actually a

20  good idea or not given my --

21      MR. BRODSKY:  I guess I would say, Your Honor, I

22  prefer that the Court order the location today.

23      THE COURT:  Well, that's what I intend -- well, I

24  cannot today because you don't have a date.  You don't have a

25  firm proposal.

```
 1              MR. BRODSKY:  Well, so I would --
 2              THE COURT:  I want you to go back and think about it.
 3              MR. BRODSKY:  Okay.
 4              THE COURT:  So that way in a week -- what is today,
 5    the 5th?
 6              THE COURTROOM DEPUTY:  Yes.
 7              THE COURT:  So by the 12th I will enter the order that
 8    sets the time and the place for October 3rd.  At least we have
 9    a date.  Everybody seems to be in agreement with the date come
10    hell or high water.  So have backup plans accordingly.
11              And then, the location, either agree upon or just give
12    me a proposal.  I think I understand their proposal.  Their
13    proposal is more understood.  If you have an alternative
14    proposal and you do not have an agreement, give it to me and I
15    will decide.
16              And then, in the meantime, that causes me to then
17    potentially inquire realistically is it viable for us to do
18    that.  I may have been speaking out of turn, but that is fine.
19    I can figure that out.
20              MR. BRODSKY:  Okay.  So I guess, then, Your Honor --
21              THE COURT:  Because if you are not uncomfortable --
22    let's put it this way.  I have only taken two depositions at
23    people's own places, but they were very sick people, right?
24              I was not going to force very sick Plaintiffs suing my
25    client to go to my office.  So there were medical issues there.
```

1    So I traveled to that location.  Other than that, I always

2    either did it at my office or at a neutral location.

3            So that would be the norm.  So, in this case, this is

4    an unusual case in fairness.  Maybe not like that, but if you

5    decide that you are fine with their proposal, then that is fine

6    with me.

7            To some extent we need to think about that now.  They

8    have given you a proposal and you think it through and, then,

9    we will finalize it on the 12th; by the 12th, okay?

10           MR. BRODSKY:  Okay.

11           THE COURT:  One thing I will order now is we will get

12   by a week, by the 12th, the declaration of the in-house counsel

13   who reviewed the production and the client certifying that

14   there are no other documents, right?

15           MR. BRODSKY:  Okay.

16           THE COURT:  Because I can then bind the Plaintiff.

17           And then you may have information from which to then

18   go to Mr. Brito and say, hey, see what I mean?  They didn't go

19   to this person.  Whatever that is, but then we can get that

20   issue off the table.

21           In fairness, it is not necessarily surprising to me

22   that a lot of this communication was not put in e-mail or on

23   paper given the nature of what you are talking about, but I

24   leave open the room for possibility that you are right and I am

25   wrong.  Fair enough?

1      MR. BRITO:  Fair.

2      THE COURT:  And then, obviously you can develop, like

3  in any other case, you can develop a record from which to make

4  arguments from.

5      He has already represented on the privilege log -- I

6  would have ordered that by today, but he is representing that

7  based on their review there is no privilege log.  So we will

8  take that at face value for now.  Okay.

9      MR. BRODSKY:  Okay.

10     THE COURT:  And then, so you will get that on the

11 12th.  That gives them a week to prepare it and make sure it is

12 right.  And then, by the 12th, you will give me either your

13 proposal for an alternative location or an agreed protocol at

14 Mar-a-Lago.  In which case, I will incorporate it and put it on

15 the order by the 12th.  So that way the 3rd is set in stone no

16 matter what.  Fair?

17     MR. BRODSKY:  Thank you.

18     THE COURT:  And then what was the third thing?

19     MR. BRITO:  They wanted to have our privilege waived,

20 but I think that there is no --

21     THE COURT:  At this point, yes, it is premature for me

22 to do anything like that.

23     MR. BRITO:  And the other thing is they wanted to

24 overrule our objections, but that is not really at issue.  Your

25 Honor already addressed the objections and to produce the

1   documents.

2          THE COURT:  I never entered an order, but nobody ever

3   asked for one, right?

4          MR. BRODSKY:  In the event we would want the Court to

5   do that we will circle back with a motion for --

6          THE COURT:  I think I -- yes, motion for entry of

7   order.

8          MR. BRODSKY:  Correct.

9          THE COURT:  That's fine.

10          MR. BRODSKY:  Okay.

11          THE COURT:  Okay.  So we will do that.  At least we

12   can make progress there.

13          Anything else in my last 15 minutes?

14          MR. BRODSKY:  I believe that is it for the Defendant,

15   Your Honor.

16          THE COURT:  For the Plaintiff?

17          MR. BRITO:  Nothing further.  Thank you for your time.

18          THE COURT:  Okay.  All right.  So we have made that

19   progress and I will look out for what you submit by the 12th

20   and I will enter it.  And then that way October 3rd will be set

21   and then we will see where we are.

22          MR. BRITO:  Thank you, Your Honor.

23          THE COURT:  Okay.

24          MR. BRODSKY:  Thank you, Your Honor.

25          (Thereupon, the proceedings concluded.)

```
 1

 2                              CERTIFICATE

 3

 4          I hereby certify that the foregoing transcript is an

 5   accurate transcript of the audiotape recorded proceedings in

 6   the above-entitled matter.

 7

 8

 9

10
     09/06/23                        Bonnie Joy Lewis,
11                            Registered Professional Reporter
                                  CASE LAW REPORTING, INC.
12                                7001 Southwest 13 Street,
                                Pembroke Pines, Florida 33023
13                                     954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25
```