**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

DONALD J. TRUMP,

                    *Plaintiff,*                          Case No. 23-cv-21377-DPG

        *v.*

MICHAEL D. COHEN,

                    *Defendant.*

---

**DEFENDANT'S AMENDED MOTION FOR HEARING**
**(amending S.D. Fla. L. R. 7.1(a)(3) certificate of conferral)**

Defendant, Michael D. Cohen, by and through undersigned counsel and pursuant to this Court's Order Setting Discovery Procedures, identifies the following issues to be heard during the discovery hearing to be scheduled for Thursday, September 21, 2023 or the Court's preferred date,[1] in person at the James Lawrence King Federal Justice Building, 99 N.E. Fourth Street, Tenth Floor, Courtroom Five, Miami, Florida 33132:

**I.      Plaintiff's Deficient Rule 26(a)(1) Initial Disclosures**

Plaintiff has served a pro forma set of initial disclosures that, in fact, disclose nothing. Five months after bringing this case and with just three weeks before trial witness lists are due [D.E. 27 ¶ 3], Plaintiff still has not provided any information about the scope, nature, or basis of his supposed injuries—or the over $500 million in damages he seeks.  Defendant seeks an order compelling Plaintiff to produce initial disclosures that comply with all three of Rule 26(a)(1)'s main requirements:

---

[1] Undersigned counsel's phone call and emails to Plaintiff's counsel to confirm his availability for a hearing have gone unanswered. Defendant's counsel is available any time in the morning of Thursday, September 21.

- **Identifying Witnesses.** Fed. R. Civ. P. 26(a)(1)(A)(i) requires the disclosure of the **name and contact information** for individuals likely to have discoverable information that the disclosing party may use, but Plaintiff identified only two individuals: himself and Defendant (plus a catchall for any individuals Defendant happened to have listed in his disclosures). Rule 26(a)(1)(A)(i) also requires the disclosure of the **subject of information** those individuals likely have, but Plaintiff noted only that the two individuals he identified "are likely to have knowledge regarding the issues framed by the pleadings in this case."

- **Identifying Documents.** Fed. R. Civ. P. 26(a)(1)(A)(ii) requires either the production of— or a description of the category and location of—documents in the disclosing party's custody that it may use to support its claims. Plaintiff provided only a boilerplate response of "any and all documents produced" by either party in discovery.

- **Damages.** Fed. R. Civ. P. 26(a)(1)(A)(iii) requires both "a computation of each category of damages" and the production of the documents or other evidence that form the basis of that computation, "including materials bearing on the nature and extent of injuries suffered." Plaintiff produced no documents and merely pasted the first three paragraphs of the "Prayer for Relief" from his Complaint with minimal rewording. Needless to say, Plaintiff provides no computations, detail, or analysis to justify his pursuit of over $500 million.

## II.     Defendant's Renewed Motion to Compel Production of Injury- and Damages-Related Documents

Given Plaintiff's continued failure to produce documents related to his purported injuries and damages, Defendant renews his motion to compel production of documents responsive to his Requests for Production Nos. 59, 60, 61, 64, and 65–69, which address Plaintiff's claimed injuries and damages. The motion to compel was deferred in anticipation that Plaintiff's initial disclosures would provide at least some of the requested information.

## III.    Plaintiff's Failure to Comply with Fed. R. Civ. P. 34(b)(2)(E)

Pursuant to Rule 34(b)(2)(E) of the Federal Rules of Civil Procedure, parties must "produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request" and "produce [ESI] in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms." Although Steven Yurowitz's declaration makes it clear that Plaintiff did not produce documents as they are kept in the usual

course of business, Plaintiff's counsel has rejected the undersigned counsels' repeated requests that he specify which documents are responsive to which request. Instead, Plaintiff has delivered each of his productions as one, consolidated pdf file with no way to definitively determine which documents should have been produced as native ESI or even where one document ends and the next begins.

Defendant seeks an order compelling Plaintiff to comply with his production obligations under Fed. R. Civ. P. 34(b)(E).

**IV.    Plaintiff's Deficient Searches**

Declarations submitted by Steven Yurowitz and Plaintiff describe a plainly deficient search—in addition to failing to disclose key elements of the search process as would be required pursuant to Defendant's pending Motion for Entry [D.E. 61-1]. Defendant seeks an order compelling Plaintiff to conduct—and certify the completion of—the requisite reasonable inquiry to locate responsive documents.

Most significantly, Steven Yurowitz apparently only "search[ed] for and identif[ied] documents in the possession of [the Trump Organization]." There is no suggestion that Mr. Yurowitz, or anyone else, searched files in the possession of Mr. Trump himself. This contradicts Plaintiff's counsel's representation to the Court.[2] As a result, many repositories that Plaintiff's other attorneys have identified as containing Plaintiff's files from the relevant period appear to have gone entirely unsearched. *See, e.g.*, Ex. 1 Affidavit of Compliance with Subpoena

---

[2] Mr. Yurowitz's declaration contradicts the representations made by Plaintiff's counsel at the discovery hearing on September 5, 2023: "I am representing to the Court in communications that I have had with Alan Garten, who is the Chief Legal Officer or General Counsel for the Trump Organization, that we have gone beyond. And not just going through Mr. Trump's personal files, but we've gone through the Trump Organization to gather all of these documents." Sept. 5, 2023 Hr'g Tr. 13:19-24.

from Alina Habba (representing Donald Trump), filed in *People of the State of New York v. The Trump Organization, et al.*, 451685/2020 D.E. 769, at 2–29 (N.Y. Sup Ct, May 6, 2022). Unsearched repositories appear to include Plaintiff's "correspondence files" (*id.* ¶ 14); Plaintiff's phones (which are not issued by the Trump Organization) (*id.* ¶ 22.a); Plaintiff's residence and personal office at the Trump National Golf Club in Bedminster (*id.* ¶¶ 22.b, c); Plaintiff's residence and personal office at Mar-a-Lago (*id.* ¶¶ 22.d, e); Plaintiff's residence in Trump Tower (*id.* ¶ 22.f); Plaintiff's office in the Trump Organization's corporate offices and his associated file cabinets, storage closets and rooms, and offsite document storage facilities (*id.* ¶¶ 23, 24).

Additionally, the search terms used are unreasonably narrow:[3]

- "Michael Cohen" AND "Bonus"
- "Cohen" AND ("resignation" or "termination")
- "Essential Consultants"
- "Stephanie Clifford"
- Some ambiguous search(es) related to "Cohen's book manuscript, Cohen's books Disloyal or Revenge or Cohen's podcasts."
- "desist" AND "Cohen" AND "Harder"

The deficiencies in Plaintiff's searches are not just theoretical. For example, the undersigned located an email related to Plaintiff's settlement with Stephanie Clifford between Defendant (via his Trump Organization email account) and Stephanie Clifford's attorney, Keith Davidson, that would not be captured by any of Plaintiff's search terms but is unambiguously responsive to at least Request No. 40. Ex. 2, Responsive Email from Oct. 26, 2016, at 36.[4] The undersigned located this document via a quick Google search, yet this document would not have been captured by the Plaintiff's very limited search terms.

---

[3] The Declaration does not clarify what email repositor(ies) were searched, what date limitation(s) were imposed (if any), what the hit counts were, or any other basic details about the searches.
[4] Available at: https://www.fec.gov/files/legal/murs/7313/7313_08.pdf.

## <u>CERTIFICATE OF GOOD FAITH CONFERRAL</u>

Pursuant to S.D. Fla. L. R. 7.1(a)(3), undersigned counsel for Defendant certifies that he has made reasonable efforts to confer with Plaintiff's counsel in a good faith effort to resolve the issues raised herein, including extensive communications regarding Defendant's requests for documents and information related to Plaintiff's purported injuries and damages and Plaintiff's failure to comply with Fed. R. Civ. P. 34(b)(2)(E). (*E.g.*, emails on June 30, 2023 at 11:34 AM; July 18, 2023 at 5:32 PM; Sept. 6, 2023 at 8:15 PM; Sept. 6, 2023 at 8:15 PM; Sept. 7, 2023 at 5:16 PM (response from Plaintiff refusing Fed. R. Civ. P. 34(b) requests).) For the remaining issues, the undersigned emailed Defendant's counsel on September 14, 2023 at 9:02 PM and called him at 11:00 AM on September 15, 2023. No telephone conversation has occurred regarding some of these issues. Notwithstanding that Plaintiff's counsel was able to file a response to this Motion, he still has not returned the undersigned's most recent emails or calls seeking to meet and confer. Given the need to (i) address these issues in an expedited fashion due to Plaintiff's upcoming and twice-rescheduled deposition on October 3, 2023 and (ii) meet the Court's deadline for filing to get this matter set for hearing in the forthcoming week, Defendant proceeded to file this Motion.

Respectfully submitted,

By: /s/ *Benjamin H. Brodsky*
Benjamin H. Brodsky
Florida Bar No. 73748
Max A. Eichenblatt
Florida Bar No. 1025141
BRODSKY FOTIU-WOJTOWICZ, PLLC
200 SE 1st Street, Suite 400
Miami, Florida 33131
Tel: 305-503-5054
Fax: 786-749-7644
bbrodsky@bfwlegal.com
docketing@bfwlegal.com

E. Danya Perry

New York Bar No. 2839983
(admitted *pro hac vice*)
E. DANYA PERRY PLLC
157 East 86th Street, 4th Floor
New York, NY 10028
Tel: 646-349-7550
dperry@danyaperrylaw.com

Lilian M. Timmermann
Florida Bar No.1033260
E. DANYA PERRY PLLC
700 S. Rosemary St., Suite 204
West Palm Beach, FL 33401
Tel: (646) 357-9953
Fax: (646) 849-9609
ltimmermann@danyaperrylaw.com

*Counsel for Defendant Michael D. Cohen*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this September 17, 2023, a copy of this filing was submitted electronically via the CM/ECF system to all parties that have entered an appearance in this case and on the Court's electronic system.

By: */s/ Benjamin H. Brodsky*
            Benjamin H. Brodsky

# EXHIBIT 1



Alina Habba, Esq.
Managing Partner
ahabba@habbalaw.com
Admitted to practice in NJ, NY & CT

May 6, 2022

**Via NYSCEF**
Hon. Arthur F. Engoron, J.S.C.
Supreme Court of the State of New York
60 Centre Street, Room 519
New York, NY 10007

     Re:    *People v. Trump, et. al.*
           Docket No.: 451685/2020

Dear Judge Engoron,

     We write in accordance with the Decision and Order dated April 29, 2022 (the "Order") (NYSCEF No. 768), which directed respondent, Donald J. Trump ("Respondent") to comply with the Office of the Attorney General's ("OAG") subpoena and provide additional affidavits evidencing that a detailed search to locate and produce responsive documents.

     Without waiving any rights to contest the validity of the above-referenced Order on appeal, enclosed herein, please find the following:

    (i)     Affidavit of Compliance of Alina Habba, Esq. dated 5/6/22;
    (ii)    Affidavit of Compliance of Michael T. Madaio, Esq. dated 5/6/22;
    (iii)   Affidavit of Donald J. Trump dated 5/6/22 and a Certificate of Conformity;
    (iv)   Affidavit of Eric Brunnett dated 5/6/22[1];
    (v)    Affidavit of Chris Herndon dated 5/6/22; and
    (vi)   Schedule A (revised).

     In accordance and compliance with the Order, we respectfully renew our request that this Court purge the finding of civil contempt.

     We thank the Court for its attention to this matter.

Dated: May 6, 2022         Respectfully submitted,
      New York, New York

          By: _____
          Alina Habba, Esq.
          For HABBA MADAIO & ASSOCIATES LLP

Encl.
cc:    Kevin Wallace (kevin.wallace@ag.ny.gov)
      Colleen Faherty (colleen.faherty@ag.ny.gov)

---

[1] To be supplemented with a notarized copy on or before Monday, May 9, 2022.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No.: 451685/2020 |
| Petitioner, | |
| v. | **AFFIDAVIT OF COMPLIANCE WITH SUBPOENA** |
| THE TRUMP ORGANIZATION, INC., DJT HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER LLC, SEVEN SPRINGS LLC, ERIC TRUMP, CHARLES MARTABANO, MORGAN, LEWIS & BOCKIUS, LLP, SHERI DILLON, DONALD J. TRUMP, IVANKA TRUMP, DONALD TRUMP, JR., and CUSHMAN AND WAKEFIELD, INC., | |
| Respondents. | |

I, Alina Habba, Esq., being duly sworn, state as follows:

1. My office represents the respondent, Donald J. Trump ("Respondent"), in connection with the above-referenced action and is responsible for preparing and assembling Respondent's production and response to the *Subpoena Duces Tecum* dated December 1, 2021 (the "Subpoena"). My office also represents the respondent, The Trump Organization, Inc. (the "Trump Organization") in this action.

2. I submit this affirmation in further compliance with Instruction C14 of the Subpoena and in accordance with the Court's Order dated April 29, 2022.

3. Respondent previously submitted a Response and Objections to the Subpoena dated March 31, 2022 (the "Response"). Consistent with the Court's Order dated April 26, 2022, Respondent hereby withdraws all objections raised in the Response.

1

**Ex. 1_002**

4.      Respondent's productions and responses to the Subpoena are complete and correct to the best of my knowledge and belief.

5.      No documents or information responsive to the Subpoena have been withheld from Respondent's production and response.

6.      Attached as Schedule A is a true and accurate record of all persons who prepared and assembled any productions and responses to the Subpoena, all persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.

7.      As described herein, I made or caused to be made a diligent, complete and comprehensive search for all documents and information requested by the Subpoena, in full accordance with the instructions and definitions set forth in the Subpoena.

## Overview of Search Efforts

8.      Commencing in January 2022, my office undertook significant, diligent, and comprehensive search efforts in response to the Subpoena.

9.      Our search efforts consisted of a two-pronged approach to ensure that all responsive documents have been produced to the OAG: first, in coordination with co-counsel for the Trump Organization, LaRocca Hornik Rosen & Greenberg LLP ("TTO Co-Counsel"), the Trump Organization legal team including its General Counsel, Alan Garten, Esq. (the "TTO Legal Dept."), and the Trump Organization IT Department (the "Trump IT Dept.") my office performed a thorough review of the prior document productions and search efforts undertaken by the Trump Organization in response to prior subpoenas served the OAG, for the purpose of cross-checking

2

for responsive documents that had already been produced by the Trump Organization; <u>second</u>, my office, in coordination with prior counsel for Respondent, Van der Veen, O'Neill, Hartshorn, and Levin ("Prior Counsel") and co-counsel for Respondent, Fischetti & Malgieri LLP ("Co-Counsel"), conducted full, complete and comprehensive searches for any and all responsive documents that had not previously been produced by the Trump Organization to the OAG.

10. The steps taken by my office in furtherance of these search efforts are outlined herein.

11. From January 2022 through March 2022, I had numerous in-person meetings, phone calls, and communications with TTO Co-Counsel, the TTO Legal Dept, and the TTO IT Dept., for the purpose of assessing and verifying the extent of the searches performed in connection with the Trump Organization's prior document productions and determining which documents responsive to the Subpoena have already been produced by the Trump Organization.

12. My office had numerous phone calls and communications with Prior Counsel concerning their search efforts that had been undertaken in connection with the Subpoena.

13. Prior Counsel confirmed that their office had interviewed all of Respondent's executive assistants as to whether they had any documents or communications responsive to the Subpoena and that no such responsive documents were identified.

14. Prior Counsel further informed that their office conducted a search of Respondent's correspondence files (the "chron files") and produced relevant portions thereof to the NYDA. The Trump Organization then caused all of those same documents to be produced to the OAG on February 9, 2022. The production to the NYDA included the following custodial documents for Respondent: TTO_05439138, TTO_05439139 through TTO_05439275, TTO_05439276 through TTO_05439412, TTO_05439413 through TTO_05439654, TTO_05439655, TTO_05439656

3

through TTO_05439675, and TTO_05439676. TTO Counsel further advised that the Trump Organization's production to the NYDA was re-produced to the OAG in its entirety.[1]

15.     My office also had numerous phone calls and communications with co-counsel for Respondent, Fischetti & Malgieri LLP ("Co-Counsel"), concerning their office's search efforts undertaken in connection with the Subpoena.

16.     From January 2022 through March 2022, my office reviewed the prior document productions produced by the Trump Organization to the OAG.

17.     From January 2022 through March 2022, my office reviewed attorney work product provided by TTO Co-Counsel which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG, which I personally cross-checked for responsive documents as to each individual demand of the Subpoena.

18.     From January 2022 through March 2022, I personally reviewed portions of Respondent's chron files as to whether they contained any documents responsive to the Subpoena. Collectively, my firm performed a full, complete, and diligent search of the chron files. After the search, it was determined that any documents in the chron files that are responsive to the Subpoena had already been produced to the OAG.

19.     From January 2022 through March 2022, I had numerous conversations with Respondent by telephone concerning the Subpoena, his electronic devices, the locations likely to house responsive documents, and whether he had any responsive documents in his possession, custody, or control.

---

[1] The chron files produced to the OAG is comprised of 542 pages of documents and can be found at TTO_05439134 through TTO_05439676.

4

20.     On March 17, 2022, I met with Respondent in-person at Mar-a-Lago and reviewed the Subpoena with him, including each individual demand contained therein. As to each demand, he verified that he did not have any responsive documents in his personal possession and that, if there were any responsive documents, they would be in the possession, custody, or control of the Trump Organization.

21.     On April 8, 2022, Mr. Madaio and I conducted a telephone interview with Respondent, as per Haystack ID's request. After completion, the completed HaystackID interview forms were submitted to HaystackID.

22.     In addition, in accordance with the Order of the Hon. Arthur Engoron, J.S.C. dated April 29, 2022, I personally performed several additional searches to further ensure that there are no documents responsive to the Subpoena that have not been previously produced by the Trump Organization:

      a.   On May 2, 2022, I interviewed Eric Brunnett, the Vice President of Information Technology of the Trump Organization, to review and verify the specific phones, computers and other devices that have been issued to Respondent by the Trump Organization. A separate affidavit of Mr. Brunnett is attached hereto. Based on my conversation with Mr. Brunnett, I understand that Respondent does not have any Trump Organization-issued phones, computers, or devices in his personal possession. Respondent only has two phones in his personal possession: (i) an iPhone; and (ii) a new phone he was recently given by TruthSocial which is used exclusively for posting on that site. Respondent's iPhone been searched and imaged twice by Chris Herndon of TechCentrics, Inc., once in March 21, 2022 and again on May 4, 2022. A separate affidavit of Mr. Herndon is attached hereto.

b.  On May 4, 2022, I diligently searched each and every room of Respondent's private residence located at Trump National Golf Club Bedminster, including all desks, drawers, nightstands, dressers, closets, etc. I was unable to locate any documents responsive to the Subpoena that have not already been produced to the OAG by the Trump Organization.

c.  On May 4, 2022, I diligently searched Respondent's personal office located at Trump National Golf Club Bedminster, including all desks, drawers, file cabinets, etc. I was unable to locate any documents responsive to the Subpoena that have not already been produced to the OAG by the Trump Organization.

d.  On May 5, 2022, I diligently searched each and every room of Respondent's private residence located at Mar-a-Lago, including all desks, drawers, nightstands, dressers, closets, etc. I was unable to locate any documents responsive to the Subpoena that have not already been produced to the OAG by the Trump Organization.

e.  On May 5, 2022, I diligently searched Respondent's personal office located at Mar-a-Lago, including all desks, drawers, file cabinets, etc. I was unable to locate any documents responsive to the Subpoena that have not already been produced to the OAG by the Trump Organization.

f.  On May 5, 2022, I coordinated and communicated with Alan Garten via telephone with regard to his search of Respondent's private residence in Trump Tower including all desks, drawers, file cabinets, and similar locations likely to house files or documents. The search did not identify any documents responsive to the Subpoena.

23.     Further, it was agreed by all parties at the April 26, 2022 hearing that Haystack would perform an additional follow-up search for responsive documents stored in: (i) the file cabinets located outside Respondent's office the Trump Organization's corporate offices in Trump Tower; (ii) file cabinets located outside Respondent's office the Trump Organization's corporate offices in Trump Tower; (iii) the file cabinets located on the 25th and 26th floors of the Trump Organization's corporate offices in Trump Tower; (iv) Respondent's hard copy calendar files located in the Trump Organization's corporate offices in Trump Tower; and (iv) off-site storage.

24.     Based upon the foregoing, it is my understanding that, between the collective efforts of my office, Co-Counsel, Prior Counsel, and TTO Counsel, as well as the independent searches of HaystackID, the following searches have been performed of the Respondent's physical documents and files at these relevant locations:

    a.  Cabinets Outside of Respondent's Office (Trump Tower)

        i.  On July 19, 2021, Owen Reidy, an attorney with the Trump Legal Dept., searched the physical documents and files located in the file cabinets located outside Respondent's office the Trump Organization's corporate offices in Trump Tower. These file cabinets have, at all relevant times, been maintained by Respondent's executive assistants, including Jessica Macchia, Chelsea Frommer, Holly Lorenzo, Kelly Malley, Katie Murphy, Kelli Rose, Thuy Colayco, Cammie Artusa, and Meredith McIver. As a result of Mr. Reidy's collective search efforts on that date, the following custodial documents for Respondent were identified and subsequently produced to the OAG: TTO_214579, TTO_214580, TTO_214581 through

TTO_214583.

ii.   On November 12, 2021, Cynthia Arce, a paralegal with the Trump Legal Dept., searched the physical documents and files located in the file cabinets located outside Respondent's office the Trump Organization's corporate offices in Trump Tower. These file cabinets have, at all relevant times, been maintained by Respondent's executive assistants, including Jessica Macchia, Chelsea Frommer, Holly Lorenzo, Kelly Malley, Katie Murphy, Kelli Rose, Thuy Colayco, Cammie Artusa, and Meredith McIver. No custodial documents for Respondent were identified as a result of this search.

iii.   From late April through May 6, 2022, HaystackID searched the file cabinets located outside Respondent's office the Trump Organization's corporate offices in Trump Tower. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent were identified.

b.   <u>Executive Office Storage Closet / Storage Room by Respondent's Office (Trump Tower)</u>

i.   On July 19, 2021, Owen Reidy searched the physical documents and files located in the file cabinets in the Executive Office storage closet and the storage room by Respondent's office in the Trump Organization's corporate offices in Trump Tower for all of Respondent's executive assistants. As a result of Mr. Reidy's collective search efforts on that date, the following custodial documents for Respondent were identified and subsequently produced to the OAG: TTO_214579, TTO_214580, TTO_214581 through

8

TTO_214583.

ii. On November 12, 2021, Cynthia Arce searched the physical documents and files located in the file cabinets in the Executive Office storage closet and the storage room by Respondent's office in the Trump Organization's corporate offices in Trump Tower, including the file cabinets maintained by Respondent's executive assistants, Jessica Macchia, Chelsea Frommer, Holly Lorenzo, Kelly Malley, Katie Murphy, Kelli Rose, Thuy Colayco, Cammie Artusa, and Meredith McIver. No custodial documents for Respondent were identified as a result of this search.

iii. On November 23, 2021, Cynthia Arce searched the physical documents and files located in the file cabinets in the Executive Office storage closet and the storage room by Respondent's office in the Trump Organization's corporate offices in Trump Tower, including the file cabinets maintained by Respondent's executive assistants, Randi Gleason, Laurden Kelly, Casey Kennedy, and Jaquiline Fini. No custodial documents for Respondent were identified as a result of this search.

iv. From late April through May 6, 2022, HaystackID searched the physical documents and files located in the file cabinets in the Executive Office storage closet and the storage room by Respondent's office in the Trump Organization's corporate offices in Trump Tower for all of Respondent's executive assistants. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent were identified.

9

c.  File Cabinets located on the 25th and 26th Floors

i.  On or about January 24, 2020, Maria Enriquez, an attorney with the Trump Legal Dept., searched the physical documents and files located in the file cabinets located on the 25th and 26th floors of the Trump Organization's corporate offices in Trump Tower. Any documents responsive to those searches were produced to the OAG by the Trump Organization. No custodial documents for Respondent were identified as a result of this search.

ii.  From late April through May 6, 2022, HaystackID searched physical files and documents contained in file cabinets located on the 25th and 26th floors of the Trump Organization's corporate offices in Trump Tower. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent were identified.

d.  Hard Copy Calendars

i.  On July 19, 2021, Owen Reidy searched all of the hard copy calendars maintained by Respondent. These hard copy calendars are located the Trump Organization's corporate offices in Trump Tower. As a result of Mr. Reidy's collective search efforts on that date, the following custodial documents for Respondent were identified and subsequently produced to the OAG: TTO_214579, TTO_214580, TTO_214581 through TTO_214583.

ii.  From late April through May 6, 2022, HaystackID searched the hard copy

10

calendars maintained by Respondent in the Trump Organization's corporate offices in Trump Tower. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent were identified.

e.   Off-site Storage

i.   In mid-January, 2020, Adam Rosen, Alex Cannon, and Maria Enriquez, all attorneys with the Trump Legal Dept., conducted searches of inventories the off-site storage files for any documents responsive to the OAG's December 2019 subpoena. The files that were identified as potentially responsive were shipped from the off-site storage facility to the Trump Organization's corporate offices at Trump Tower, where they were received on or about January 15, 2020. The files were thereafter reviewed by the Trump Organization's General Counsel and all non-privileged documents that were located were produced to the OAG. No custodial documents for Respondent were identified as a result of this search.

ii.   On November 23, 2021, Cynthia Arce reviewed and assessed the off-site storage log and verified that the off-site stored files did not include any custodial documents for Respondent.

iii.   From late April through May 6, 2022 and continuing, HaystackID searched physical files and documents contained in off-site storage. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent have been identified to date.

f.   Chron Files

11

i.   On July 19, 2021, Owen Reidy searched all of the hard copy calendars maintained by Respondent. These hard copy calendars are located the Trump Organization's corporate offices in Trump Tower. As a result of Mr. Reidy's collective search efforts on that date, the following custodial documents for Respondent were identified and subsequently produced to the OAG: TTO_214579, TTO_214580, TTO_214581 through TTO_214583.

ii.  In or around early 2022, Prior Counsel searched Respondent's chron file for any and all responsive documents to the NYDA's subpoena requests. In response to those searches, on February 9, 2022, Prior Counsel produced to the NYDA, the following documents custodial documents for Respondent: TTO_05439138, TTO_05439139 through TTO_05439275, TTO_05439276 through TTO_05439412, TTO_05439413 through TTO_05439654, TTO_05439655, TTO_05439656 through TTO_05439675, and TTO_05439676. The Trump Organization's production to the NYDA was re-produced to the OAG in its entirety.

iii. Commencing in January 2022, my office performed a full, complete, and diligent search of the chron files. After the search, it was determined that any documents in the chron files that are responsive to the Subpoena had already been produced to the OAG.

iv.  From late April through May 6, 2022, HaystackID searched Respondent's chron files. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent were

12

identified.

g.  Trump National Golf Club Bedminster

    i.  On May 5, 2022, I personally searched each and every room of Respondent's private residence located at Trump National Golf Club Bedminster, including all desks, drawers, file cabinets, etc. No documents responsive to the Subpoena were identified other than those that had already been produced by the Trump Organization.

    ii.  On May 5, 2022, I personally searched Respondent's personal office located at Trump National Golf Club Bedminster, including all desks, drawers, file cabinets, etc. No documents responsive to the Subpoena were located or identified.

h.  Mar-a-Lago

    i.  On May 5, 2022, I personally searched each and every room of Respondent's private residence located at Mar-a-Lago, including all desks, drawers, file cabinets, and similar locations likely to house files or documents. No documents responsive to the Subpoena were located or identified.

    ii.  On May 5, 2022, I personally searched Respondent's personal office located at Mar-a-Lago, including all desks, drawers, file cabinets, etc. No documents responsive to the Subpoena were located or identified.

i.  Trump Tower Apartment

    i.  On May 5, 2022, Alan Garten searched each and every room of Respondent's private apartment located at Trump Tower, including all

13

desks, drawers, file cabinets, etc. No documents responsive to the Subpoena were located or identified.

**<u>Demand No. 1</u>**

25. With respect to Demand No. 1, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 1 and/or cross-checking whether any documents responsive to Demand No. 1 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Trump Organization's prior searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

26. I had numerous discussions with TTO Co-Counsel, the TTO Legal Dept., and the TTO IT Dept., for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 1 and verifying whether potentially responsive documents had previously been produced to the OAG.

27. I searched for responsive documents at the following locations: (i) Respondent's private residence located at Trump National Golf Club Bedminster; (ii) Respondent's personal office located at Trump National Golf Club Bedminster Mar-a-Lago; (iii) Respondent's private residence located at Mar-a-Lago; and (iv) Respondent's personal office located at Trump National Golf Club Bedminster.

28. I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control responsive to Demand No. 1.

14

29.     In addition, Demand No. 1 of the Subpoena calls for "all documents and communications concerning any Statement of Financial Condition." I cross-checked the search terms used by the Trump Organization in connection with its searches in response to the OAG's 2019 Subpoena, which included, without limitation, the following search terms:

Statement of Financial Condition
Personal financial statement
PFS
DJTFS
DJT FS
Personal financial
SOFC
DJT SOFC
DJT W/5 SOFC
f/s
Financial statement;
Compilation
balance sheet
Blakely
Cushman
Mazars
Weiser
Trump National AND (LA or Los Angeles)
TNGCLA or TNGC LA
Palos
Verdes
*@cushmanwakefield.com
*@cushwake.com
Tower w/5 worth, valu*
TWT w/5 worth, valu*
Trump Park" w/5 valu*
555 Cal*" w/5 valu*
Nike w/5 valu*
502 Park" w/5 valu* S
cotland w/5 worth, valu*
40 Wall" w/5 valu*
Mar-a-lago" w/5 worth, valu*
Trump Parc" w/5 valu*
845* w/5 worth, valu*
Aberdeen w/5 worth, valu*
Bedminster w/5 worth, valu*
Charlotte w/5 worth, valu*
Colts Neck w/5 worth, valu*

15

Doral w/5 worth, valu*
Washington DC w/5 worth, valu*
Ferry Point w/5 worth, valu*
Las Vegas w/5 worth, valu*
Turnberry w/5 worth, valu*
Doonbeg w/5 worth, valu*
Hawaii w/5 worth, valu*
TIHT w/5 worth, valu*
OPO w/5 worth, valu*
Pine Hill w/5 worth, valu*
Philadelphia w/5 worth, valu*
Winery w/5 worth, valu*

Based on the use of these search terms, the documents responsive to Demand No. 1 of the Subpoena would have been produced to the OAG in connection with the Trump Organization's prior searches.

30.    Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 1, other than those documents that had already been produced by the Trump Organization.

**<u>Demand No. 2</u>**

31.    Demand No. 2 calls for "[a]ll documents and communications concerning any valuation of any asset whose value is identified or incorporated into any Statement of Financial Condition." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Trump Organiation's prior searches wholly encompassed the items responsive to this demand.

32.    With respect to Demand No. 2, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 2 and/or cross-checking whether any documents responsive to Demand No. 2 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized,

16

organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Trump Organization's prior searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

33.     I had numerous discussions with TTO Co-Counsel, the TTO Legal Dept., and the TTO IT Dept., for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 2 and verifying whether potentially responsive documents had previously been produced to the OAG.

34.     I searched for responsive documents at the following locations: (i) Respondent's private residence located at Trump National Golf Club Bedminster; (ii) Respondent's personal office located at Trump National Golf Club Bedminster Mar-a-Lago; (iii) Respondent's private residence located at Mar-a-Lago; and (iv) Respondent's personal office located at Trump National Golf Club Bedminster.

35.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control responsive to Demand No. 2.

36.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 2, other than those documents that had already been produced by the Trump Organization.

## **Demand No. 3**

37.     Demand No. 3 calls for "[a]ll documents reviewed, used, or relied on in the preparation of the Statements of Financial Condition, and all communications relating to any of the foregoing." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Prior Searches

encompassed the items responsive to this demand.

38.     With respect to Demand No. 3, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 3 and/or cross-checking whether any documents responsive to Demand No. 3 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Trump Organization's prior searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

39.     I had numerous discussions with TTO Co-Counsel, the TTO Legal Dept., and the TTO IT Dept., for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 3 and verifying whether potentially responsive documents had previously been produced to the OAG.

40.     I searched for responsive documents at the following locations: (i) Respondent's private residence located at Trump National Golf Club Bedminster; (ii) Respondent's personal office located at Trump National Golf Club Bedminster Mar-a-Lago; (iii) Respondent's private residence located at Mar-a-Lago; and (iv) Respondent's personal office located at Trump National Golf Club Bedminster.

41.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control responsive to Demand No. 3.

42.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No.

18

3, other than those documents that had already been produced by the Trump Organization.

**Demand No. 4**

43.     Demand No. 4 calls for "[a]ll documents and communications concerning any financing or debt related to Trump International Hotel and Tower Chicago or Chicago Unit Acquisition LLC." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Prior Searches encompassed the items responsive to this demand.

44.     With respect to Demand No. 4, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 4 and/or cross-checking whether any documents responsive to Demand No. 4 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Trump Organization's prior searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

45.     I had numerous discussions with TTO Co-Counsel, the TTO Legal Dept., and the TTO IT Dept., for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 4 and verifying whether potentially responsive documents had previously been produced to the OAG.

46.     I searched for responsive documents at the following locations: (i) Respondent's private residence located at Trump National Golf Club Bedminster; (ii) Respondent's personal office located at Trump National Golf Club Bedminster Mar-a-Lago; (iii) Respondent's private

residence located at Mar-a-Lago; and (iv) Respondent's personal office located at Trump National Golf Club Bedminster.

47.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control responsive to Demand No. 4.

48.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 4, other than those documents that had already been produced by the Trump Organization.

## Demand No. 5

49.     Demand No. 5 calls for "[a]ll documents and communications concerning the donation or potential donation of a conservation or preservation easement by [Respondent]." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Prior Searches encompassed the items responsive to this demand.

50.     With respect to Demand No. 5, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 5 and/or cross-checking whether any documents responsive to Demand No. 5 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Trump Organization's prior searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

51.     I had numerous discussions with TTO Co-Counsel, the TTO Legal Dept., and the

TTO IT Dept., for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 5 and verifying whether potentially responsive documents had previously been produced to the OAG.

52.   I searched for responsive documents at the following locations: (i) Respondent's private residence located at Trump National Golf Club Bedminster; (ii) Respondent's personal office located at Trump National Golf Club Bedminster Mar-a-Lago; (iii) Respondent's private residence located at Mar-a-Lago; and (iv) Respondent's personal office located at Trump National Golf Club Bedminster.

53.   I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control responsive to Demand No. 5.

54.   Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 5, other than those documents that had already been produced by the Trump Organization.

**Demand No. 6**

55.   Demand No. 6 calls for "[a]ll documents and communications concerning any planned or potential development or alteration of the Seven Springs Estate." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Prior Searches encompassed the items responsive to this demand.

56.   With respect to Demand No. 6, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 5 and/or cross-checking whether any documents responsive to Demand No. 6 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii)

attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Trump Organization's prior searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

57.     I had numerous discussions with TTO Co-Counsel, the TTO Legal Dept., and the TTO IT Dept., for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 6 and verifying whether potentially responsive documents had previously been produced to the OAG.

58.     I searched for responsive documents at the following locations: (i) Respondent's private residence located at Trump National Golf Club Bedminster; (ii) Respondent's personal office located at Trump National Golf Club Bedminster Mar-a-Lago; (iii) Respondent's private residence located at Mar-a-Lago; and (iv) Respondent's personal office located at Trump National Golf Club Bedminster.

59.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control responsive to Demand No. 6.

60.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 6, other than those documents that had already been produced by the Trump Organization.

### Demand No. 7

61.     With respect to Demand No. 7, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 7 and/or cross-checking whether any documents responsive to Demand No. 7 had been

previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Trump Organization's prior searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG.

62.     I had numerous discussions with TTO Co-Counsel, the TTO Legal Dept., and the TTO IT Dept., for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 7 and verifying whether potentially responsive documents had previously been produced to the OAG.

63.     I searched for responsive documents at the following locations: (i) Respondent's private residence located at Trump National Golf Club Bedminster; (ii) Respondent's personal office located at Trump National Golf Club Bedminster Mar-a-Lago; (iii) Respondent's private residence located at Mar-a-Lago; and (iv) Respondent's personal office located at Trump National Golf Club Bedminster.

64.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control responsive to Demand No. 7.

65.     Further, with respect to Demand No. 7 of the Subpoena, which calls for "all documents and communications with Forbes Magazine…," my office confirmed that all communications and documents with Forbes Magazine had been produced to the OAG through August 14, 2021.

66.     In particular, through conversations with Prior Counsel, TTO Legal Dept., and TTO IT Dept., my office confirmed that the Trump Organization had performed searches for all

communications and documents with Forbes Magazine in response to the NYDA subpoena, which covered through the period of August 14, 2021. The custodial documents for Respondent produced to the NYDA on February 2, 2022 were the following: TTO_05324574 through TTO_05347249. These documents were subsequently reproduced to the OAG by the Trump Organization.

67.     To supplement this search, on March 16, 2022, Mr. Madaio coordinated with the Trump Organization's IT team to commence a search for any responsive documents to Demand No. 7 (regarding Forbes Magazine) for the time period from January 1, 2021 through March 16, 2022. Search parameters included the term "forbes" and communications with "forbes.com" e-mail addresses, and the e-mail addresses of ten Trump Organization individuals were searched, including Alan Garten, Eric Trump, Donald Trump, Jr., Allen Weisselberg, Amanda Miller, Kim Benza, Jeffrey McCooney, Patrick Birney, Ray Flores and Deborah Tarasoff.

68.     The search returned 1,386 documents and/or communications. Three employees of my firm, in coordination with HaystackID, reviewed these items as to whether they were responsive to Demand No. 7. After a full, complete and diligent search, it was determined that none of the documents were responsive.

69.     Additionally, I searched the chron files and did not find any documents responsive to the Subpoena which had not already been produced by the Trump Organization to the NYDA and, subsequently, to the OAG.

70.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 7, other than those documents that had already been produced by the Trump Organization.

**Demand No. 8**

71.     With respect to Demand No. 8, I personally reviewed and analyzed the following

files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 7 and/or cross-checking whether any documents responsive to Demand No. 7 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Trump Organization's prior searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; and (v) weekly status reports provided by TTO Co-Counsel to the OAG

72.     I searched for responsive documents at the following locations: (i) Respondent's private residence located at Trump National Golf Club Bedminster; (ii) Respondent's personal office located at Trump National Golf Club Bedminster Mar-a-Lago; (iii) Respondent's private residence located at Mar-a-Lago; and (iv) Respondent's personal office located at Trump National Golf Club Bedminster.

73.     I personally interviewed Respondent as to whether he had any responsive documents in his possession, custody or control with respect to Demand No. 8.

74.     Based on my discussions with Respondent and communications with the Trump Legal Dept., I confirmed that insurance procurement, both personal and business-related, were coordinated through the Trump Organization and handled by individuals other than Respondent or his executive assistants.

75.     Demand No. 8 of the Subpoena calls for "[a]ll documents relating to your financial condition or that of the Trump Organization reviewed, used, shared, or relied on in obtaining or renewing insurance coverage for you and/or the Trump Organization, including without limitation all Statements of Financial Condition disclosed to insurance underwriters or insurance brokers,

and all communications relating to any of the foregoing." I cross-checked the search terms used

by the Trump Organization in connection with its searches in response to the prior OAG

subpoenas, which included, without limitation, the following search terms:

      Statement of Financial Condition
      Personal financial statement
      PFS
      DJTFS
      DJT FS
      Personal financial
      SOFC
      DJT SOFC
      DJT W/5 SOFC
      f/s
      Financial statement
      Compilation
      balance sheet
      Trump National AND (LA or Los Angeles)
      TNGCLA or TNGC LA
      Palos
      Verdes
      Tower w/5 worth, valu*
      TWT w/5 worth, valu*
      Trump Park" w/5 valu*
      555 Cal*" w/5 valu*
      Nike w/5 valu*
      502 Park" w/5 valu* S
      cotland w/5 worth, valu*
      40 Wall" w/5 valu*
      Mar-a-lago" w/5 worth, valu*
      Trump Parc" w/5 valu*
      845* w/5 worth, valu*
      Aberdeen w/5 worth, valu*
      Bedminster w/5 worth, valu*
      Charlotte w/5 worth, valu*
      Colts Neck w/5 worth, valu*
      Doral w/5 worth, valu*
      Washington DC w/5 worth, valu*
      Ferry Point w/5 worth, valu*
      Las Vegas w/5 worth, valu*
      Turnberry w/5 worth, valu*
      Doonbeg w/5 worth, valu*
      Hawaii w/5 worth, valu*
      TIHT w/5 worth, valu*

OPO w/5 worth, valu*
Pine Hill w/5 worth, valu*
Philadelphia w/5 worth, valu*
Winery w/5 worth, valu*

In addition, specific searches were previously performed by the Trump Organization with respect to the following items:

- Budgets, income statements, financial statements, balance sheets, and similar documents reflecting the financial performance of, or financial projections for, TTO golf or other club properties whose value is incorporated into SOFC produced by TTO to the DANY.

- Documents reflecting financial performance of, or financial projections for, Trump Organization club properties.

- All documents and communications relating to the negotiation, closing, or modification of any loan secured by any property identified on the SoFC

Based on the use of these search terms and parameters, the documents responsive to Demand No. 8 of the Subpoena would have been produced to the OAG in connection with the Trump Organization's prior searches.

76.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in possession of any documents responsive to Demand No. 8, other than those documents that had already been produced by the Trump Organization.

## **Stipulation**

77.     On behalf of Respondent, I hereby stipulate that the Trump Organization-produced documents can be used as if those documents were produced by Respondent because they were under Respondent's "control," in that they were documents in the possession of a company owned or controlled by a Respondent or a Trust owned by him, to the extent allowable by law. In so stipulating, Respondent does not waive any objections to such documents or the introduction of those documents in evidence that he would otherwise have if he had produced those documents solely because they were in the custody or control of a company owned or controlled by him or a Trust owned by him.

Ex. 1_028

ALINA HABBA

May 6th, 2022
DATE

STATE OF Florida )
COUNTY OF Palm Beach )

On this 6th day of May in the year 2022, before me, the undersigned, a notary public in and for said state, personally appeared Alina Habba personally known to be or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

Notary Public

JOSE PAULO LOZANO
MY COMMISSION EXPIRES
JANUARY 8, 2026
#HH 192014
Bonded thru
Notary Public Underwriters
NOTARY PUBLIC, STATE OF FLORIDA

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No.: No.: 451685/2020 |
| Petitioner, | |
| v. | **AFFIDAVIT OF COMPLIANCE WITH SUBPOENA** |
| THE TRUMP ORGANIZATION, INC., DJT HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER LLC, SEVEN SPRINGS LLC, ERIC TRUMP, CHARLES MARTABANO, MORGAN, LEWIS & BOCKIUS, LLP, SHERI DILLON, DONALD J. TRUMP, IVANKA TRUMP, DONALD TRUMP, JR., and CUSHMAN AND WAKEFIELD, INC., | |
| Respondents. | |

I, Michael T. Madaio, Esq., being duly sworn, state as follows:

1.     My office represents the respondent, Donald J. Trump ("Respondent"), in connection with the above referenced action and is responsible for preparing and assembling Respondent's production and response to the *Subpoena Duces Tecum* dated December 1, 2021 (the "Subpoena"). My office also represents the respondent, The Trump Organization, Inc. (the "Trump Organization") in this action.

2.     I submit this affirmation in further compliance with Instruction C14 of the Subpoena and in accordance with the Court's Order dated April 29, 2022.

3.     Respondent previously submitted a Response and Objections to the Subpoena dated March 31, 2022 (the "Response"). Consistent with the Court's Order dated April 26, 2022, Respondent hereby withdraws all objections raised in the Response.

1

4.      Respondent's productions and responses to the Subpoena are complete and correct to the best of my knowledge and belief.

5.      No documents or information responsive to the Subpoena have been withheld from Respondent's production and response.

6.      Attached as Schedule A is a true and accurate record of all persons who prepared and assembled any productions and responses to the Subpoena, all persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.

7.      As described herein, I made or caused to be made a diligent, complete and comprehensive search for all documents and information requested by the Subpoena, in full accordance with the instructions and definitions set forth in the Subpoena.

## Overview of Search Efforts

8.      Commencing in January 2022, my office undertook significant, diligent, and comprehensive search efforts in response to the Subpoena.

9.      Our search efforts consisted of a two-pronged approach to ensure that all responsive documents have been produced to the OAG: first, in coordination with co-counsel for the Trump Organization, LaRocca Hornik Rosen & Greenberg LLP ("TTO Co-Counsel"), the Trump Organization legal team including its General Counsel, Alan Garten, Esq. (the "TTO Legal Dept."), and the Trump Organization IT Department (the "TTO IT Dept.") my office performed a thorough review of the prior document productions and search efforts undertaken by the Trump Organization in response to prior subpoenas served the OAG, for the purpose of cross-checking

2

for responsive documents that had already been produced by the Trump Organization; <u>second</u>, my office, in coordination with prior counsel for Respondent, Van der Veen, O'Neill, Hartshorn, and Levin ("Prior Counsel") and co-counsel for Respondent, Fischetti & Malgieri LLP ("Co-Counsel"), conducted full, complete and comprehensive searches for any and all responsive documents that had not previously been produced by the Trump Organization to the OAG.

10.     The steps taken by my office in furtherance of these search efforts are outlined herein.

11.     From January 2022 through March 2022, I had numerous phone calls and communications with Prior Counsel concerning their search efforts that had been undertaken in connection with the Subpoena.

12.     Prior Counsel confirmed that their office had interviewed all of Respondent's executive assistants as to whether they had any documents or communications responsive to the Subpoena and that no such responsive documents were identified.

13.     Prior Counsel further informed that their office conducted a search of Respondent's correspondence files (the "chron files") and produced relevant portions thereof to the NYDA. The Trump Organization then caused all of those same documents to be produced to the OAG on February 9, 2022. The production to the NYDA included the following custodial documents for Respondent: TTO_05439138, TTO_05439139 through TTO_05439275, TTO_05439276 through TTO_05439412, TTO_05439413 through TTO_05439654, TTO_05439655, TTO_05439656 through TTO_05439675, and TTO_05439676. TTO Counsel further advised that the Trump Organization's production to the NYDA was re-produced to the OAG in its entirety.[1]

---

[1] The chron files produced to the OAG is comprised of 542 pages of documents and can be found at TTO_05439134 through TTO_05439676.

14.     I also had numerous phone calls and communications with co-counsel for Respondent, Fischetti & Malgieri LLP ("Co-Counsel"), concerning their office's search efforts undertaken in connection with the Subpoena.

15.     Co-Counsel confirmed that he personally reviewed the Subpoena with Respondent over the telephone as to whether he was in possession, custody or control of any responsive documents to the Subpoena.

16.     Further, I had numerous phone calls and communications with TTO Co-Counsel, the TTO Legal Dept., and the TTO IT Dept. for the purpose of assessing and verifying the extent of the searches performed in relation to the Trump Organization's prior document productions.

17.     I personally reviewed attorney work product provided by TTO Co-Counsel which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG, which I personally cross-checked for responsive documents as to each individual demand of the Subpoena. I also reviewed each individual demand contained in the Subpoena with TTO Co-Counsel as to whether any responsive documents pertaining to Respondent had been previously produced by the Trump Organization to the OAG.

18.     From January 2022 through March 2022, I personally reviewed portions of Respondent's chron files as to whether they contained any documents responsive to the Subpoena. Collectively, my firm performed a full, complete, and diligent search of the chron files. After the search, it was determined that any documents in the chron files that are responsive to the Subpoena had already been produced to the OAG.

19.     I personally reviewed the weekly status reports provided by TTO Co-Counsel to the OAG.

20.     I personally reviewed the prior subpoenas served upon the Trump Organization by

the OAG.

21.     I personally reviewed relevant portions of the Trump Organization's prior document productions to the OAG.

22.     My office had numerous conversations with Respondent by telephone concerning the Subpoena, his electronic devices, the locations likely to house responsive documents, and whether he had any responsive documents in his possession, custody, or control.

23.     On March 17, 2022, Alina Habba met with Respondent in-person at Mar-a-Lago and reviewed the Subpoena with him, including each individual demand contained therein.

24.     On April 8, 2022, Alina Habba and I conducted a telephone interview with Respondent, as per Haystack ID's request. After completion, the completed HaystackID interview forms were submitted to HaystackID.

25.     In addition, in accordance with the Order of the Hon. Arthur Engoron, J.S.C. dated April 29, 2022, my office performed several additional searches to further ensure that there are no documents responsive to the Subpoena that have not been previously produced by the Trump Organization:

    a.  On May 2, 2022, Alina Habba interviewed Eric Brunnett, the Vice President of Information Technology of the Trump Organization, to review and verify the specific phones, computers and other devices that have been issued to Respondent by the Trump Organization. A separate affidavit of Mr. Brunnett is attached hereto. Based on Alina Habba's conversation with Mr. Brunnett, A separate affidavit of Mr. Brunnett is attached hereto. Based on my conversation with Mr. Brunnett, I understand that Respondent does not have any Trump Organization-issued phones, computers, or devices in his personal possession. Respondent only has two phones

in his personal possession: (i) an iPhone; and (ii) a new phone he was recently given by TruthSocial which is used exclusively for posting on that site. Respondent's iPhone been searched and imaged twice by Chris Herndon of TechCentrics, Inc., once in March 21, 2022 and again on May 4, 2022. A separate affidavit of Mr. Herndon is attached hereto.

b.  On May 4, 2022, Alina Habba diligently searched each and every room of Respondent's private residence located at Trump National Golf Club Bedminster, including all desks, drawers, nightstands, dressers, closets, etc.

c.  On May 4, 2022, Alina Habba diligently searched Respondent's personal office located at Trump National Golf Club Bedminster, including all desks, drawers, file cabinets, etc.

d.  On May 5, 2022, Alina Habba diligently searched each and every room of Respondent's private residence located at Mar-a-Lago, including all desks, drawers, nightstands, dressers, closets, etc.

e.  On May 5, 2022, Alina Habba diligently searched Respondent's personal office located at Mar-a-Lago, including all desks, drawers, file cabinets, etc.

f.  On May 5, 2022, Alina Habba coordinated and communicated with Alan Garten via telephone with regard to his search of Respondent's private residence in Trump Tower including all desks, drawers, file cabinets, and similar locations likely to house files or documents.

26.  Further, it was agreed by all parties at the April 26, 2022 hearing that Haystack would perform an additional follow-up search for responsive documents stored in: (i) the file cabinets located outside Respondent's office the Trump Organization's corporate offices in Trump

Tower; (ii) file cabinets located outside Respondent's office the Trump Organization's corporate offices in Trump Tower; (iii) the file cabinets located on the 25th and 26th floors of the Trump Organization's corporate offices in Trump Tower; (iv) Respondent's hard copy calendar files located in the Trump Organization's corporate offices in Trump Tower; and (iv) off-site storage.

27.     Based upon the foregoing, it is my understanding that, between the collective efforts of my office, Co-Counsel, Prior Counsel, and TTO Counsel, as well as the independent searches of HaystackID, the following searches have been performed of the Respondent's physical documents and files at these relevant locations:

    a.  <u>Cabinets Outside of Respondent's Office (Trump Tower)</u>

        i.  On July 19, 2021, Owen Reidy, an attorney with the TTO Legal Dept., searched the physical documents and files located in the file cabinets located outside Respondent's office the Trump Organization's corporate offices in Trump Tower. These file cabinets have, at all relevant times, been maintained by Respondent's executive assistants, including Jessica Macchia, Chelsea Frommer, Holly Lorenzo, Kelly Malley, Katie Murphy, Kelli Rose, Thuy Colayco, Cammie Artusa, and Meredith McIver. As a result of Mr. Reidy's collective search efforts on that date, the following custodial documents for Respondent were identified and subsequently produced to the OAG: TTO_214579, TTO_214580, TTO_214581 through TTO_214583.

       ii.  On November 12, 2021, Cynthia Arce, a paralegal with the TTO Legal Dept., searched the physical documents and files located in the file cabinets located outside Respondent's office the Trump Organization's corporate

7

offices in Trump Tower. These file cabinets have, at all relevant times, been maintained by Respondent's executive assistants, including Jessica Macchia, Chelsea Frommer, Holly Lorenzo, Kelly Malley, Katie Murphy, Kelli Rose, Thuy Colayco, Cammie Artusa, and Meredith McIver. No custodial documents for Respondent were identified as a result of this search.

    iii.  From late April through May 6, 2022, HaystackID searched the file cabinets located outside Respondent's office the Trump Organization's corporate offices in Trump Tower. Based on my review of HaystackID's report regarding this search, I understand that no documents responsive to the Subpoena were identified.

  b.  <u>Executive Office Storage Closet / Storage Room by Respondent's Office (Trump Tower)</u>

    i.  On July 19, 2021, Owen Reidy searched the physical documents and files located in the file cabinets in the Executive Office storage closet and the storage room by Respondent's office in the Trump Organization's corporate offices in Trump Tower for all of Respondent's executive assistants. As a result of Mr. Reidy's collective search efforts on that date, the following custodial documents for Respondent were identified and subsequently produced to the OAG: TTO_214579, TTO_214580, TTO_214581 through TTO_214583.

    ii.  On November 12, 2021, Cynthia Arce searched the physical documents and files located in the file cabinets in the Executive Office storage closet and the storage room by Respondent's office in the Trump Organization's

8

corporate offices in Trump Tower, including the file cabinets maintained by Respondent's executive assistants, Jessica Macchia, Chelsea Frommer, Holly Lorenzo, Kelly Malley, Katie Murphy, Kelli Rose, Thuy Colayco, Cammie Artusa, and Meredith McIver. No custodial documents for Respondent were identified as a result of this search.

iii. On November 23, 2021, Cynthia Arce searched the physical documents and files located in the file cabinets in the Executive Office storage closet and the storage room by Respondent's office in the Trump Organization's corporate offices in Trump Tower, including the file cabinets maintained by Respondent's executive assistants, Randi Gleason, Lauren Kelly, Casey Kennedy, and Jaquiline Fini. No custodial documents for Respondent were identified as a result of this search.

iv. From late April through May 6, 2022, HaystackID searched the physical documents and files located in the file cabinets in the Executive Office storage closet and the storage room by Respondent's office in the Trump Organization's corporate offices in Trump Tower for all of Respondent's executive assistants. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent were identified.

c. <u>File Cabinets located on the 25th and 26th Floors</u>

i. On or about January 24, 2020, Maria Enriquez, an attorney with the TTO Legal Dept., searched the physical documents and files located in the file cabinets located on the 25th and 26th floors of the Trump Organization's

9

corporate offices in Trump Tower. Any documents responsive to those searches were produced to the OAG by the Trump Organization. No custodial documents for Respondent were identified as a result of this search.

ii. From late April through May 6, 2022, HaystackID searched the physical documents and files located in the file cabinets located on the 25th and 26th floors of the Trump Organization's corporate offices in Trump Tower. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent were identified.

d. <u>Hard Copy Calendars</u>

i. On July 19, 2021, Owen Reidy searched all of the hard copy calendars maintained by Respondent. These hard copy calendars are located the Trump Organization's corporate offices in Trump Tower. As a result of Mr. Reidy's collective search efforts on that date, the following custodial documents for Respondent were identified and subsequently produced to the OAG: TTO_214579, TTO_214580, TTO_214581 through TTO_214583.

ii. From late April through May 6, 2022, HaystackID searched the hard copy calendars maintained by Respondent in the Trump Organization's corporate offices in Trump Tower. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent were identified.

e. <u>Off-site Storage</u>

    i.   In mid-January, 2020, Adam Rosen, Alex Cannon, and Maria Enriquez, all attorneys with the Trump Legal Dept., conducted searches of inventories the off-site storage files for any documents responsive to the OAG's December 2019 subpoena. The files that were identified as potentially responsive were shipped from the off-site storage facility to the Trump Organization's corporate offices at Trump Tower, where they were received on or about January 15, 2020. The files were thereafter reviewed by the Trump Organization's General Counsel and all non-privileged documents that were located were produced to the OAG. No custodial documents for Respondent were identified as a result of this search.

    ii.   On November 23, 2021, Cynthia Arce reviewed and assessed the off-site storage log and verified that the off-site stored files did not include any custodial documents for Respondent.

    iii.   From late April through the present and continuing, HaystackID searched physical files and documents contained in off-site storage. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent were identified.

f.   <u>Chron Files</u>

    i.   On July 19, 2021, Owen Reidy searched all of the hard copy calendars maintained by Respondent. These hard copy calendars are located the Trump Organization's corporate offices in Trump Tower. As a result of Mr. Reidy's collective search efforts on that date, the following custodial documents for Respondent were identified and subsequently produced to

11

the OAG: TTO_214579, TTO_214580, TTO_214581 through TTO_214583.

ii.   In or around early 2022, Prior Counsel searched Respondent's chron file for any and all responsive documents to the NYDA's subpoena requests. In response to those searches, on February 9, 2022, Prior Counsel produced to the NYDA, the following custodial documents for Respondent: TTO_05439138, TTO_05439139 through TTO_05439275, TTO_05439276 through TTO_05439412, TTO_05439413 through TTO_05439654, TTO_05439655, TTO_05439656 through TTO_05439675, and TTO_05439676. The Trump Organization's production to the NYDA was re-produced to the OAG in its entirety.

iii.   Commencing in January 2022, my office performed a full, complete, and diligent search of the chron files. After the search, it was determined that any documents in the chron files that are responsive to the Subpoena had already been produced to the OAG.

iv.   From late April through May 6, 2022, HaystackID searched Respondent's chron files. Based on my review of HaystackID's report regarding this search, I understand that no custodial documents for Respondent were identified.

g.   Trump National Golf Club Bedminster

i.   On May 5, 2022, Alina Habba searched each and every room of Respondent's private residence located at Trump National Golf Club Bedminster, including all desks, drawers, file cabinets, etc. No documents

12

responsive to the Subpoena were located or identified.

    ii. On May 5, 2022, Alina Habba searched Respondent's personal office located at Trump National Golf Club Bedminster, including all desks, drawers, file cabinets, etc. No documents responsive to the Subpoena were located or identified.

  h. Mar-a-Lago

    i. On May 5, 2022, Alina Habba searched each and every room of Respondent's private residence located at Mar-a-Lago, including all desks, drawers, file cabinets, etc. No documents responsive to the Subpoena were located or identified.

    ii. On May 5, 2022, Alina Habba searched Respondent's personal office located at Mar-a-Lago, including all desks, drawers, file cabinets, etc. No documents responsive to the Subpoena were located or identified.

  i. Trump Tower Apartment

    i. On May 5, 2022, Alan Garten searched each and every room of Respondent's private apartment located at Trump Tower, including all desks, drawers, file cabinets, etc. No documents responsive to the Subpoena were identified.

**Demand No. 1**

28.    With respect to Demand No. 1, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 1 and/or cross-checking whether any documents responsive to Demand No. 1 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii)

Ex. 1_042

attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Trump Organization's prior searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; (v) relevant portions of the Trump Organization's prior document productions to the OAG; and (vi) weekly status reports provided by TTO Co-Counsel to the OAG.

29.     I had numerous discussions with TTO Co-Counsel, Prior Counsel, Co-Counsel, and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Trump Organization's prior searches and productions, identifying documents potentially responsive to Demand No. 1 and verifying whether potentially responsive documents had previously been produced to the OAG.

30.     In addition, Demand No. 1 of the Subpoena calls for "all documents and communications concerning any Statement of Financial Condition." I cross-checked the search terms used by the Trump Organization in connection with its searches in response to the OAG's 2019 Subpoena, which included, without limitation, the following search terms:

> Statement of Financial Condition
> Personal financial statement
> PFS
> DJTFS
> DJT FS
> Personal financial
> SOFC
> DJT SOFC
> DJT W/5 SOFC
> f/s
> Financial statement;
> Compilation
> balance sheet
> Blakely
> Cushman
> Mazars

Weiser
Trump National AND (LA or Los Angeles)
TNGCLA or TNGC LA
Palos
Verdes
*@cushmanwakefield.com
*@cushwake.com
Tower w/5 worth, valu*
TWT w/5 worth, valu*
Trump Park" w/5 valu*
555 Cal*" w/5 valu*
Nike w/5 valu*
502 Park" w/5 valu* S
cotland w/5 worth, valu*
40 Wall" w/5 valu*
Mar-a-lago" w/5 worth, valu*
Trump Parc" w/5 valu*
845* w/5 worth, valu*
Aberdeen w/5 worth, valu*
Bedminster w/5 worth, valu*
Charlotte w/5 worth, valu*
Colts Neck w/5 worth, valu*
Doral w/5 worth, valu*
Washington DC w/5 worth, valu*
Ferry Point w/5 worth, valu*
Las Vegas w/5 worth, valu*
Turnberry w/5 worth, valu*
Doonbeg w/5 worth, valu*
Hawaii w/5 worth, valu*
TIHT w/5 worth, valu*
OPO w/5 worth, valu*
Pine Hill w/5 worth, valu*
Philadelphia w/5 worth, valu*
Winery w/5 worth, valu*

Based on the use of these search terms, the documents responsive to Demand No. 1 of the Subpoena would have been produced to the OAG in connection with the Trump Organization's prior searches.

31.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in any possession of any documents responsive to Demand No. 1, other than those documents that had already been produced by the Trump Organization.

15

**Demand No. 2**

32.     Demand No. 2 calls for "[a]ll documents and communications concerning any valuation of any asset whose value is identified or incorporated into any Statement of Financial Condition." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Trump Organization's prior searches and productions encompassed the items responsive to this demand.

33.     With respect to Demand No. 2, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 2 and/or cross-checking whether any documents responsive to Demand No. 2 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; (v) relevant portions of the Trump Organization's prior document productions to the OAG; and (vi) weekly status reports provided by TTO Co-Counsel to the OAG.

34.     In addition, I had numerous discussions with TTO Co-Counsel, Prior Counsel, Co-Counsel, and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 2 and verifying that all potentially responsive documents had previously been produced to the OAG.

35.     Based on the foregoing, together with my firm's collective search efforts, I

16

determined that Respondent was not in any possession of any documents responsive to Demand No. 2, other than those documents that had already been produced by the Trump Organization.

### Demand No. 3

36.     Demand No. 3 calls for "[a]ll documents reviewed, used, or relied on in the preparation of the Statements of Financial Condition, and all communications relating to any of the foregoing." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Trump Organization's prior searches and productions encompassed the items responsive to this demand.

37.     With respect to Demand No. 3, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 3 and/or cross-checking whether any documents responsive to Demand No. 3 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; (v) relevant portions of the Trump Organization's prior document productions to the OAG; and (vi) weekly status reports provided by TTO Co-Counsel to the OAG.

38.     In addition, I had numerous discussions with TTO Co-Counsel, Prior Counsel, Co-Counsel, and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 3 and verifying that all potentially responsive documents had previously been produced to the OAG.

39.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in any possession of any documents responsive to Demand No. 3, other than those documents that had already been produced by the Trump Organization.

**Demand No. 4**

40.     Demand No. 4 calls for "[a]ll documents and communications concerning any financing or debt related to Trump International Hotel and Tower Chicago or Chicago Unit Acquisition LLC." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Trump Organization's prior searches and productions encompassed the items responsive to this demand.

41.     With respect to Demand No. 4, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 4 and/or cross-checking whether any documents responsive to Demand No. 4 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; (v) relevant portions of the Trump Organization's prior document productions to the OAG; and (vi) weekly status reports provided by TTO Co-Counsel to the OAG.

42.     In addition, I had numerous discussions with TTO Co-Counsel, Prior Counsel, Co-Counsel, and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 4 and verifying that all potentially responsive documents had previously been produced to the

OAG.

43.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in any possession of any documents responsive to Demand No. 4, other than those documents that had already been produced by the Trump Organization.

**<u>Demand No. 5</u>**

44.     Demand No. 5 calls for "[a]ll documents and communications concerning the donation or potential donation of a conservation or preservation easement by [Respondent]." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Trump Organization's prior searches and productions encompassed the items responsive to this demand.

45.     With respect to Demand No. 5, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 5 and/or cross-checking whether any documents responsive to Demand No. 5 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; (v) relevant portions of the Trump Organization's prior document productions to the OAG; and (vi) weekly status reports provided by TTO Co-Counsel to the OAG.

46.     In addition, I had numerous discussions with TTO Co-Counsel, Prior Counsel, Co-Counsel, and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No.

4 and verifying that all potentially responsive documents had previously been produced to the OAG.

47.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in any possession of any documents responsive to Demand No. 5, other than those documents that had already been produced by the Trump Organization.

### Demand No. 6

48.     Demand No. 6 calls for "[a]ll documents and communications concerning any planned or potential development or alteration of the Seven Springs Estate." This identical demand was set forth in a subpoena dated December 27, 2019 that was previously served upon the Trump Organization by the OAG; therefore, the Trump Organization's prior searches and productions encompassed the items responsive to this demand.

49.     With respect to Demand No. 6, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 6 and/or cross-checking whether any documents responsive to Demand No. 6 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; (v) relevant portions of the Trump Organization's prior document productions to the OAG; and (vi) weekly status reports provided by TTO Co-Counsel to the OAG.

50.     In addition, I had numerous discussions with TTO Co-Counsel, Prior Counsel, Co-Counsel, and the TTO Legal Dept. for the purpose of reviewing the documents produced in

connection with the Prior Searches, identifying documents potentially responsive to Demand No. 6 and verifying that all potentially responsive documents had previously been produced to the OAG.

51.      Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in any possession of any documents responsive to Demand No. 6, other than those documents that had already been produced by the Trump Organization.

### **Demand No. 7**

52.      With respect to Demand No. 7, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 7 and/or cross-checking whether any documents responsive to Demand No. 7 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; (v) relevant portions of the Trump Organization's prior document productions to the OAG; and (vi) weekly status reports provided by TTO Co-Counsel to the OAG.

53.      In addition, I had numerous discussions with TTO Co-Counsel, Prior Counsel, and the TTO Legal Dept. for the purpose of reviewing the documents produced in connection with the Prior Searches, identifying documents potentially responsive to Demand No. 7 and verifying whether potentially responsive documents had previously been produced to the OAG.

54.      Further, with respect to item 7 of the Subpoena, which calls for "all documents and communications with Forbes Magazine…," I confirmed that all communications and documents

with Forbes Magazine had been produced to the OAG through August 14, 2021.

55.     In particular, through conversations with Prior Counsel, TTO Legal Dept., and TTO IT Dept., I confirmed that the Trump Organization had performed searches for all communications and documents with Forbes Magazine in response to the NYDA subpoena, which covered through the period of August 14, 2021. The custodial documents for Respondent produced to the NYDA on February 2, 2022 were the following: TTO_05324574 through TTO_05347249. These documents were subsequently reproduced to the OAG by the Trump Organization.

56.     To supplement this search, on March 16, 2022, I coordinated with the Trump Organization's IT team to commence a search for any responsive documents to Demand No. 7 (regarding Forbes Magazine) for the time period from January 1, 2021 through March 16, 2022. Search parameters included the term "forbes" and communications with "forbes.com" e-mail addresses, and the e-mail addresses of ten Trump Organization individuals were searched, including Alan Garten, Eric Trump, Donald Trump, Jr., Allen Weisselberg, Amanda Miller, Kim Benza, Jeffrey McCooney, Patrick Birney, Ray Flores and Deborah Tarasoff.

57.     The search returned 1,386 documents and/or communications. Three employees of my firm, in coordination with HaystackID, reviewed these items as to whether they were responsive to Demand No. 7. After a full, complete and diligent search, it was determined that none of the documents were responsive.

58.     Additionally, I searched the chron files and did not find any documents responsive to the Subpoena which had not already been produced.

59.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in any possession of any documents responsive to Demand No. 7, other than those documents that had already been produced by the Trump Organization.

**Demand No. 8**

60.     With respect to Demand No. 8, I personally reviewed and analyzed the following files, logs and/or documents for the purpose of searching for documents responsive to Demand No. 8 and/or cross-checking whether any documents responsive to Demand No. 8 had been previously produced by the Trump Organization to the OAG: (i) Respondent's chron files; (ii) attorney work product provided by TTO Co-Counsel and the TTO Legal Dept. which summarized, organized and identified with particularity the documents produced by the Trump Organization to the OAG; (iii) relevant search terms utilized in the Prior Searches; (iv) prior subpoenas served upon the Trump Organization by the OAG; (v) relevant portions of the Trump Organization's prior document productions to the OAG; and (vi) weekly status reports provided by TTO Co-Counsel to the OAG.

61.     Demand No. 8 of the Subpoena calls for "[a]ll documents relating to your financial condition or that of the Trump Organization reviewed, used, shared, or relied on in obtaining or renewing insurance coverage for you and/or the Trump Organization, including without limitation all Statements of Financial Condition disclosed to insurance underwriters or insurance brokers, and all communications relating to any of the foregoing." I cross-checked the search terms used by the Trump Organization in connection with its searches in response to the prior OAG subpoenas, which included, without limitation, the following search terms:

> Statement of Financial Condition
> Personal financial statement
> PFS
> DJTFS
> DJT FS
> Personal financial
> SOFC
> DJT SOFC

Ex. 1_052

DJT W/5 SOFC
f/s
Financial statement
Compilation
balance sheet
Trump National AND (LA or Los Angeles)
TNGCLA or TNGC LA
Palos
Verdes
Tower w/5 worth, valu*
TWT w/5 worth, valu*
Trump Park" w/5 valu*
555 Cal*" w/5 valu*
Nike w/5 valu*
502 Park" w/5 valu* S
cotland w/5 worth, valu*
40 Wall" w/5 valu*
Mar-a-lago" w/5 worth, valu*
Trump Parc" w/5 valu*
845* w/5 worth, valu*
Aberdeen w/5 worth, valu*
Bedminster w/5 worth, valu*
Charlotte w/5 worth, valu*
Colts Neck w/5 worth, valu*
Doral w/5 worth, valu*
Washington DC w/5 worth, valu*
Ferry Point w/5 worth, valu*
Las Vegas w/5 worth, valu*
Turnberry w/5 worth, valu*
Doonbeg w/5 worth, valu*
Hawaii w/5 worth, valu*
TIHT w/5 worth, valu*
OPO w/5 worth, valu*
Pine Hill w/5 worth, valu*
Philadelphia w/5 worth, valu*
Winery w/5 worth, valu*

In addition, specific searches were previously performed by the Trump Organization with respect to the following items:

- Budgets, income statements, financial statements, balance sheets, and similar documents reflecting the financial performance of, or financial projections for, TTO golf or other club properties whose value is incorporated into SOFC produced by TTO to the DANY.

- Documents reflecting financial performance of, or financial projections for, Trump Organization club properties.

24

- All documents and communications relating to the negotiation, closing, or modification of any loan secured by any property identified on the SoFC

Based on the use of these search terms and parameters, the documents responsive to Demand No. 8 of the Subpoena would have been produced to the OAG in connection with the Trump Organization's prior searches.

62.     Based on the foregoing, together with my firm's collective search efforts, I determined that Respondent was not in any possession of any documents responsive to Demand No. 8, other than those documents that had already been produced by the Trump Organization.

**<u>Stipulation</u>**

63.     On behalf of Respondent, I hereby stipulate that the Trump Organization-produced documents can be used as if those documents were produced by Respondent because they were under Respondent's "control," in that they were documents in the possession of a company owned or controlled by a Respondent or a Trust owned by him, to the extent allowable by law. In so stipulating, Respondent does not waive any objections to such documents or the introduction of those documents in evidence that he would otherwise have if he had produced those documents solely because they were in the custody or control of a company owned or controlled by him or a Trust owned by him.



_____
MICHAEL T. MADAIO

_____
DATE

5/6/22

STATE OF   New Jersey )
COUNTY OF  Somerset  )

On this __6th__ day of May in the year 2022, before me, the undersigned, a notary public in and for said state, personally appeared Michael T. Madaio personally known to be or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

26

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No. 451685/2020 |
| Petitioner, | |
| v. | **AFFIDAVIT** |
| THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS & BOCKIUS, LLP; SHERI DILLON; DONALD J. TRUMP; IVANKA TRUMP; AND DONALD TRUMP, JR., | |
| Respondents. | |

I, Donald J. Trump, being duly sworn, state as follows:

1.      I am a named Respondent in the above-captioned matter. I submit this affirmation in accordance with the Court's Order dated April 29, 2022 (the "Order").

2.      I have personally reviewed the subpoena issued by the Office of the Attorney General (the "OAG") dated December 1, 2021 (the "Subpoena").

3.      I have had numerous discussions with my attorney, Alina Habba, regarding the Subpoena. We also met in-person at Mar-a-Lago on March 17, 2022 to review and discuss the Subpoena.

4.      Since at least January 1, 2010, it has been my customary practice to not keep any documents, files, or papers relating to my business activities in my private residences.

5.      Nevertheless, in an abundance of caution and in accordance with the Order, I authorized the additional, follow-up searches to be performed on my private residences:

a.   On May 4, 2022, I authorized my attorney, Alina Habba, to search my private

residence and personal office located at Trump National Golf Club in Bedminster, New Jersey for any and all documents responsive to the Subpoena.

b.  On May 5, 2022, I authorized Alina Habba to search my private residence and personal office located at The Mar-a-Lago Club in Palm Beach, Florida for any and all documents responsive to the Subpoena.

c.  On May 5, 2022, I authorized Alan Garten, General Counsel for the Trump Organization, to search my private apartment located in Trump Tower in New York, New York for any and all documents responsive to the Subpoena.

6.  As for documents kept in my regular course of business with the Trump Organization, these documents would be in the possession, custody and/or control of the Trump Organization.

7.  Since at least January 1, 2010, it has been my customary practice to delegate document handling and retention responsibilities to my executive assistants.

8.  My understanding is that, if any corporate records were kept, they would be exclusively in the corporate offices of the Trump Organization. I believe these documents would be stored in:

a.  My 'chron' files;

b.  My hard copy calendars;

c.  The files in the cabinets located outside my office;

d.  The storage room by my office and the Executive Office storage closet; and

e.  The file cabinets located on the 26th floor.

9.  To the extent there are any documents responsive to the Subpoena, it is my firm belief that they would have been kept in the above-listed locations in the regular course of business.

Ex. 1_057

10.     It is my understanding that searches of the above-listed locations have been performed by my attorneys, the Trump Organization Legal Department, the Trump Organization IT Department, and others.

11.     I am not currently in possession of any Trump Organization-issued phones, computers or similar devices. I believe the last phone or device I was issued by the Trump Organization was a cell phone in 2015. I no longer have the cell phone in my possession and I am not aware of its current location.

12.     Since January 1, 2010, I previously owned two flip phones and a Samsung mobile phone.

     a.  I do not have the two flips phones in my possession and I do not know their current whereabouts.

     b.  I took the Samsung with me to the White House and it was taken from me at some point while I was President. I do not have the Samsung in my possession and I do not know its current whereabouts.

13.     Currently, I own two personal mobile phones:

     a.  I have an iPhone which I have owned for several years and is for my personal use.

     b.  I also have a new phone which I was recently given by Truth Social just last week. I use this phone exclusively for posting on Truth Social and no other purpose. I have never placed or received a call, sent or received a text message, or used this phone in any other manner.

14.     I previously submitted my iPhone to be searched and imaged on March 21, 2022.

15.     In an abundance of caution, and in accordance with the Order, I recently resubmitted my cell phone to be searched and imaged again in early May 2022.

Ex. 1_058

16.     Since at least January 1, 2010, it has been my customary practice to not communicate via e-mail, text message, or other digital methods of communication. I also do not use a computer for work-related purposes. I confirmed the same on April 8, 2022, when I conducted a telephone interview with my attorneys, Alina Habba and Michael Madaio, pursuant to HaystackID's request.

17.     At all relevant times, I have authorized, and continue to authorize, the release of any documents responsive to the various subpoenas issued by the OAG.

18.     To the best of my knowledge, there are no documents responsive to the Subpoena in my possession, custody or control that have not already been produced by the Trump Organization to the OAG.

_____
DONALD J. TRUMP

_____May 6, 2022_____
DATE

STATE OF  Florida          )
COUNTY OF  Palm Beach )

On this ⁶ᵗʰ day of May in the year 2022, before me, the undersigned, a notary public in and for said state, personally appeared Donald J. Trump personally known to be or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

_____
Notary Public



4

Ex. 1_059

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No.: 451685/2020 |
| Petitioner, | |
| -against- | |
| THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS & BOCKIUS, LLP; SHERI DILLON; MAZARS USA LLC; DONALD J. TRUMP; DONALD TRUMP, JR.; and IVANKA TRUMP, | **CERTIFICATE OF CONFORMITY** |
| Respondents. | |

ALINA HABBA, ESQ., an attorney duly admitted and licensed to practice law before the Courts of the State of New York, certifies the following under penalties of perjury:

1.      I am the managing partner of Habba Madaio & Associates LLP, counsel of record for respondent, Donald J. Trump, in the above-reference matter. I am an attorney duly admitted to practice in the State of New York.

2.      I make this declaration pursuant to CPLR § 2309(c) to certify that, based upon my review, the attached Affidavit of Donald J. Trump was sworn to before Jose Paulo Lozano, a Notary Public in the State of Florida, in a manner prescribed by the laws of Florida, and that it duly conforms with all such laws and is in all respects valid and effective in Florida.

Dated: May 6, 2022
        New York, New York

_____
Alina Habba, Esq.
**HABBA MADAIO & ASSOCIATES LLP**

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York,<br><br>                    Petitioner,<br><br>            v.<br><br>THE TRUMP ORGANIZATION, INC., DJT HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER LLC, SEVEN SPRINGS LLC, ERIC TRUMP, CHARLES MARTABANO, MORGAN, LEWIS & BOCKIUS, LLP, SHERI DILLON, DONALD J. TRUMP, IVANKA TRUMP, DONALD TRUMP, JR., and CUSHMAN AND WAKEFIELD, INC.,<br><br>                    Respondents. | Index No.: 451685/2020<br><br><br><br>**AFFIDAVIT OF ERIC BRUNNETT** |

I, Eric Brunnett, being duly sworn, deposes and says:

1.      I am the Senior Vice President of The Trump Organization's ("TTO") Information Technology Department.

2.      I am tasked with overseeing the use, maintenance, and operation of the devices issued by TTO.

3.      Since January 1, 2010, two flip phones and a Samsung Galaxy S4 were issued by TTO to Mr. Trump. These mobile phones are no longer in operation, and I do not know their whereabouts.

4.      TTO has not issued any mobile phones to Mr. Trump since he was elected President of the United States.

ERIC BRUNNETT

STATE OF         )
COUNTY OF     )

On this ___ day of May in the year 2022, before me, the undersigned, a notary public in and for said state, personally appeared Eric Brunnett personally known to be or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No.: 451685/2020 |
| Petitioner, | |
| v. | **AFFIDAVIT OF CHRIS HERNDON** |
| THE TRUMP ORGANIZATION, INC., DJT HOLDINGS LLC, DJT HOLDINGS MANAGING MEMBER LLC, SEVEN SPRINGS LLC, ERIC TRUMP, CHARLES MARTABANO, MORGAN, LEWIS & BOCKIUS, LLP, SHERI DILLON, DONALD J. TRUMP, IVANKA TRUMP, DONALD TRUMP, JR., and CUSHMAN AND WAKEFIELD, INC., | |
| Respondents. | |

I, Chris Herndon, being duly sworn, deposes and says:

1.      I am the Chief Operating Officer of TechCentrics, Inc. I previously served as the White House Director of Information Technology from January 20, 2017 through December 18, 2018.

2.      Prior to entering the White House, Mr. Trump utilized a Samsung Galaxy S4 mobile phone. This mobile phone was turned over to me in March of 2017 and remained in my custody until I left my position in 2018. I do not know the current whereabouts or condition of this mobile phone since the time that it was turned over. The standard protocol would have been for the phone to be turned over to the National Archives and Records Administration at the conclusion of Mr. Trump's term of presidency.

3.      I imaged and searched the current iPhone 12 Pro Max used by Mr. Trump, pursuant

1

to a security protocol which is intended to regularly search for malware and other irregularities in the phone used by Mr. Trump.

4.      Following this search, I determined that there were no documents, irregularities or unexpected findings in the device. The device contained only four unread incoming text messages.

5.      At the direction of Mr. Trump's counsel, Alina Habba, I performed an additional detailed search of the image of Mr. Trump's phone on May 4, 2022 with specific reference to the items sought in the subpoena dated December 1, 2022 (the "Subpoena") issued by the Office of the Attorney General.

6.      Following this search, I confirmed that the findings remain the same. There are no additional documents, texts, or emails stored on this mobile device, nor are there any documents or communications that are responsive to the Subpoena.


_____                    _____
CHRIS HERNDON                                        6 May 2022
                                                     DATE


STATE OF Virginia          )
COUNTY OF Fairfax          )

On this 6 day of May in the year 2022, before me, the undersigned, a notary public in and for said state, personally appeared Chris Herndon personally known to be or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person or entity upon behalf of which the individual acted, executed the instrument.


_____
Notary Public

KYLE KENNEDY
NOTARY PUBLIC
REG # 7516972
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES 08/31/2024

2

Ex. 1_064

## **SCHEDULE A**

List of Persons Who Supervised/Participated in Subpoena Compliance

1. **Peter W. Gabra, Esq.**
   Associate Attorney
   Habba Madaio & Associates LLP
   1430 U.S. Highway 206, Suite 240
   Bedminster, New Jersey 07921
   Telephone: (908) 869-1188

2. **Randee Ingram**
   Paralegal
   Habba Madaio & Associates LLP
   1430 U.S. Highway 206, Suite 240
   Bedminster, New Jersey 07921
   Telephone: (908) 869-1188

3. **Na'syia Drayton**
   Paralegal
   Habba Madaio & Associates LLP
   1430 U.S. Highway 206, Suite 240
   Bedminster, New Jersey 07921
   Telephone: (908) 869-1188

4. **Alan Garten, Esq.**
   Executive Vice President & Chief Legal Officer
   The Trump Organization
   725 5th Avenue, New York, NY 10022
   Telephone: (212) 836-3203

5. **Ronald P. Fischetti, Esq.**
   Fischetti & Malgieri LLP
   565 5th Avenue, 7th Floor
   New York, New York 10017
   Telephone: (212) 593-7100

6. **Michael T. van der Veen, Esq.**
   Van der Veen, O'Neill, Hartshorn, and Levin
   1219 Spruce Street
   Philadelphia, PA 19107
   Telephone: (215) 546-1000

7. **Lawrence Rosen, Esq.**
   Managing Partner
   LaRocca Hornik Rosen & Greenberg LLP
   The Trump Building
   40 Wall Street, 32nd Floor
   New York, NY 10005
   Telephone: (732) 246-2112

8. **Amy D. Carlin, Esq.**
   Partner
   LaRocca Hornik Rosen & Greenberg LLP
   The Trump Building
   40 Wall Street, 32nd Floor
   New York, NY 10005
   Telephone: (732) 246-2112

9. **Chris Herndon**
   Chief Operating Officer
   TechCentrics, Inc
   1271 La Ronde Ct
   Alexandria, VA 22307

10. **Eric Brunnett**
    Senior Vice President, IT Department
    The Trump Organization
    725 5th Avenue, New York, NY 10022
    Telephone: (212) 836-3203

# EXHIBIT 2



805 Fifteenth Street NW, Suite 800
Washington DC 20005
202 833 1200

**www.commoncause.org**

*Holding Power Accountable*

# BEFORE THE FEDERAL ELECTION COMMISSION

COMMON CAUSE
805 Fifteenth Street, NW, Suite 800
Washington, DC 20005
(202) 833-1200

Amendment
**MUR #** _____

PAUL S. RYAN
805 Fifteenth Street, NW, Suite 800
Washington, DC 20005
(202) 833-1200

v.                                    MUR No. 7313

PRESIDENT DONALD J. TRUMP
The White House
1600 Pennsylvania Avenue NW
Washington, DC 20500

DONALD J. TRUMP FOR PRESIDENT, INC.
725 Fifth Avenue
New York, NY 10022

THE TRUMP ORGANIZATION
725 Fifth Avenue
New York, NY 10022

MICHAEL D. COHEN
c/o Michael D. Cohen & Associates, PC
30 Rockefeller Plaza, 23rd Floor
New York, NY 10112-0015

ESSENTIAL CONSULTANTS, LLC
160 Greentree Drive
Suite #101
Dover, DE 19904

JOHN DOE, unknown person that reimbursed Michael D. Cohen for payment to Stephanie Clifford via Essential Consultants LLC

## COMPLAINT (AMENDED)

1.    This complaint is filed pursuant to 52 U.S.C. § 30109(a)(1) and is based on information

providing reason to believe that Donald J. Trump, Donald J. Trump for President, Inc. (FEC

I.D.#C00580100), the Trump Organization, Michael D. Cohen, Essential Consultants LLC

and/or unknown persons ("John Doe") violated reporting requirements and contribution

limits and restrictions of the Federal Election Campaign Act (FECA), 52 U.S.C. § 30101, *et seq.*

and Commission regulations.

2.    Specifically, based on publicly available data and published reports, complainants have reason

to believe that the payment of $130,000 from Michael D. Cohen through Essential Consultants

LLC to Ms. Stephanie Clifford was an unreported in-kind contribution to Donald J. Trump and

Donald J. Trump for President, Inc., and an unreported expenditure by Donald J. Trump and

Donald J. Trump for President, Inc.—because the payment was made for the purpose of

influencing the 2016 presidential general election and the payment was made by Donald J.

Trump, or an employee and agent of Donald J. Trump (Michael D. Cohen), or in coordination

with Donald J. Trump. *See* 52 U.S.C. §§ 30101(8)(A) (defining "contribution"), 30101(9)(A)

(defining "expenditure") and 30116(a)(7) (coordinated "expenditure" a "contribution"); *see*

*also* 52 U.S.C. § 30104(b) (requiring reporting of "contributions" and "expenditures" by

political committees).

3.  Regardless of the source of the funds paid to Ms. Stephanie Clifford (including, *e.g.*, if Donald J.
    Trump provided the funds), complainants have reason to believe that Donald J. Trump for
    President, Inc. failed to report its receipt of the $130,000 in-kind contribution and failed to
    report its $130,000 expenditure to Ms. Stephanie Clifford in violation of 52 U.S.C. § 30104(b).

4.  Complainants have reason to believe that Michael D. Cohen made, and Donald J. Trump and
    Donald J. Trump for President, Inc. received, an excessive in-kind contribution in violation of
    52 U.S.C. § 30116(a)(1)(A).

5.  Complainants have reason to believe that Essential Consultants LLC made, and Donald J.
    Trump and Donald J. Trump for President, Inc. received, an excessive in-kind contribution in
    violation of 52 U.S.C. § 30116(a)(1)(A) or a corporate contribution in violation of 52 U.S.C.
    § 30118(a).

6.  Complainants have reason to believe that the Trump Organization facilitated a contribution to
    Donald J. Trump and Donald J. Trump for President, Inc. in violation of 11 C.F.R. § 114.2(f)(1)
    and 52 U.S.C. § 30118(a).

7.  Complainants have reason to believe that the Trump Organization made, and Donald J. Trump
    and Donald J. Trump for President, Inc. received, a corporate contribution in violation of 52
    U.S.C. § 30118(a).

8.  Complainants have reason to believe that John Doe made, and Donald J. Trump and Donald J.
    Trump for President, Inc. received, an excessive in-kind contribution in violation of 52 U.S.C.
    § 30116(a)(1)(A) or a corporate contribution in violation of 52 U.S.C. § 30118(a).

9.    "If the Commission, upon receiving a complaint . . . has reason to believe that a person has
      committed, or is about to commit, a violation of [the FECA] . . . [t]he Commission shall make an
      investigation of such alleged violation . . . ." 52 U.S.C. § 30109(a)(2) (emphasis added); *see
      also* 11 C.F.R. § 111.4(a).

10.   "A 'reason to believe' finding followed by an investigation would be appropriate when a
      complaint credibly alleges that a significant violation may have occurred, but further
      investigation is required to determine whether a violation in fact occurred and, if so, its exact
      scope." FEC, Statement of Policy Regarding Commission Action in Matters at the Initial Stage
      in the Enforcement Process, 72 Fed. Reg. 12545 (March 16, 2007).

## FACTS

11.   President Donald J. Trump was a candidate for election to the office of President in the 2016
      election and ran the Trump Organization as its chairman and president until January 19, 2017.[1]

12.   Donald J. Trump for President, Inc. was the principal campaign committee of candidate Donald
      J. Trump in the 2016 presidential election.[2]

13.   The Trump Organization is a privately held corporation owned nearly entirely by Donald J.
      Trump.[3]

---

[1] Donald J. Trump, FEC Form 2 Statement of Candidacy, filed June 22, 2015, *available at*
http://docquery.fec.gov/pdf/291/15031432291/15031432291.pdf; *see also* Jill Disis, Drew Griffin, Curt Devine
and Scott Bronstein, "Trump Organization documents say he has resigned from more than 400 businesses,"
CNN MONEY, January 23, 2017, *available at* http://money.cnn.com/2017/01/23/news/donald-trump-resigns-
business/index.html.

[2] Donald J. Trump for President, Inc., FEC Form 1 Statement of Organization, filed June 29, 2015, *available at*
http://docquery.fec.gov/pdf/501/201506299000000501/201506299000000501.pdf.

[3] *See, e.g.,* Megan Twohey, Russ Buettner and Steve Eder, "Inside the Trump Organization, the Company That Has
Run Trump's Big World," NEW YORK TIMES, December 25, 2016, *available at*

14. Michael D. Cohen is an attorney licensed to practice law in the State of New York and, in 2016,

was employed by the Trump Organization as executive vice president and counsel to Trump

Organization chairman and president Donald J. Trump.[4]

15. Essential Consultants LLC is a limited liability company created by Mr. Cohen in the State of

Delaware on October 17, 2016.[5]

16. On January 12, 2018, the *Wall Street Journal* reported that Mr. Cohen arranged for a payment

of \$130,000 to adult film actress Stephanie Clifford, known professionally as "Stormy

Daniels."[6]

17. Mr. Cohen worked as "top attorney" at the Trump Organization "from 2007 until after the

election," serves as Donald J. Trump's personal attorney, and referred to himself in a January

---

https://www.nytimes.com/2016/12/25/us/politics/trump-organization-business.html; *see also* Trump Organization LLC, New York State Department of State, Division of Corporations Entity Information, *available at* https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_token=BB2254921C9A677 4118FF322870EBFF5B7047890C19A60AE8F7339397146C73F88AEB3F466B181345BF425299FAA4917&p_na meid=412D34A4B6E8C483&p_corpid=E8EB48F78472048A&p_captcha=17512&p_captcha_check=BB225492 1C9A6774118FF322870EBFF5B7047890C19A60AE8F7339397146C73F6B4DBE74546CDD460032599C1CF0E 2A5&p_entity_name=trump%20organization&p_name_type=A&p_search_type=BEGINS&p_srch_results_pag e=0.

[4] *See* Attorney Detail, New York State Unified Court System, Michael Dean Cohen, *available at* http://iapps.courts.state.ny.us/attorney/AttorneyDetails?attorneyId=ROkQI3NU31LJo1kGBolG4Q%3D%3D; *see also* Rosalind S. Helderman, "Michael Cohen will stay Trump's personal attorney — even in the White House," NEW YORK TIMES, January 19, 2017, *available at* https://www.washingtonpost.com/news/post-politics/wp/2017/01/19/michael-cohen-special-counsel-to-donald-trump-will-follow-him-to-washington/?utm_term=.aeb9eefa22d3.

[5] *See* Essential Consultants LLC, State of Delaware Limited Liability Company Certificate of Formation, October 17, 2016, *available at* http://online.wsj.com/public/resources/documents/Essential_Consultants_01_12_17.pdf.

[6] Michael Rothfeld and Joe Palazzolo, "Trump Lawyer Arranged \$130,000 Payment for Adult-Film Star's Silence," WALL STREET JOURNAL, January 12, 2018, *available at* https://www.wsj.com/articles/trump-lawyer-arranged-130-000-payment-for-adult-film-stars-silence-1515787678 .

2017 interview as the "fix-it guy."[7] Mr. Cohen was an agent of Mr. Trump and the Trump

Organization in October 2016.

18.     According to the *Wall Street Journal*, Ms. Clifford has alleged that she had a sexual encounter

with Mr. Trump in 2006 and "had been in talks with ABC's 'Good Morning America' in the fall

of 2016 about an appearance to discuss Mr. Trump."[8]

19.     This payment of $130,000 was part of a nondisclosure agreement by which Ms. Clifford would

be precluded from publicly discussing the alleged sexual encounters between her and Mr.

Trump.[9]

20.     Although the alleged sexual affair between Mr. Trump and Ms. Clifford occurred in 2006, the

nondisclosure agreement was reached less than one month before the 2016 Presidential

election.[10]

21.     The *Wall Street Journal* explained:

> The agreement with Ms. Clifford came as the Trump campaign confronted allegations
> from numerous women who described unwanted sexual advances and alleged assaults
> by Mr. Trump. In October 2016, the Washington Post published a videotape made, but
> never aired, by NBC's "Access Hollywood" in which Mr. Trump spoke of groping
> women.[11]

22.     On February 13, 2018, the *New York Times* reported that Mr. Cohen told the newspaper he

"had paid $130,000 out of his own pocket" and that "[n]either the Trump Organization nor the

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed [him]

for the payment, either directly or indirectly[.]"[12]

23.     On February 14, 2018, the *Washington Post* quoted Mr. Cohen's statement, first reported by

the *New York Times*, as:

> I am Mr. Trump's longtime special counsel and I have proudly served in that role for
> more than a decade[.] . . . In a private transaction in 2016, I used my own personal funds
> to *facilitate* a payment of $130,000 to Ms. Stephanie Clifford. Neither the Trump
> Organization nor the Trump campaign was a party to the transaction with Ms. Clifford,
> and neither reimbursed me for the payment, either directly or indirectly.[13]

24.     In a February 14, 2018, follow-up story the *New York Times* reported that Mr. Cohen had told

the newspaper that "he had used his own funds to *facilitate* the payment to the actress."[14] Mr.

Cohen "declined to answer questions about whether Mr. Trump had reimbursed him [or]

whether the two men had made any arrangement at the time of the payment[.]"[15]

25.     On March 5, 2018, the *Wall Street Journal* reported that Mr. Cohen's payment to Ms. Clifford

was received by Ms. Clifford on October 27, 2016—12 days before the presidential election—

and that "Mr. Cohen said he missed two deadlines earlier that month to make the $130,000

payment to Ms. Clifford *because he couldn't reach Mr. Trump in the hectic final days of the*

---

[12] Maggie Haberman, "Michael D. Cohen, Trump's Longtime Lawyer, Says He Paid Stormy Daniels Out of His Own
Pocket," NEW YORK TIMES, February 13, 2018, *available at*
https://www.nytimes.com/2018/02/13/us/politics/stormy-daniels-michael-cohen-trump.html.

[13] Mark Berman, "Longtime Trump attorney says he made $130,000 payment to Stormy Daniels with his
money," WASHINGTON POST, February 14, 2018 (emphasis added), *available at*
https://www.washingtonpost.com/news/post-nation/wp/2018/02/14/longtime-trump-attorney-says-he-
made-130000-payment-to-stormy-daniels-with-his-money/?utm_term=.a308d0220a5f.

[14] Maggie Haberman and Charlie Savage, "Trump Lawyer's Payment to Porn Star Raises New Questions," NEW
YORK TIMES, February 14, 2018 (emphasis added), *available at*
https://www.nytimes.com/2018/02/14/us/politics/stormy-daniels-michael-cohen-trump.html.

[15] *Id.*

*presidential campaign*."[16] And "[a]fter Mr. Trump's victory, Mr. Cohen complained to friends

that *he had yet to be reimbursed* for the payment to Ms. Clifford[.]"[17]

26.     On March 6, 2018, Stephanie Clifford filed a complaint for declaratory relief against Donald J.

Trump and Essential Consultants LLC in California superior court in Los Angeles County,

challenging the validity of the October 2016 nondisclosure agreement between Ms. Clifford,

Essential Consultants LLC and Donald J. Trump—on the ground that Donald J. Trump had not

signed the agreement.[18]

27.     In the complaint, Ms. Clifford alleges that in October 2016, around the time that the *Access*

*Hollywood* tape was made public, she "sought to share details concerning her relationship and

encounters with Mr. Trump with various media outlets."[19]

28.     Ms. Clifford further alleges: "As a result of Ms. Clifford's efforts aimed at publicly disclosing her

story and her communications with various media outlets, Ms. Clifford's plans came to the

attention of Mr. Trump and his campaign, including Mr. Michael Cohen[.]"[20]

> After discovering Ms. Clifford's plans, *Mr. Trump*, with the assistance of his attorney
> Mr. Cohen, *aggressively sought to silence Ms. Clifford* as part of an effort to avoid her
> telling the truth, *thus helping to ensure he won the Presidential Election*. Mr. Cohen

---

[16] Joe Palazzolo and Michael Rothfeld, "Trump Lawyer's Payment to Stormy Daniels Was Reported as Suspicious by Bank," WALL STREET JOURNAL, March 5, 2018 (emphasis added), *available at*
https://www.wsj.com/articles/trump-lawyers-payment-to-porn-star-was-reported-as-suspicious-by-bank-1520273701.

[17] *Id.* (emphasis added).

[18] Complaint, *Clifford v. Trump*, March 6, 2018, Superior Court for the State of California for the County of Los Angeles, *available at* https://assets.documentcloud.org/documents/4403879/Filed-Complaint.pdf (Attached as APPENDIX 1).

[19] *Id.* at ¶14.

[20] *Id.* at ¶15.

> subsequently prepared a draft non-disclosure agreement and presented it to Ms.
> Clifford . . . .[21]

29.  According to Ms. Clifford's complaint, Essential Consultants LLC "was created by Mr. Cohen

*with Mr. Trump's knowledge* for one purpose—to hide the true source of funds to be used to

pay Ms. Clifford, thus further insulating Mr. Trump from later discovery and scrutiny."[22]

30.  According to Ms. Clifford's complaint, the nondisclosure agreement, as drafted, was between

three parties, Ms. Clifford (using the alias Peggy Peterson), Essential Consultants LLC and

Donald J. Trump (using the alias David Dennison). The agreement "imposed various conditions

and obligations not only on Ms. Clifford, but also on Mr. Trump" and the agreement "required

the signatures of all parties to the agreement, including that of Mr. Trump."[23]

> On or about October 28, 2016, only days before the election, two of the parties signed
> the Hush Agreement—Ms. Clifford and Mr. Cohen (on behalf of [Essential Consultants
> LLC]). Mr. Trump, however, did not sign the agreement, thus rendering it legally null
> and void and of no consequence. On information and belief, despite having detailed
> knowledge of the Hush Agreement and its terms, including the proposed payment of
> monies to Ms. Clifford and the routing of those monies through [Essential Consultants
> LLC], Mr. Trump purposely did not sign the agreement so he could later, if need be,
> publicly disavow any knowledge of the Hush Agreement and Ms. Clifford.[24]

31.  Ms. Clifford's complaint explains that, under Rule 1.4 of New York Rules of Professional

Conduct governing attorneys, Mr. Cohen was required "*at all times* to promptly communicate

all material information relating to the [nondisclosure agreement] to Mr. Trump" and to

"reasonably consult with [Mr. Trump] about the means by which [his] objectives are to be

---

[21] *Id.* at ¶16 (emphasis added).

[22] *Id.* at ¶17 (emphasis added).

[23] *Id.* at ¶21.

[24] *Id.* at ¶22.

accomplished" and to "keep [Mr. Trump] reasonably informed about the status of the

matter."[25]

> Accordingly, unless Mr. Cohen flagrantly violated his ethical obligations and the most
> basic rules governing his license to practice law (which is highly unlikely), there can be
> no doubt that Mr. Trump *at all times* has been fully aware of the negotiations with Ms.
> Clifford, the existence and terms of the Hush Agreement, the payment of the
> $130,000.00, the use of [Essential Consultants LLC] as a conduit, and the recent
> attempts to intimidate and silence Ms. Clifford by way of the bogus arbitration
> proceeding.[26]

32. On March 9, 2018, *NBC News* reported that Ms. Clifford's attorney had provided the news

outlet with an email showing that Mr. Cohen used his Trump Organization corporate email, not

his personal email account, to communicate with First Republic Bank to arrange the $130,000

payment to Ms. Clifford through Essential Consultants LLC.[27]

33. On March 9, 2018, Mr. Cohen reportedly explained the October 2016 financial transaction to

*ABC News* as follows: "I transferred money from one account at [my] bank into my LLC and

then wired said funds to Ms. Clifford's attorney in Beverly Hills, California" and that "the funds

were taken from my home equity line and transferred internally to my LLC account in the same

bank."[28]

---

[25] *Id.* at ¶31.

[26] *Id.* at ¶32.

[27] Sarah Fitzpatrick and Tracy Connor, "Michael Cohen used Trump Org. email in Stormy Daniels arrangements," NBC NEWS, March 9, 2018, *available at* https://www.nbcnews.com/news/us-news/michael-cohen-used-trump-org-email-stormy-daniels-arrangements-n855021?cid=sm_npd_nn_tw_ma (Cohen email attached as APPENDIX 2).

[28] Tom Llamas, Zunaira Zaki, Katherine Faulders, Christina Peck, "Michael Cohen dismisses claims of email as proof that Trump knew about payment to porn star to buy her silence," ABC NEWS, March 9, 2018, *available at* http://abcnews.go.com/Politics/michael-cohen-dismisses-claims-email-proof-trump-knew/story?id=53642094.

## SUMMARY OF THE LAW

## "CONTRIBUTION" AND "EXPENDITURE" DEFINITIONS AND RESTRICTIONS

34.  The term "contribution" is defined in FECA to mean "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person *for the purpose of influencing any election for Federal office*." 52 U.S.C. § 30101(8)(A)(i) (emphasis added); *see also* 11 C.F.R. §§ 100.51–100.56.

35.  As used in the definition of "contribution," the phrase "anything of value" includes "all in-kind contributions." The "provision of any goods or services without charge or at a charge that is less than the usual and normal charge for such goods or services is a contribution." 11 C.F.R. § 100.52(d)(1).

36.  The term "expenditure" is defined in FECA to mean "any purchase, payment, distribution, loan, advance, deposit, or gift or money or anything of value, made by any person *for the purpose of influencing any election for Federal office*." 52 U.S.C. § 30101(9)(A)(i) (emphasis added); *see also* 11 C.F.R. §§ 100.110–100.114.

37.  As used in the definition of "expenditure," the phrase "anything of value" includes "all in-kind contributions." The "provision of any goods or services without charge or at a charge that is less than the usual and normal charge for such goods or services is an expenditure." 11 C.F.R. § 100.111(e)(1).

38.  FECA limits to $2,700 per election the amount of a contribution that a person can make to a

     federal candidate. 52 U.S.C § 30116(a)(1).[29]

39.  FECA prohibits a corporation or labor union from making a contribution to a federal candidate

     and prohibits a candidate from accepting or receiving a contribution from a corporation or

     labor union. 52 U.S.C. § 30118(a).

40.  Commission regulation makes clear that the prohibition on corporate contributions includes a

     prohibition on the use of corporate resources to facilitate the making of contributions:

> Corporations and labor organizations (including officers, directors or other
> representatives acting as agents of corporations and labor organizations) are
> prohibited from facilitating the making of contributions to candidates or political
> committees . . . . Facilitation means using corporate or labor organization resources or
> facilities to engage in fundraising activities in connection with any federal election[.]

     11 C.F.R. § 114.2(f)(1).[30]

41.  Commission regulation provides that a contribution by a limited liability company (LLC) that

     elects to be treated as a partnership by the Internal Revenue Service shall be considered a

     partnership for the purpose of the FECA contribution limits. 11 C.F.R. § 110.1(g)(2). An LLC that

     elected to be treated as a corporation by the Internal Revenue Service shall be considered a

     corporation for the purpose of the FECA corporate contribution prohibition. 11 C.F.R. §

     110.1(g)(3).

---

[29] The statutory limits are $2,000 and $25,000, respectively, and are indexed for inflation in odd-numbered years. *See* 52 U.S.C. § 30116(c); *see also* FEC, "Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold," 80 Fed. Reg. 5750, 5752, February 3, 2015 (adjusting contribution limit to $2,700 for 2015-16 election cycle), *available at*
https://transition.fec.gov/law/cfr/ej_compilation/2015/notice2015-01.pdf.

[30] Commission regulation exempts from the definition of "contribution" certain **uncompensated** Internet activities, including "sending or forwarding electronic messages." *See* 11 C.F.R. § 100.94.

42.    Generally, federal candidates may make "unlimited expenditures from personal funds." 11

C.F.R. § 100.10.

43.    When a federal candidate receives a contribution or makes any disbursement in connection

with her campaign, the candidate "shall be considered as having received such

contribution . . . or made such disbursement as an agent of his or her authorized

committee(s)." 11 C.F.R. § 101.2(a); see also 11 C.F.R. §§ 102.7(d), 109.3(b) and 300.2(b).

44.    Candidates and political committees are prohibited from knowingly accepting any

contribution or making any expenditure in violation of federal law. 11 C.F.R. § 110.9. Similarly,

officers and employees of political committees are prohibited from knowingly accepting a

contribution made for the benefit or use of a candidate, or making any expenditure on behalf of

a candidate, in violation of any limitation imposed on contributions and expenditures. 11 C.F.R.

§ 110.9.

## COORDINATED SPENDING

45.    Any expenditure "made by any person in cooperation, consultation, or concert, with, or at the

request or suggestion of, a candidate, his authorized political committees, or their agents" is

considered a contribution to such candidate. 52 U.S.C. 30116(a)(7)(B)(i).

46.    Similarly, any expenditure made by any person, other than a candidate or candidate's

committee, "in cooperation, consultation, or concert with, or at the request or suggestion of, a

national, State, or local committee of a political party" is considered a contribution to such

party committee. 52 U.S.C. 30116(a)(7)(B)(ii).

47. "Coordinated" means made in cooperation, consultation or concert with, or at the request or

suggestion of, a candidate, a candidate's authorized committee or an agent thereof. 11 C.F.R. §

109.20(a). *Any expenditure that is "coordinated" with a candidate* or political party

committee, but that is not made for a "coordinated communication" under 11 C.F.R. § 109.21,

*is an in-kind contribution to the "candidate* or political party committee with whom or with

which it was coordinated *and must be reported as an expenditure made by that candidate* or

political party committee" unless otherwise exempted. 11 C.F.R. § 109.20(b) (emphasis

added).

48. In its 2003 *Explanation and Justification* for 11 C.F.R. § 109.20, the Commission made clear

that, whereas coordinated expenditures for communications—*i.e.,* political ads—are regulated

by 11 C.F.R. § 109.21, coordinated expenditures for things other than political ads are regulated

by 11 C.F.R. § 109.20. The Commission explained:

> One commenter asserted that only express advocacy communications can constitute
> coordination, and urged the Commission to provide explicitly that non-communication
> expenditures will not be considered to be coordination. The Commission disagrees with
> the commenter's assertion because Congress has not so limited the statutory
> provisions relating to coordination.[31]

49. Commission regulations provide that "agent" means "any person who has actual authority,

either express or implied," to engage in campaign spending and other specified campaign-

related activities. *See* 11 C.F.R. §§ 109.3 and 300.2(b).

---

[31] FEC, *Coordinated and Independent Expenditures*, Final Rules and Explanation and Justification, 68 Fed. Reg.
421, 425-26 (January 3, 2003).

## REPORTING AND DISCLOSURE REQUIREMENTS

50.  The authorized committee of a candidate for federal office must report to the Commission the

identification of each person who makes a contribution to the committee with an aggregate

value in excess of $200 within an election cycle. 52 U.S.C. § 30104(b)(3)(A).

51.  The authorized committee of a candidate for federal office must report as a designated

category of receipt "contributions from the candidate." 11 C.F.R. § 104.3(a)(3)(ii).

52.  The authorized committee of a candidate for federal office must report to the Commission the

name and address of each person to whom an expenditure in an aggregate amount in excess of

$200 within the calendar year is made by the committee. 52 U.S.C. § 30104(b)(5)(A).

53.  Expenditures of a candidate's personal funds must be reported to the Commission as in-kind

contributions to the candidate's campaign. *See, e.g.*, FEC Advisory Opinion 1990-09.

## CAUSES OF ACTION

## COUNT ONE:

## DONALD J. TRUMP FOR PRESIDENT, INC. FAILED TO REPORT RECEIPT OF A $130,000 IN-KIND CONTRIBUTION AS WELL AS A $130,000 EXPENDITURE IN VIOLATION OF FECA

54.  Paragraphs 1 through 53 are incorporated herein.

55.  In October 2016, Michael D. Cohen was an employee and agent of Donald J. Trump. Based on

published reports, there is reason to believe that Mr. Cohen's payment of $130,000 to Ms.

Stephanie Clifford was for the purpose of influencing the 2016 presidential election and,

therefore, constituted an "expenditure" by Mr. Trump or an "expenditure" coordinated with

Mr. Trump—and, therefore, constituted an in-kind "contribution" to and an "expenditure" by Donald J. Trump and Donald J. Trump for President, Inc.

56. When a federal candidate receives a contribution or makes any disbursement in connection with his campaign, the candidate is considered to have received such contribution or made such disbursement as an agent of his authorized committee. 11 C.F.R. § 101.2(a).

57. Under FECA, Donald J. Trump for President, Inc. was required to report to the Commission the identification of each person who makes a contribution to the committee with an aggregate value in excess of $200 within an election cycle. 52 U.S.C. § 30104(b)(3)(A).

58. Under FECA, Donald J. Trump for President, Inc. was required to report to the Commission the name and address of each person to whom an expenditure in an aggregate amount in excess of $200 within the calendar year is made by the committee. 52 U.S.C. § 30104(b)(5)(A).

59. Based on published reports and review of FEC records, there is reason to believe that Donald J. Trump for President, Inc. failed to report its receipt of this $130,000 contribution in violation of 52 U.S.C. § 30104(b)(3)(A).

60. Based on published reports and review of FEC records, there is reason to believe that Donald J. Trump for President, Inc. failed to report this $130,000 expenditure in violation of 52 U.S.C. § 30104(b)(5)(A).

## COUNT TWO:

## MICHAEL D. COHEN MADE, AND DONALD J. TRUMP AND DONALD J. TRUMP FOR PRESIDENT, INC. RECEIVED, A CONTRIBUTION IN VIOLATION OF FECA

61. Paragraphs 1 through 53, and 55 through 60 are incorporated herein.

62.   In October 2016, Michael D. Cohen was an agent and employee of Donald J. Trump. Based on published reports, there is reason to believe that Donald J. Trump was a party to the nondisclosure agreement negotiated with Ms. Stephanie Clifford that led to the payment of $130,000 to Ms. Clifford.

63.   Based on published reports, there is reason to believe that Mr. Cohen's payment of $130,000 to Ms. Stephanie Clifford was for the purpose of influencing the 2016 presidential election and, therefore, constituted an "expenditure" by Mr. Trump or an "expenditure" coordinated with Mr. Trump—and, therefore, constituted an in-kind "contribution" to and an "expenditure" by Donald J. Trump and Donald J. Trump for President, Inc.

64.   When a federal candidate receives a contribution or makes any disbursement in connection with his campaign, the candidate is considered to have received such contribution or made such disbursement as an agent of his authorized committee. 11 C.F.R. § 101.2(a).

65.   Federal law prohibits individuals from making contributions to federal candidates in excess of $2,700 per election. 52 U.S.C. § 30116(a)(1)(A).

66.   Based on published reports, there is reason to believe that Michael D. Cohen was the source of the $130,000 paid to Ms. Clifford.

67.   Based on published reports, there is reason to believe that Michael D. Cohen made, and Donald J. Trump and Donald J. Trump for President, Inc. received, a contribution in violation of the $2,700 limit established by 52 U.S.C. § 30116(a)(1)(A).

## COUNT THREE:

## ESSENTIAL CONSULTANTS LLC MADE, AND DONALD J. TRUMP AND DONALD J. TRUMP FOR PRESIDENT, INC. RECEIVED, A CORPORATE CONTRIBUTION IN VIOLATION OF FECA

68.  Paragraphs 1 through 53, 55 through 60, and 62 through 67 are incorporated herein.

69.  In October 2016, Michael D. Cohen was an agent and employee of Donald J. Trump. Based on

published reports, there is reason to believe that Donald J. Trump was a party to the

nondisclosure agreement negotiated with Ms. Stephanie Clifford that led to the payment of

$130,000 to Ms. Clifford.

70.  Based on published reports, there is reason to believe that Mr. Cohen's payment of $130,000

to Ms. Clifford was for the purpose of influencing the 2016 presidential election and, therefore,

constituted an "expenditure" by Mr. Trump or an "expenditure" coordinated with Mr. Trump—

and, therefore, constituted an in-kind "contribution" to and an "expenditure" by Donald J.

Trump and Donald J. Trump for President, Inc.

71.  When a federal candidate receives a contribution or makes any disbursement in connection

with his campaign, the candidate is considered to have received such contribution or made

such disbursement as an agent of his authorized committee. 11 C.F.R. § 101.2(a).

72.  Federal law prohibits individuals from making contributions to federal candidates in excess of

$2,700 per election. 52 U.S.C. § 30116(a)(1)(A).

73.  Federal law prohibits corporations from making contributions to federal candidates. 52 U.S.C.

§ 30118(a).

74. Based on published reports, there is reason to believe that Essential Consultants paid
$130,000 to Ms. Clifford.

75. Pursuant to 11 C.F.R. § 110.1(g), if Essential Consultants LLC elects to be treated as a
partnership by the Internal Revenue Service, then Essential Consultants LLC made, and Donald
J. Trump and Donald J. Trump for President, Inc. received, a contribution in violation of the
$2,700 limit established by 52 U.S.C. § 30116(a)(1)(A).

76. Pursuant to 11 C.F.R. § 110.1(g), if Essential Consultants LLC elects to be treated as a
corporation by the Internal Revenue Service, then Essential Consultants LLC made, and Donald
J. Trump and Donald J. Trump for President, Inc. received, a corporate contribution in violation
of 52 U.S.C. § 30118(a).

## COUNT FOUR:

## THE TRUMP ORGANIZATION FACILITATED A CONTRIBUTION TO DONALD J. TRUMP AND DONALD J. TRUMP FOR PRESIDENT, INC. IN VIOLATION OF FECA

77. Paragraphs 1 through 53, 55 through 60, 62 through 67, and 69 through 76 are incorporated
herein.

78. In October 2016, Michael D. Cohen was an agent and employee of Donald J. Trump and the
Trump Organization. Based on published reports, there is reason to believe that Donald J.
Trump was a party to the nondisclosure agreement negotiated with Ms. Stephanie Clifford that
led to the payment of $130,000 to Ms. Clifford.

79. Based on published reports, there is reason to believe that Mr. Cohen's payment of $130,000
to Ms. Stephanie Clifford was for the purpose of influencing the 2016 presidential election and,

therefore, constituted an "expenditure" by Mr. Trump or an "expenditure" coordinated with

Mr. Trump—and, therefore, constituted an in-kind "contribution" to and an "expenditure" by

Donald J. Trump and Donald J. Trump for President, Inc.

80.   Based on published reports, there is reason to believe that Michael D. Cohen made the

payment of $130,000 to Ms. Stephanie Clifford in his paid capacity as the Trump

Organization's executive vice president and counsel to Trump Organization chairman and

president Donald J. Trump including, but not limited to, the fact that Michael D. Cohen used his

Trump Organization email to facilitate the payment to Ms. Clifford.

81.   Based on published reports, there is reason to believe that the Trump Organization, through its

executive vice president and counsel to Trump Organization chairman and president Donald J.

Trump, facilitated the making of a contribution to Donald J. Trump and Donald J. Trump for

President, Inc., through its payment of salary to Mr. Cohen and through Mr. Cohen's use of

Trump Organization resources, in violation of 11 C.F.R. § 114.2(f)(1) and 52 U.S.C. § 30118(a).

## COUNT FIVE:

## THE TRUMP ORGANIZATION MADE, AND DONALD J. TRUMP AND DONALD J. TRUMP FOR PRESIDENT, INC. RECEIVED, A CORPORATE CONTRIBUTION IN VIOLATION OF FECA

82.   Paragraphs 1 through 53, 55 through 60, 62 through 67, 69 through 76, and 78 through 81 are

incorporated herein.

83.   In October 2016, Michael D. Cohen was an agent and employee of Donald J. Trump. Based on

published reports, there is reason to believe that Donald J. Trump was a party to the

nondisclosure agreement negotiated with Ms. Stephanie Clifford that led to the payment of
$130,000 to Ms. Clifford.

84.   Based on published reports, there is reason to believe that Mr. Cohen's payment of $130,000
      to Ms. Stephanie Clifford was for the purpose of influencing the 2016 presidential election and,
      therefore, constituted an "expenditure" by Mr. Trump or an "expenditure" coordinated with
      Mr. Trump—and, therefore, constituted an in-kind "contribution" to and an "expenditure" by
      Donald J. Trump and Donald J. Trump for President, Inc.

85.   In October 2016, Michael D. Cohen was an employee and agent of the Trump Organization.
      Based on published reports, there is reason to believe that the Trump Organization reimbursed
      Michael D. Cohen for the $130,000 paid to Ms. Clifford.

86.   Federal law prohibits corporations from making contributions to federal candidates. 52 U.S.C.
      § 30118(a).

87.   When a federal candidate receives a contribution or makes any disbursement in connection
      with his campaign, the candidate is considered to have received such contribution or made
      such disbursement as an agent of his authorized committee. 11 C.F.R. § 101.2(a).

88.   If the Trump Organization reimbursed Michael D. Cohen the $130,000 paid to Ms. Clifford, the
      Trump Organization made, and Donald J. Trump and Donald J. Trump for President, Inc.
      received, a corporate contribution in violation of 52 U.S.C. § 30118(a).

## COUNT SIX:

## JOHN DOE MADE, AND DONALD J. TRUMP AND DONALD J. TRUMP FOR PRESIDENT, INC. RECEIVED, AN EXCESSIVE OR CORPORATE CONTRIBUTION IN VIOLATION OF FECA

89.     Paragraphs 1 through 53, 55 through 60, 62 through 67, 69 through 76, 78 through 81 and 83

through 88 are incorporated herein.

90.     In October 2016, Michael D. Cohen was an agent and employee of Donald J. Trump. Based on

published reports, there is reason to believe that Donald J. Trump was a party to the

nondisclosure agreement negotiated with Ms. Stephanie Clifford that led to the payment of

$130,000 to Ms. Clifford.

91.     Based on published reports, there is reason to believe that Mr. Cohen's payment of $130,000

to Ms. Stephanie Clifford was for the purpose of influencing the 2016 presidential election and,

therefore, constituted an "expenditure" by Mr. Trump or an "expenditure" coordinated with

Mr. Trump—and, therefore, constituted an in-kind "contribution" to and an "expenditure" by

Mr. Trump's authorized campaign committee, Donald J. Trump for President, Inc.

92.     When a federal candidate receives a contribution or makes any disbursement in connection

with his campaign, the candidate is considered to have received such contribution or made

such disbursement as an agent of his authorized committee. 11 C.F.R. § 101.2(a).

93.     Federal law prohibits individuals from making contributions to federal candidates in excess of

$2,700 per election. 52 U.S.C. § 30116(a)(1)(A).

94.     Federal law prohibits corporations from making contributions to federal candidates. 52 U.S.C.

§ 30118(a).

95. Based on published reports, there is reason to believe that John Doe reimbursed Michael D. Cohen the $130,000 paid to Ms. Clifford.

96. If John Doe reimbursed Michael D. Cohen the $130,000 paid to Ms. Clifford and John Doe is an individual, then John Doe made, and Donald J. Trump and Donald J. Trump for President, Inc. received, a contribution in violation of the $2,700 limit established by 52 U.S.C. § 30116(a)(1)(A).

97. If John Doe reimbursed Michael D. Cohen the $130,000 paid to Ms. Clifford and John Doe is a corporation, then John Doe made, and Donald J. Trump and Donald J. Trump for President, Inc. received, a corporate contribution in violation of 52 U.S.C. § 30118(a).

## PRAYER FOR RELIEF

98. Wherefore, the Commission should find reason to believe that Donald J. Trump, Donald J. Trump for President, Inc., the Trump Organization, Michael D. Cohen, Essential Consultants LLC and/or John Doe violated 52 U.S.C. § 30101, et seq., and conduct an immediate investigation under 52 U.S.C. § 30109(a)(2). Further, the Commission should determine and impose appropriate sanctions for any and all violations, should enjoin respondent(s) from any and all violations in the future, and should impose such additional remedies as are necessary and appropriate to ensure compliance with the FECA.

March 12, 2018

Respectfully submitted,

Common Cause, by

Paul S. Ryan
805 Fifteenth Street, NW, Suite 800
Washington, DC 20005
(202) 833-1200

_____

Paul S. Ryan
805 Fifteenth Street, NW, Suite 800
Washington, DC 20005
(202) 833-1200

## VERIFICATION

The complainants listed below hereby verify that the statements made in the attached

Complaint are, upon their information and belief, true. Sworn pursuant to 18 U.S.C. § 1001.

**For Complainants Common Cause and Paul S. Ryan**

Paul S. Ryan

Sworn to and subscribed before me this 12th day of March 2018.

Karen B. Watson

Notary Public



**Ex. 2_025**

# APPENDIX 1

26

Ex. 2_026

COPY



CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAR 0 6 2018

Sherd R. Carrel, Executive Officer/Clerk
By: Gborletta Robinson, Deputy

1   Michael J. Avenatti, Bar No. 206929
    AVENATTI & ASSOCIATES, APC
2   mavenatti@eoalaw.com
    520 Newport Center Drive, Suite 1400
3   Newport Beach, CA 92660
    Tel:   (949) 706-7000
4   Fax:   (949) 706-7050
5
    Attorneys for Plaintiff Stephanie Clifford
6   a.k.a. Stormy Daniels a.k.a. Peggy Peterson
7
8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                            FOR THE COUNTY OF LOS ANGELES
10
11  STEPHANIE CLIFFORD a.k.a. STORMY       Case No.        BC 6 9 6 5 6 8
    DANIELS a.k.a. PEGGY PETERSON, an
12  individual,
13          Plaintiff,                     **COMPLAINT FOR DECLARATORY**
                                           **RELIEF**
14              vs.
15
    DONALD J. TRUMP a.k.a. DAVID DENNISON,
16  an individual, ESSENTIAL CONSULTANTS,
    LLC, a Delaware Limited Liability Company, and
17  DOES 1 through 10, inclusive
18          Defendants.
19
20
21
22
23
24
25
26
27
28

                              COMPLAINT

Plaintiff Stephanie Clifford a.k.a. Stormy Daniels a.k.a. Peggy Peterson ("Ms. Clifford" or "Plaintiff") hereby alleges the following:

## THE PARTIES

1.     Plaintiff Ms. Clifford, an individual, is a resident of the State of Texas.

2.     Defendant Donald J. Trump a.k.a. David Dennison ("Mr. Trump"), an individual, is a resident of the District of Columbia (among other places).

3.     Defendant Essential Consultants, LLC ("EC") is a Delaware limited liability company formed on October 17, 2016.

4.     Mr. Trump and EC together shall be referred to hereafter as "Defendants."

5.     The true names and capacities of the defendants DOES 1 through 10, inclusive, whether individual, plural, corporate, partnership, associate or otherwise, are not known to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will seek leave of court to amend this Complaint to show the true names and capacities of defendants DOES 1 through 10, inclusive, when the same have been ascertained.

6.     Plaintiff is also informed and believe and thereon alleges that DOES 1 to 10 were the agents, principals, and/or alter egos of Defendants, at all times herein relevant, and that they are therefore liable for the acts and omissions of Defendants.

## JURISDICTION AND VENUE

7.     Jurisdiction for this matter properly lies with this Court because Plaintiff seeks declaratory relief.

8.     Venue is appropriate in the County of Los Angeles, and this Court has personal jurisdiction over Defendants and each of them, by reason of the fact that, among other things, (a) the alleged agreement that is at issue in this Complaint was purportedly made and negotiated, at least in substantial part, in the County of Los Angeles, and (b) many of the events giving rise to this action arose in California, including within the County of Los Angeles.

1

**FACTUAL BACKGROUND**

2      9.     Ms. Clifford began an intimate relationship with Mr. Trump in the Summer of 2006 in

3   Lake Tahoe and continued her relationship with Mr. Trump well into the year 2007. This relationship

4   included, among other things, at least one "meeting" with Mr. Trump in a bungalow at the Beverly

5   Hills Hotel located within Los Angeles County.

6      10.    In 2015, Mr. Trump announced his candidacy for President of the United States.

7      11.    On July 19, 2016, Mr. Trump secured the Republican Party nomination for President.

8      12.    On October 7, 2016, the Washington Post published a video, now infamously known as

9   the *Access Hollywood Tape*, depicting Mr. Trump making lewd remarks about women. In it, Mr.

10  Trump described his attempt to seduce a married woman and how he may start kissing a woman that

11  he and his companion were about to meet. He then added: "I don't even wait. And when you're a

12  star, they let you do it, you can do anything . . ."

13     13.    Within days of the publication of the *Access Hollywood Tape*, several women came

14  forward publicly to tell their personal stories about their sexual encounters with Mr. Trump.

15     14.    Around this time, Ms. Clifford likewise sought to share details concerning her

16  relationship and encounters with Mr. Trump with various media outlets.

17     15.    As a result of Ms. Clifford's efforts aimed at publicly disclosing her story and her

18  communications with various media outlets, Ms. Clifford's plans came to the attention of Mr. Trump

19  and his campaign, including Mr. Michael Cohen, an attorney licensed in the State of New York. Mr.

20  Cohen worked as the "top attorney" at the Trump Organization from 2007 until after the election and

21  presently serves as Mr. Trump's personal attorney. He is also generally referred to as Mr. Trump's

22  "fixer."

23     16.    After discovering Ms. Clifford's plans, Mr. Trump, with the assistance of his attorney

24  Mr. Cohen, aggressively sought to silence Ms. Clifford as part of an effort to avoid her telling the

25  truth, thus helping to ensure he won the Presidential Election. Mr. Cohen subsequently prepared a

26  draft non-disclosure agreement and presented it to Ms. Clifford and her attorney (the "Hush

27  Agreement"). Ms. Clifford at the time was represented by counsel in California whose office is

28  located in Beverly Hills, California within the County of Los Angeles.

-2-

**COMPLAINT**

Ex. 2_029

1    17.    The parties named in the Hush Agreement were Ms. Clifford, Mr. Trump, and Essential

2   Consultants LLC.  As noted above, Essential Consultants LLC ("EC") was formed on October 17,

3   2016, just weeks before the 2016 presidential election.  On information and belief, EC was created by

4   Mr. Cohen with Mr. Trump's knowledge for one purpose – to hide the true source of funds to be used

5   to pay Ms. Clifford, thus further insulating Mr. Trump from later discovery and scrutiny.

6    18.    By design of Mr. Cohen, the Hush Agreement used aliases to refer to Ms. Clifford and

7   Mr. Trump.  Specifically, Ms. Clifford was referred to by the alias "Peggy Peterson" or "PP."  Mr.

8   Trump, on the other hand, was referred to by the alias "David Dennison" or "DD."

9    19.    Attached hereto as Exhibit 1 is a true and correct copy of the Hush Agreement, titled

10  Confidential Settlement Agreement and Mutual Release; Assignment of Copyright and Non-

11  Disparagment [sic] Agreement.  Exhibit 1 is incorporated herein by this reference and made a part of

12  this Complaint as if fully set forth herein.

13   20.    Attached hereto as Exhibit 2 is a true and correct copy of the draft Side Letter

14  Agreement, which was Exhibit A to the Hush Agreement.  Exhibit 2 is incorporated herein by this

15  reference and made a part of this Complaint as if fully set forth herein.

16   21.    Importantly, the Hush Agreement imposed various conditions and obligations not only

17  on Ms. Clifford, but also on Mr. Trump.  The agreement also required the signature of all parties to the

18  agreement, including that of Mr. Trump.  Moreover, as is customary, it was widely understood at all

19  times that unless all of the parties signed the documents as required, the Hush Agreement, together

20  with all of its terms and conditions, was null and void.

21   22.    On or about October 28, 2016, only days before the election, two of the parties signed

22  the Hush Agreement - Ms. Clifford and Mr. Cohen (on behalf of EC).  Mr. Trump, however, did not

23  sign the agreement, thus rendering it legally null and void and of no consequence.  On information and

24  belief, despite having detailed knowledge of the Hush Agreement and its terms, including the

25  proposed payment of monies to Ms. Clifford and the routing of those monies through EC, Mr. Trump

26  purposely did not sign the agreement so he could later, if need be, publicly disavow any knowledge of

27  the Hush Agreement and Ms. Clifford.

28

23. Despite Mr. Trump's failure to sign the Hush Agreement, Mr. Cohen proceeded to cause $130,000.00 to be wired to the trust account of Ms. Clifford's attorney. He did so even though there was no legal agreement and thus no written nondisclosure agreement whereby Ms. Clifford was restricted from disclosing the truth about Mr. Trump.

24. Mr. Trump was elected President of the United States on November 8, 2016.

25. In January 2018, certain details of the draft Hush Agreement emerged in the news media, including, among other things, the existence of the draft agreement, the parties to the draft agreement, and the $130,000.00 payment provided for under the draft agreement. Also in January 2018, and concerned the truth would be disclosed, Mr. Cohen, through intimidation and coercive tactics, forced Ms. Clifford into signing a false statement wherein she stated that reports of her relationship with Mr. Trump were false.

26. On or about February 13, 2018, Mr. Cohen issued a public statement regarding Ms. Clifford, the existence of the Hush Agreement, and details concerning the Hush Agreement. He did so without any consent by Ms. Clifford, thus evidencing Mr. Cohen's apparent position (at least in that context) that no binding agreement was in place. Among other things, Mr. Cohen stated: "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford. Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly." Mr. Cohen concluded his statement with lawyer speak: "Just because something isn't true doesn't mean that it can't cause you harm or damage. *I will always protect Mr. Trump.*" (emphasis added).

27. Importantly, at no time did Mr. Cohen claim Ms. Clifford did not have an intimate relationship with Mr. Trump. Indeed, were he to make such a statement, it would be patently false.

28. Because the agreement was never formed and/or is null and void, no contractual obligations were imposed on any of the parties to the agreement, including any obligations to keep information confidential. Moreover, to the extent any such obligations did exist, they were breached and/or excused by Mr. Cohen and his public statements to the media.

Ex. 2_031

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29.     To be clear, the attempts to intimidate Ms. Clifford into silence and "shut her up" in order to "protect Mr. Trump" continue unabated. For example, only days ago on or about February 27, 2018, Mr. Trump's attorney Mr. Cohen surreptitiously initiated a bogus arbitration proceeding against Ms. Clifford in Los Angeles. Remarkably, he did so without even providing Ms. Clifford with notice of the proceeding and basic due process.

30.     Put simply, considerable steps have been taken by Mr. Cohen in the last week to silence Ms. Clifford through the use of an improper and procedurally defective arbitration proceeding hidden from public view. The extent of Mr. Trump's involvement in these efforts is presently unknown, but it strains credibility to conclude that Mr. Cohen is acting on his own accord without the express approval and knowledge of his client Mr. Trump.

31.     Indeed, Rule 1.4 of New York Rules of Professional Conduct governing attorneys has required Mr. Cohen *at all times* to promptly communicate all material information relating to the matter to Mr. Trump, including but not limited to "any decision or circumstance with respect to which [Mr. Trump's] informed consent [was] required" and "material developments in the matter including settlement or plea offers." Moreover, this same Rule required Mr. Cohen *at all times* to "reasonably consult with [Mr. Trump] about the means by which [his] objectives are to be accomplished" and to "keep [Mr. Trump] reasonably informed about the status of the matter."

32.     Accordingly, unless Mr. Cohen flagrantly violated his ethical obligations and the most basic rules governing his license to practice law (which is highly unlikely), there can be no doubt that Mr. Trump *at all times* has been fully aware of the negotiations with Ms. Clifford, the existence and terms of the Hush Agreement, the payment of the $130,000.00, the use of EC as a conduit, and the recent attempts to intimidate and silence Ms. Clifford by way of the bogus arbitration proceeding.

33.     Because there was never a valid agreement and thus, no agreement to arbitrate, any subsequent order obtained by Mr. Cohen and/or Mr. Trump in arbitration is of no consequence or effect.

**Ex. 2_032**

1

## FIRST CAUSE OF ACTION

### Declaratory Relief

### (Against all Defendants)

2

3

4
34.     Plaintiff restates and re-alleges each and every allegation in Paragraphs 1 through 33

5
above as if fully set forth herein.

6
35.     This action concerns the legal significance, if any, of the documents attached hereto as

7
Exhibit 1, entitled Confidential Settlement Agreement and Mutual Release; Assignment of Copyright

8
and Non-Disparagment [sic] Agreement, and Exhibit 2, entitled Side Letter Agreement.

9
36.     California Code of Civil Procedure section 1060 authorizes declaratory relief for any

10
person who desires a declaration of rights or duties with respect to one another. In cases of actual

11
controversy relating to the legal rights and duties of the respective parties, such a person may seek a

12
judicial declaration of his or her rights and duties relative to an instrument or contract, or alleged

13
contract, including a determination of any question of construction or validity arising under the

14
instrument or contract, or alleged contract. This includes a determination of whether a contract was

15
ever formed.

16
37.     An actual controversy exists between Plaintiff and Defendants as to their rights and

17
duties to each other. Accordingly, a declaration is necessary and proper at this time.

18
38.     Specifically, Plaintiff seeks an order of this Court declaring that the agreements in the

19
forms set out in Exhibits 1 and 2 between Plaintiff and Defendants were never formed, and therefore

20
do not exist, because, among other things, Mr. Trump never signed the agreements. Nor did Mr.

21
Trump provide any other valid consideration. He thus never assented to the duties, obligations, and

22
conditions the agreements purportedly imposed upon him. Plaintiff contends that, as a result, she is

23
not bound by any of the duties, obligations, or conditions set forth in Exhibits 1 and 2. Moreover, as a

24
further result, there is no agreement to arbitrate between the parties.

25
39.     In the alternative, Plaintiff seeks an order of this Court declaring that the agreements in

26
the forms set out in Exhibits 1 and 2 are invalid, unenforceable, and/or void under the doctrine of

27
unconscionability.     Plaintiff contends that, as a result, she is not bound by any of the duties,

28

**Ex. 2_033**

1  obligations, or conditions set forth in Exhibits 1 and 2. Moreover, as a further result, there is no

2  agreement to arbitrate between the parties.

3       40.    In the further alternative, Plaintiff seeks an order of this Court declaring that the

4  agreements in the forms set out in Exhibits 1 and 2 are invalid, unenforceable, and/or void because

5  they are illegal and/or violate public policy. Plaintiff contends that, as a result, she is not bound by

6  any of the duties, obligations, or conditions set forth in Exhibits 1 and 2. Moreover, as a further result,

7  there is no agreement to arbitrate between the parties.

8       41.    Defendants dispute these contentions.

9       42.    Accordingly, Ms. Clifford desires a judicial determination of her rights and duties with

10  respect to the alleged agreements in the forms set out in Exhibits 1 and 2.

11

12  **PRAYER FOR RELIEF**

13      WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, declaring

14  that no agreement was formed between the parties, or in the alternative, to the extent an agreement

15  was formed, it is void, invalid, or otherwise unenforceable.

16

17  **ON THE FIRST CAUSE OF ACTION**

18       1.    For a judgment declaring that no agreement was formed between the parties, or in the

19  alternative, to the extent an agreement was formed, it is void, invalid, or otherwise unenforceable.

20       2.    For costs of suit; and

21       3.    For such other and further relief as the Court may deem just and proper.

22

23  DATED: March 6, 2018                 AVENATTI & ASSOCIATES, APC

24

25

26                          MICHAEL J. AVENATTI

27                          Attorneys for Plaintiff

28

Ex. 2_034

# APPENDIX 2

| From: | Michael Cohen |
|-------|---------------|
| To: | Keith Davidson |
| Subject: | Fwd: FW: First Republic Bank Transfer |
| Date: | October 26, 2016 1:51:11 PM |

---------- Forwarded message ----------
From: **Michael Cohen** <mcohen@trumporg.com>
Date: Wed, Oct 26, 2016 at 4:49 PM
Subject: FW: First Republic Bank Transfer
To: "

**From:** Rappaport, Elizabeth [mailto:erappaport@firstrepublic.com]
**Sent:** Wednesday, October 26, 2016 4:15 PM
**To:** Michael Cohen <mcohen@trumporg.com>
**Subject:** RE: First Republic Bank Transfer

Good Afternoon Mr. Cohen,

The funds have been deposited into your checking account ending in

Best,

Lizzy

**Elizabeth Rappaport**
Assistant to Gary Farro
First Republic Bank

1230 Ave of the Americas, 3rd Floor | New York, NY 10020